UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| THOMAS DAGGETT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00303-JAW |
| | ) | |
| YORK COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Police arrested a man for allegedly violating a state court protection order, which prohibited him from being on the premises of his estranged wife's residence. The man, who has Parkinson's Disease, spent the night in county jail and he alleges he suffered injuries from inadequate medical care while in jail. The man filed a multi-defendant complaint in federal court, asserting constitutional claims under 42 U.S.C. § 1983, a civil rights conspiracy claim under 42 U.S.C. § 1985, and related state law claims against the officer who arrested him, the arresting police department, the police chief, the county that owns and operates the jail, the sheriff who oversees the jail, three unnamed sheriff's department employees, the company that administers medical care within the jail, and two of its unnamed employees. The Defendants move for summary judgment, maintaining that factual and legal shortcomings as well as immunity doctrines entitle them to judgment as a matter of law. The Court grants the Defendants' motions for summary judgment.

## I.    PROCEDURAL HISTORY

On August 8, 2018, Thomas Daggett filed a complaint against York County; Sheriff William King, both individually and as Sheriff of York County, Michael Vitiello, both individually and as an employee of the York County Sheriff's Department, three unnamed York County Sheriff's Department employees, in their individual and official capacities, Corizon, Inc., two unnamed Corizon employees, both individually and in their capacities as employees of Corizon, the town of Berwick, Maine, Chief Timothy Towne of the Berwick Police Department, and Officer Eli Poore, individually and as an employee of the town of Berwick. *Pl.'s Compl.* at 1 (ECF No. 1) (*Compl.*).

On September 25, 2018, Mr. Daggett moved to amend his Complaint after learning that Correct Care Solutions, LLC (CCS), not Corizon, Inc., was the proper defendant and filed a proposed amended complaint, which substituted CCS for Corizon. *Mot. to Amend Compl.* at 1-2 (ECF No. 8); *id.*, Attach. 1, *Pl.'s Am. Compl. Pl.'s Am. Compl.* (ECF No. 9) (*Am. Compl.*).  On September 26, 2018, the Magistrate Judge granted Mr. Daggett's motion to amend and accepted the Amended Complaint as the operative pleading.  *Order Granting Mot. to Amend Compl.* (ECF No. 10).

On October 3, 2018, the town of Berwick, Chief Towne, and Officer Poore (the Berwick Defendants) answered.  *Answer to Pl.'s Am. Compl.* (ECF No. 12); *Am. Answer to Pl.'s Am. Compl.* (ECF No. 13).  On October 5, 2018, York County, Sheriff King, and Michael Vitiello (the York Defendants) answered.  *Answer (Defs. York*

*County, William King, and Michael Vitiello*) (ECF No. 15).  On November 9, 2018, CCS answered.  *Def. Correct Care Solutions, LLC's Answer* (ECF No. 17).

Discovery closed on November 15, 2019.  *Order on Disc. Issues and Am. Scheduling Order* at 2 (ECF No. 39).  On November 22, 2019, the Defendants each notified the Court they intended to move for summary judgment and requested a pre-filing conference pursuant to Local Rule 56(h).  *Defs. Town of Berwick, Timothy Towne and Eli Poore's Notice of Intent to File Mot. for Summ. J. and Req. for Pre-Filing Conference* (ECF No. 40); *Def. Correct Care Solutions LLC's Notice of Intent to Move for Summ. J.* (ECF No. 41); *County Defs.' Notice of Intent to File Mot. for Summ. J.* (ECF No. 42).  On November 25, 2019, the Court issued a procedural order, which scheduled the Local Rule 56(h) conference for December 16, 2019.  *Procedural Order* (ECF No. 43).  On December 16, 2019, the Court held the Local Rule 56(h) conference. *Min. Entry* (ECF No. 47).

On March 6, 2020 the Berwick Defendants filed a stipulated record on behalf of all parties, which contains twenty-seven stipulated exhibits.  *Stipulated R.* (ECF No. 48) (*R.*); *id.*, Attachs. 1-27.  On March 23, 2020 the Berwick Defendants moved for summary judgment and filed a statement of material facts.  *Defs. Town of Berwick, Timothy Towne and Eli Poore's Mot. for Summ. J.* (ECF No. 49) (*Berwick Mot.*); *Berwick Defs.' Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 50) (BDSMF).  On March 25, 2020, CCS moved for summary judgment and filed its statement of material facts.  *Def. Correct Care Solutions LLC's Mot. for Summ. J.* (ECF No. 52) (*CCS Mot.*); *Def. Correct Care Solutions LLC's Statement of*

3

*Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 53) (CDSMF).  On April 22, 2020, the York Defendants filed their motion for summary judgment and statement of material facts.  *County Defs.' Mot. for Summ. J.* (ECF No. 55) (*York Mot.*); *County Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 56) (YDSMF).

On June 8, 2020, Mr. Daggett filed a consolidated response in opposition to the motions for summary judgment.  *Pl.'s Resp. in Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 60) (*Pl.'s Opp'n*).  On the same day, Mr. Daggett also responded to each Defendant's statement of material facts and filed his own statement of material facts.  *Pl.'s Resp. to Berwick Defs.' Statement of Undisputed Material Facts* (ECF No. 61) (PRBDSMF); *Pl.'s Resp. to County Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 62) (PRYDSMF); *Pl.'s Resp. to Def. Correct Care Solutions LLC's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 63) (PRCDSMF); *Pl.'s Statement of Additional Facts* (ECF No. 64) (PSAMF).

On June 17, 2020, the Berwick Defendants replied to Mr. Daggett's response and Mr. Daggett's additional statement of material facts.  *Defs. Town of Berwick, Timothy Towne and Eli Poore's Reply to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 65) (*Berwick Reply*); *Berwick Defs.' Resp. to Pl.'s Additional Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 66) (BDRPSAMF).  The next day, CCS did the same.  *Def. Correct Care Solutions LLC's Reply to Pl.'s Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 67) (*CCS Reply*); *Def. Correct Care Solutions LLC's Reply to Pl.'s Statement of Additional Facts* (ECF No. 68) (CDRPSAMF).  On

4

June 22, 2020, the York Defendants replied to Mr. Daggett. *County Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 69) (*York Reply*); *County Defs.' Resp. to Pl.'s Statement of Additional Facts* (ECF No. 70) (YDRPSAMF).

## II.   FACTUAL BACKGROUND[1]

Thomas Daggett was diagnosed with Parkinson's Disease in 2000. PSAMF ¶ 1; BDRPSAMF ¶ 1; CDRPSAMF ¶ 1; YDRPSAMF ¶ 1.   He takes a medication called Sinemet every ninety minutes to two hours to treat his symptoms. CDSMF ¶ 2; PRCDSMF ¶ 2.  In May 2015, when the events giving rise to this case arose, Mr. Daggett's prescribed dose of Sinemet was 25/250 mg.   CDSMF ¶ 2; PRCDSMF ¶ 2.  If a Parkinson's patient does not take their prescribed Sinemet, they may experience muscular rigidity and paralysis.[2]  PSAMF ¶ 42; BDRPSAMF ¶ 42; CDRPSAMF ¶ 42; YDRPSAMF ¶ 42.

In May of 2015, Mr. Daggett was in the process of divorcing his then-wife, Penny Daggett.  PSAMF ¶ 2; BDRPSAMF ¶ 2; CDRPSAMF ¶ 2; YDRPSAMF ¶ 2. Mrs. Daggett had an active protection from abuse order against Mr. Daggett at that time.  PSAMF ¶ 7; *R.*, Attach. 4, at 1-2 (*Protection Order*).   By its plain text, the

---

[1]     The Court sets forth the facts of this case "in the light most hospitable to [Mr. Daggett], consistent with record support . . .." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[2]     CCS and the York Defendants denied this fact as improper expert testimony because Dr. Schmitz was not designated to testify as an expert on the issue of Parkinson's Disease and is only able to testify to the treatment he provided Mr. Daggett on May 17, 2015.  CDRPSAMF ¶ 42; YDRPSAMF ¶ 42 (citing *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 38 (1st Cir. 2012)).   The Court rejects their denial because Dr. Schmitz as a treating physician may testify regarding the general symptoms of Parkinson's Disease and what typically happens to a patient if they do not take medicine as prescribed. *See Rozzetti v. Ford Motor Co.*, No. 3:17-cv-01763-JAW, 2020 U.S. Dist. LEXIS 102069, at *7-11 (D.P.R. June 9, 2020).

protection order permitted direct contact between Mr. and Mrs. Daggett to facilitate the transfer of Mr. Daggett's belongings out of Mr. Daggett's former residence on Cranberry Meadow Road in Berwick, Maine.[3]  PSAMF ¶ 8; *Protection Order* at 2. Specifically, the protection order contained the following requirements, among others:

1.  [Mr. Daggett] is prohibited from having any contact with [Mrs. Daggett], directly or indirectly; except for direct contact related to exchange of property.

2.  [Mr. Daggett] is prohibited from imposing any restriction upon the person or liberty of [Mrs. Daggett];

3.  [Mr. Daggett] is prohibited from threatening, assaulting, molesting, harassing, or otherwise disturbing the peace of [Mrs. Daggett];

4.  [Mr. Daggett] is prohibited from, repeatedly and without reasonable cause, following [Mrs. Daggett] or being at or in the vicinity of [Mrs. Daggett's] home, school, business or place of employment;

5.  [Mr. Daggett] is prohibited from entering the family residence or premises of the separate residence of [Mrs. Daggett] at (list, unless confidential): 317 CRANBERRY MEADOW ROAD, BERWICK ME *

6.  [Mr. Daggett] is prohibited from taking, converting or damaging property in which [Mrs. Daggett] may have legal interest;

---

[3]     The Berwick Defendants and York Defendants attempted to qualify this fact.  BDRPSAMF ¶ 8; YDRPSAMF ¶ 8.  Citing the protection order, the Berwick Defendants noted that in a handwritten supplemental paragraph it "allowed for direct contact between the parties regarding the transfer of specific items of [Mr. Daggett's] property from the residence only 'with an agreed upon person at an agreed upon time'" and "also prohibits [Mr. Daggett] from being 'in the vicinity of [Mrs. Daggett's] home.'"  BDRPSAMF ¶ 8.  The York Defendants claim that the protection order's contents are a legal conclusion and therefore should be stricken or disregarded as immaterial to deciding a summary judgment motion.  *See* YDRPSAMF ¶ 8 (citing *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 30 (1st Cir. 2010)).  The Court rejects the York Defendants' qualification because stating the protection order's contents, rather than interpreting them, is not a legal conclusion.  The Court accepts the Berwick Defendants' qualification not based on their qualification, but because it is a fact that the protection order's plain language includes that provision.

> \*   The parties agree that [Mr. Daggett] may go to the marital
> residence with an agreed upon person at an agreed upon time to
> take the following items: (1) his medication, (2) his clothes,
> (3) guitars & sound gear, (4) old refurbished laptop, (5) desktop.

*Protection Order* at 2.  As a part of the divorce proceeding, Mr. Daggett reasonably

believed that Ms. Daggett had a duty to protect Mr. Daggett's property that remained

at the marital residence.[4]  PSAMF ¶ 3; YDRPSAMF ¶ 3.

## A.   Thomas Daggett's May 17, 2015 Arrest

On Sunday, May 17, 2015, Mr. Daggett was returning home from a celebration

at the American Legion Hall in Rollinsford, New Hampshire.  PSAMF ¶¶ 4-5;

BDRPSAMF ¶¶ 4-5; CDRPSAMF ¶¶ 4-5; YDRPSAMF ¶¶ 4-5.  He was a passenger

in a car driven by Mary Howarth.  PSAMF ¶ 4; BDRPSAMF ¶ 4; CDRPSAMF ¶ 4;

YDRPSAMF ¶ 4.  Mr. Daggett and Ms. Howarth stopped at a pharmacy to pick up

some prescription medications during their drive.  PSAMF ¶ 5; BDRPSAMF ¶ 5;

CDRPSAMF ¶ 5; YDRPSAMF ¶ 5.  Their customary route home from the pharmacy

took them past Mr. Daggett's former residence at 317 Cranberry Meadow Road in

Berwick, Maine, where his estranged wife still resided.  PSAMF ¶ 6; BDRPSAMF ¶ 6;

CDRPSAMF ¶ 6; YDRPSAMF ¶ 6.

---

[4]      The York Defendants qualified this as an immaterial legal conclusion.  YDRPSAMF ¶ 3 (citing
*Chiang*, 595 F.3d at 30).  The Court overrules this objection.  To address the York Defendants' objection
to a legal conclusion, the Court altered the statement to indicate that Mr. Daggett reasonably believed
that Ms. Daggett had a duty to protect his property that remained at the marital residence.  Under
Maine law, a court may consider the economic misconduct of either party "resulting in the diminution
of marital property."  19-A M.R.S. § 951-A(5)(M).  The Court views the protection order as premised
on the notion that Ms. Daggett would not harm or lose Mr. Daggett's listed property while the divorce
was pending.

As Mr. Daggett and Ms. Howarth approached Mr. Daggett's former residence, Mr. Daggett observed that the trashcans were out by the curb. PSAMF ¶ 9; BDRPSAMF ¶ 9; CDRPSAMF ¶ 9; YDRPSAMF ¶ 9. Mr. Daggett thought this was unusual because it was Sunday, and trash pickup in that neighborhood did not occur until either Tuesday or Wednesday. PSAMF ¶¶ 9-10; BDRPSAMF ¶¶ 9-10; CDRPSAMF ¶¶ 9-10; YDRPSAMF ¶¶ 9-10. Knowing this, Mr. Daggett grew concerned that his business property was being thrown away. PSAMF ¶ 9; BDRPSAMF ¶ 9; CDRPSAMF ¶ 9; YDRPSAMF ¶ 9. He also saw a stranger picking through the unattended trashcans. PSAMF ¶ 11; BDRPSAMF ¶ 11; CDRPSAMF ¶ 11; YDRPSAMF ¶ 11.

After circling the block, Mr. Daggett got out of the car, approached the trashcans, and peered inside. PSAMF ¶¶ 12-13; BDRPSAMF ¶¶ 12-13; CDRPSAMF ¶¶ 12-13; YDRPSAMF ¶¶ 12-13. Just as he feared, some of his belongings were in the trashcans, which he believed was in violation of an order in the divorce proceedings. PSAMF ¶ 14; BDRPSAMF ¶ 14; CDRPSAMF ¶ 14; YDRPSAMF ¶ 14. [5]

---

[5]     PSAMF ¶ 15 reads: "Mr. Daggett began trying to remove items from the trashcans and in the process, tipped the cans over." *Id.* (citing *R.*, Attach. 9, at 27:17-19 (*Howarth Dep.*)). The Berwick Defendants denied this assertion, noting that the video shows Mr. Daggett intentionally pushed over a trash bin, dragged it across the lawn spilling trash and then threw the bin into the ditch. BDRPSAMF ¶ 15 (citing *Cell Phone Video* at 00:20-00:33). The Court viewed the video and accepts the Berwick Defendants' denial. Mr. Daggett's contention that he "tipped" the bins over is ambiguous as to whether he intentionally dumped the trash bin and its contents on the lawn. After viewing the video, the Court finds that no reasonable juror could find Mr. Daggett's actions were inadvertent, even when construing the video in the light most favorable to him. Mr. Daggett first pulls the trash bin back with his right hand and shoves it over with an open palm. *Cell Phone Video* at 00:20-00:40. Mr. Daggett then walks to the tipped over trash bin, which is lying on the ground, picks it up from the bottom, and empties the contents onto the lawn. *Id.* He throws the empty trash bin several feet and walks back to Ms. Howarth's vehicle after stopping to pick up a piece of trash from the ground. *Id.*

At approximately 6:31 p.m. on May 17, 2015, Officer Eli Poore, a patrol officer for the Berwick Police Department (BPD), was dispatched to 317 Cranberry Meadow Road in response to a reported violation of a protection order.  BDSMF ¶¶ 1, 3; PRBDSMF ¶¶ 1, 3.  Officer Poore is a graduate of the Maine Criminal Justice Academy and certified by the State of Maine as a full-time law enforcement officer.  BDSMF ¶¶ 2-3; PRBDSMF ¶¶ 2-3.

Officer Poore was not aware of the 911 caller's identity.  PSAMF ¶ 16; BDRPSAMF ¶ 16; CDRPSAMF ¶ 16; YDRPSAMF ¶ 16.  The dispatcher informed Officer Poore that the 911 caller had complained Mr. Daggett was on their property in a vehicle violating a protection order but had departed sometime during the 911 call.[6]  BDSMF ¶ 4; PRBDSMF ¶ 4.  Dispatch informed Officer Poore that the 911

---

[6]     The Berwick Defendants' paragraph four stated:

> Officer Poore learned from dispatch that the 911 caller was reporting that Plaintiff Thomas Daggett, the person against whom the protection order was issued, was on the property and was going through the trash and that there was paperwork in effect that stated Mr. Daggett was not to be on the property.

BDSMF ¶ 4.  In support of this assertion, the Berwick Defendants cited Officer Poore's affidavit, which tracks paragraph four.  *Id.* (citing Attach. 1, *Aff. of Eli Poore* ¶ 7).

Mr. Daggett interposed a qualified response, noting that Officer Poore testified that dispatch told him that the nature of the complaint made to 911 was that Mr. Daggett was on the property.  PRBDSMF ¶ 4 (citing *R.*, Attach. 10, *Dep. of Eli Poore*, at 12:1-13:8 (*Poore Dep.*)).  Mr. Daggett further states that Officer Poole testified that Mr. Daggett was in a vehicle that had left the scene while the complainant was calling 911 and returned to the scene.  *Id.*  Mr. Daggett states that Officer Poore was unaware as to whether Mr. Daggett had exited the vehicle the first time the vehicle arrived at the scene.

The Court sustains in part and denies in part Mr. Daggett's qualified response.  The Court sustains the part of paragraph four that asserts that Officer Poore learned from dispatch that Mr. Daggett had been going through the trash.  Although this statement is supported by Officer Poore's affidavit, it is not supported by his deposition testimony and the Court is required to view conflicting testimony in the light most favorable to the non-movant.  The Court denies Mr. Daggett's qualified response that asserts Officer Poole was unaware whether Mr. Daggett had exited his vehicle the first time he had arrived at the property.  Officer Poore's deposition testimony establishes the 911 complaint was that Mr. Daggett was on the property in violation of a protection order.  To be on the property, Mr. Daggett had to exit his vehicle.

caller reported Mr. Daggett had left the scene in a gray Nissan Versa.[7]  BDSMF ¶ 5;

PRBDSMF ¶ 5.

Officer Poore drove towards the residence and arrived around 6:37 p.m.

BDSMF ¶ 8; PRBDSMF ¶ 8.  Before he arrived, Officer Poore spoke with dispatch

and confirmed there was an active protection order in place against Mr. Daggett.[8]

BDSMF ¶ 6; PRBDSMF ¶ 6.  As Officer Poore arrived at the residence, he could see

that a gray Nissan Versa had returned to the residence and was parked along the

road.[9]  BDSMF ¶ 9; PRBDSMF ¶ 9.

As Officer Poole approached in his cruiser, he saw a male, who he believed,

based on the information from dispatch, was Thomas Daggett, standing in the area

---

[7]     Mr. Daggett denies this fact stating "Officer Poore testified that he did not know when the vehicle left and returned in relation to the complaint being called into 911."  PRBDSMF ¶ 5 (citing *Poore Dep.* at 12:21-13:8).  The cited portion of the record does not support Mr. Daggett's denial, even when viewed in the light most favorable to him.  The cited deposition testimony contains the following statement from Officer Poore:  "[T]here was a vehicle there that [Mr. Daggett] . . . was in and that it had left but it had then returned at some point while I was responding."  *Poore Dep.* at 12:23-25.  The statement does not refer to the time between the vehicle's initial departure and return to 317 Cranberry Meadow Road in relation to the 911 call, but it does establish that Officer Poore had been told that the vehicle had left and returned before he arrived.  Accordingly, the Court rejected Mr. Daggett's denial as unsupported by the record.

[8]     Mr. Daggett attempted to qualify this statement, noting that "Officer Poore learned that there was a protection order in effect from dispatch on his way to the scene of the complaint.  Officer Poore was familiar with general terms of protection orders but did not see the specific protection order that referenced Mr. Daggett until after Mr. Daggett's arrest."  PRBDSMF ¶ 6.  This attempted qualification is unresponsive to the Berwick Defendants' asserted fact, since the asserted fact does not state or imply that Officer Poore was aware of the exact terms of the protection order.  As Mr. Daggett does not deny or qualify the fact, and as the fact is supported by the record citation, the Court deems the statement admitted.  *See Forrest v. Brinker Int'l Payroll Co., LP*, No. 06-73-P-C, 2007 U.S. Dist. LEXIS 2785, at *4 (D. Me. Jan. 11, 2007) (noting that when a party's response to a statement of fact is not acceptable under D. ME. LOC. R. 56, the statement is deemed admitted if supported by the citation provided), *adopted by* 2007 U.S. Dist. LEXIS 27118 (D. Me. Apr. 11, 2007), *aff'd*, 511 F.3d 225 (1st Cir. 2007).  Even so, the Court includes that fact elsewhere in the factual background section because Mr. Daggett alleged it in his statement of material facts, PSAMF ¶ 20, and the Defendants admitted it.  BDRPSAMF ¶ 20; CDRPSAMF ¶ 20; YDRPSAMF ¶ 20.

[9]     Mr. Daggett qualified this factual statement by raising the same argument he employs to deny BDSMF ¶ 5.  PRBDSMF ¶ 9.  The Court rejects this qualification as unsupported by the record for the same reasons contained in footnote 7.

of the driveway of 317 Cranberry Meadow Road.[10]  BDSMF ¶ 10; PRBDSMF ¶ 10.

Officer Poore says he saw Mr. Daggett standing in the area behind the mailbox and

then saw him walk through the ditch in front of the home at 317 Cranberry Meadow

Road.[11]  BDSMF ¶ 11; PRBDSMF ¶ 11.

Once on the scene, Officer Poore saw Mr. Daggett carrying a white item in his

hand and enter the passenger side of the parked vehicle.  BDSMF ¶ 12; PRBDSMF

¶ 12.  Officer Poore also observed a large pile of belongings scattered throughout the

ditch in front of the home.  BDSMF ¶ 13; PRBDSMF ¶ 13.  Officer Poore decided to

arrest Mr. Daggett before he put his cruiser in park.[12]    PSAMF ¶ 18;

---

[10]    The parties dispute what Officer Poole saw as he approached 317 Cranberry Meadow Road.
BDSMF ¶ 10; PRBDSMF ¶ 10.  The Berwick Defendants based paragraph ten on Officer Poole's
affidavit that states: "As I approached closer in my cruiser, I also saw a male, who I believed, based on
the information from dispatch, was Thomas Daggett, standing in the driveway of 317 Cranberry
Meadow Road.  Mr. Daggett was standing in the area behind the mailbox and then walked through
the ditch in front of the home."  *Poole Aff.* ¶ 9.
        Mr. Daggett denied this paragraph on five bases: (1) that the dash camera video did not
corroborate Officer Poole's affidavit, (2) that Mr. Daggett denied being on the driveway, (3) that the
mailbox is not in the driveway, (4) the area just behind the mailbox is not on the driveway, and (5)
that the right of way for the roadway extends twenty-five feet on either side of the center of the road.
PRBDSMF ¶ 10.  There are several problems with Mr. Daggett's denial.  The primary problem is that
the video evidence of where Mr. Daggett was and what he did is clear from the cellphone recording
and it is consistent with the Berwick Defendants paragraph ten, not with Mr. Daggett's denial.  In
viewing contested facts in the light most favorable to Mr. Daggett, the Court is not required to
contradict what it can see in viewing the cellphone recording.  Second, Officer Poole could well have
seen things not depicted in the dash camera video.  Third, to the extent Mr. Daggett is arguing that
he was not standing in the driveway, the Court amended the paragraph to state that he was in the
area of the driveway.  Fourth, even if the Court accepts that the right of way ran twenty-five feet on
either side of the center line, the owner of 317 would have owned to the center line, subject to the right
of way.  Therefore, by entering onto the area of the trash bins, tipping one over, dumping the trash in
the ditch, and returning to his vehicle, Mr. Daggett was in fact entering onto his then-wife's property
and was violating the protection order.
[11]    Mr. Daggett interposed a qualified response to the Berwick Defendants' paragraph eleven on
the ground that he did not believe that he was on the premises of 317 Cranberry Meadow Road.
PRBDSMF ¶ 11.  The Court overrules the qualified response.  The Berwick Defendants' paragraph
eleven does not assert what Mr. Daggett believed, only what Officer Poole saw, and therefore Mr.
Daggett's qualified response is non-responsive.
[12]    The Berwick Defendants and York Defendants qualified Mr. Daggett's factual assertion on
this issue, asserting facts about why Officer Poole made the arrest decision.  PSAMF ¶ 18;
BDRPSAMF ¶ 18; YDRPSAMF ¶ 18.  The Court does not accept the Berwick and York Defendants'

BDRPSAMF ¶ 18; CDRPSAMF ¶ 18; YDRPSAMF ¶ 18.  When he made the decision to arrest Mr. Daggett, he had not spoken to the complaining party nor had he read the actual protection order.  PSAMF ¶¶ 19-20; BDRPSAMF ¶¶ 19-20; CDRPSAMF ¶¶ 19-20; YDRPSAMF ¶¶ 19-20.

Officer Poore approached the passenger side door and asked Mr. Daggett to get out, but Mr. Daggett refused to exit the vehicle.  BDSMF ¶ 14; PRBDSMF ¶ 14.  When Officer Poore asked Mr. Daggett if there was a protection order prohibiting him from entering the property at 317 Cranberry Meadow Road, Mr. Daggett responded that he was getting his belongings out of the trash and was not on the property.  BDSMF ¶¶ 15-16; PRBDSMF ¶¶ 15-16; PSAMF ¶ 23; BDRPSAMF ¶ 23; CDRPSAMF ¶ 23; YDRPSAMF ¶ 23.  Officer Poore told Mr. Daggett that he had seen him on the property and, around 6:41 p.m., told Mr. Daggett he was under arrest for violating the protection order.  BDSMF ¶ 17; PRBDSMF ¶ 17; CDSMF ¶ 4; PRCDSMF ¶ 4; YDSMF ¶ 1; PRYDSMF ¶ 1.  Mr. Daggett exited the vehicle and told Officer Poore that a pill bottle in his hand was medication.  BDSMF ¶ 18; PRBDSMF ¶ 18.  Officer Poore told Mr. Daggett to put the pill bottle in his pocket.  BDSMF ¶ 19; PRBDSMF ¶ 19.  Then, Officer Poore placed Mr. Daggett in handcuffs with his hands behind his back and told him to take a seat in the back of the police cruiser.  BDSMF ¶ 20; PRBDSMF ¶ 20.

At this point, Officer Poore learned Mr. Daggett had Parkinson's Disease.  BDSMF ¶ 22; PRBDSMF ¶ 22.  Mr. Daggett told Officer Poore his condition prevented

---

qualified responses because Mr. Daggett's paragraph eighteen is directed only to when Officer Poole made the arrest decision, not why he made it.

him from sitting with his arms behind his back and asked that his hands be placed in front of him.  BDSMF ¶ 21; PRBDSMF ¶ 21.  Officer Poore accommodated his request.  BDSMF ¶ 23; PRBDSMF ¶ 23.  Around the same time, Mary Howarth exited the Nissan and told Officer Poore that Mr. Daggett needed to take several medications at varying intervals, some as frequently as every hour and a half with a cold beverage.[13]  BDSMF ¶ 24; PRBDSMF ¶ 24; PSAMF ¶ 46; BDRPSAMF ¶ 46; CDRPSAMF ¶ 46; YDRPSAMF ¶ 46.

Officer Poore then drove Mr. Daggett to the Berwick police station, which took about seven minutes.  BDSMF ¶ 25; PRBDSMF ¶ 25.  Mr. Daggett complained about his arrest during the ride, but did not indicate he was experiencing discomfort, was in any medical distress, or otherwise needed medical attention.  BDSMF ¶ 26; PRBDSMF ¶ 26.  He never told Officer Poore that it was time for him to take his medication.  BDSMF ¶ 27; PRBDSMF ¶ 27.

The Berwick police station has one small holding area called the booking room where arrestees can be safely held on a temporary basis.  BDSMF ¶ 29; PRBDSMF ¶ 29.  However, the booking room is not equipped to hold an arrestee for more than a few hours, and the Berwick police station lacks a facility or resources to house an arrestee overnight or long term.  BDSMF ¶ 30; PRBDSMF ¶ 30.  At the police station, Officer Poore escorted Mr. Daggett into the booking room.  BDSMF ¶ 28; PRBDSMF ¶ 28.  Officer Poore asked Mr. Daggett if he had his medication with him, and

---

[13]     Mr. Daggett qualified this, relying on the dashboard camera video for the proposition that he needed to take his medicine every hour and a half with a cold beverage.  PRBDSMF ¶ 24 (citing *R.*, Attach. 25, at 4:02-10 (*Dash Camera Video*)).  The Court reviewed the video and accepts that Ms. Howarth provided these instructions.  *Dash Camera Video* at 4:02-10.

Mr. Daggett confirmed he did.  BDSMF ¶ 31; PRBDSMF ¶ 31.  Mr. Daggett took a dose of Sinemet while at the Berwick police station.  BDSMF ¶ 33; PRBDSMF ¶ 33; CDSMF ¶ 5; PRCDSMF ¶ 5.  Prior to taking this dose, Mr. Daggett had last taken his medication around 2:00 p.m.  CDSMF ¶ 5; CDSMF ¶ 5.  Officer Poore later took custody of the medication.[14]  PSAMF ¶ 47; BDRPSAMF ¶ 47; CDRPSAMF ¶ 47; YDRPSAMF ¶ 47.

Officer Poore left Mr. Daggett in the booking room and went to speak with his supervisor, Sergeant Shisler, about the arrest.  BDSMF ¶ 32; PRBDSMF ¶ 32.  Officer Poore located and reviewed a copy of the protection from abuse order against Mr. Daggett, which stated that Mr. Daggett was "prohibited from entering the family residence or premises of the separate residence of the plaintiff at . . . 317 Cranberry Meadow Road, Berwick ME," "prohibited from threatening, assaulting, molesting, harassing, or otherwise disturbing the peace of the plaintiff(s)," and "prohibited from, repeatedly and without reasonable cause, following the plaintiff or being at or in the vicinity of the plaintiff's home, school, business or place of employment."  BDSMF ¶¶ 34-35; PRBDSMF ¶¶ 34-35.

Next, Officer Poore telephoned the on-call district attorney to confirm that Mr. Daggett violated the protection order.  BDSMF ¶ 36; PRBDSMF ¶ 36.  Officer Poore spoke with the on-call assistant district attorney (ADA) and explained that he had observed Mr. Daggett in the driveway and walking through the ditch at 317 Cranberry Meadow Road.  BDSMF ¶ 37; PRBDSMF ¶ 37.  He also told the ADA that

---

[14]    The Court accepts Mr. Daggett's qualification of this point in response to BDSMF ¶ 31.

Mr. Daggett was going through the trash. BDSMF ¶ 38; PRBDSMF ¶ 38. The ADA confirmed Mr. Daggett had violated the protection order.[15] BDSMF ¶ 39; PRBDSMF ¶ 39. Then, Officer Poore contacted a bail commissioner, Kevin Cullen, to inquire about Mr. Daggett. BDSMF ¶ 41; PRBDSMF ¶ 41. The bail commissioner told Officer Poore that Mr. Daggett was not eligible for bail because he was alleged to have violated a protection order. BDSMF ¶ 41; PRBDSMF ¶ 41.

### B.    Thomas Daggett Goes to the Hospital

Due to Mr. Daggett's health conditions, Sergeant Shisler recommended that Officer Poore bring him to the hospital for an evaluation before transferring him to the York County Jail (YCJ). BDSMF ¶ 40; PRBDSMF ¶ 40. At approximately 7:34 p.m. on May 17, 2015, Officer Poore left the Berwick police station and brought Mr. Daggett to Southern Maine Health Care (SMHC) in Sanford, formerly known as Goodall Hospital. BDSMF ¶ 42; PRBDSMF ¶ 42; CDSMF ¶ 6; PRBDSMF ¶ 6.; YDSMF ¶ 2; PRYDSMF ¶ 2. They arrived at approximately 8:00 p.m. BDSMF ¶ 43; PRBDSMF ¶ 43; CDSMF ¶ 10; PRCDSMF ¶ 10; YDSMF ¶ 3; PRYDSMF ¶ 3.

At the hospital, Dr. Michael Schmitz and other SMHC providers evaluated Mr. Daggett. BDSMF ¶ 43; PRBDSMF ¶ 43; YDSMF ¶ 5; PRYDSMF ¶ 5. Before meeting with Mr. Daggett, Dr. Schmitz spoke with Mr. Daggett's on-call neurologist, Dr. John Dolan, who informed Dr. Schmitz of Mr. Daggett's medical history and

---

[15]     Mr. Daggett qualified this fact by stating the on-call ADA rendered his opinion without knowing that there was an ongoing divorce, a need for Mr. Daggett to protect his property, and the fact that Mr. Daggett's property was in a trashcan that a stranger was rooting through. PRBDSMF ¶ 39. The Court rejects this qualified response, because the Berwick Defendants' paragraph thirty-nine does not assert that Officer Poole gave the ADA any information other than what is set forth in the preceding paragraphs.

prescribed dosage of Sinemet.   BDSMF ¶ 44; PRBDSMF ¶ 44; CDSMF ¶ 13; PRCDSMF ¶ 13;  YDSMF ¶ 4; PRYDSMF ¶ 4.  Dr. Dolan reported that Mr. Daggett was a patient of Dr. Tony Knox, a neurologist at York Hospital.   CDSMF ¶ 14; PRCDSMF ¶ 14.   Dr. Dolan also told Dr. Schmitz that Mr. Daggett took Sinemet 25/100 mg every hour-and-a-half to two hours.  CDSMF ¶ 15; PRCDSMF ¶ 15.  Mr. Daggett also gave Dr. Schmitz a list of his medications.[16]  BDSMF ¶ 45; PRBDSMF ¶ 45; CDSMF ¶ 16; PRCDSMF ¶ 16.  Mr. Daggett reported no acute issues during the evaluation.  CDSMF ¶ 12; PRCDSMF ¶ 12.  Mary Howarth also talked to Dr. Schmitz and told him that Mr. Daggett took Sinemet 25/250 every hour-and-a-half to two hours.   PSAMF ¶ 23;  BDRPSAMF ¶ 23;  CDRPSAMF ¶ 23; YDRPSAMF ¶ 23; PRCDSMF ¶ 16.

Dr. Schmitz cleared Mr. Daggett to go to the YCJ and declared that he was fit for incarceration.  BDSMF ¶ 47; PRBDSMF ¶ 47; YDSMF ¶ 6; PRYDSMF ¶ 6.  A fit for incarceration evaluation is a medical screening exam to address any acute medical issues that might be present before a person enters jail.  CDSMF ¶ 8; PRCDSMF ¶ 8. Officer Poore received a form indicating that Mr. Daggett was fit for incarceration and a list of medications to provide to the YCJ staff so that they would know how to care for Mr. Daggett during his time at the jail.  BDSMF ¶ 48; PRBDSMF ¶ 48.  The form contained handwritten notes from Dr. Schmitz about four of Mr. Daggett's medications and stated those medications needed to be continued while he was in jail.

---

[16]      Mr. Daggett qualified this assertion by noting that Mary Howarth also spoke with Dr. Schmitz and told him that the correct dose of Sinemet was 25/250 mg.  PRCDSMF ¶ 16 (citing *Howarth Dep.* at 36:17-40:14).  The Court accepts this qualification.

CDSMF ¶ 18; PRCDSMF ¶ 18.   The form indicated that, as confirmed by Mr. Daggett's neurologist, he should take one tablet of Sinemet 25/100 mg every ninety to one hundred twenty minutes.  CDSMF ¶ 19; PRCDSMF ¶ 19.  Mr. Daggett asserted that the dose Dr. Schmitz documented was not his prescribed dose.  YDSMF ¶ 6; PRYDSMF ¶ 6.  Mr. Daggett received no Sinemet during his first hospital visit.[17] PRYDSMF ¶ 7.

### C.   Thomas Daggett Goes to Jail

SMHC discharged Mr. Daggett at 8:44 p.m. and Officer Poore transported him to the YCJ.  CDSMF ¶¶ 20-21; PRCDSMF ¶¶ 20-21.  Meanwhile, SMHC staff called the YCJ's medical providers about Mr. Daggett and conveyed the importance of adhering to his Sinemet schedule.  BDSMF ¶¶ 49-50; PRBDSMF ¶¶ 49-50; CDSMF ¶ 24; PRCDSMF ¶ 24; YDSMF ¶ 8; PRYDSMF ¶ 8.  Dr. Schmitz spoke with Danielle Brady, a nurse for CCS at the YCJ, and told her that Mr. Daggett needed to take his Sinemet 25/100 mg every ninety to one hundred twenty minutes.  CDSMF ¶¶ 22-24; PRCDSMF ¶¶ 22-24.  Nurse Brady memorialized this call under Mr. Daggett's clinical progress notes.  CDSMF ¶ 23; PRCDSMF ¶ 23.

---

[17]       This fact is disputed.  Relying on deposition testimony from Dr. Schmitz and medical records from the hospital, the Defendants contended Mr. Daggett received a dose of Sinemet during his first hospital visit.  BDSMF ¶ 46; CDSMF ¶ 17; YDSMF ¶ 7.  Each time, Mr. Daggett qualified or denied this assertion, relying on testimony from his November 1, 2019 deposition and asserting both that he never received Sinemet during his first hospital visit, or that the Sinemet was not the right dose if he did receive it.  *See* PRBDSMF ¶ 46 (citing *R.*, Attach. 2, at 36:24-37:12 (*Nov. 1 Daggett Dep.*)); PRCDSMF ¶ 17 (same); PRYDSMF ¶ 7 (same).  The portion of the record that Mr. Daggett cites does not refute the Defendants' factual assertions because it is clear that Mr. Daggett was referring to the Sinemet he received during his second trip to the hospital.  *See Nov. 1. Daggett Dep.* at 36:24-37:2 ("The second time on the way going out the door I got one dose of Sinemet, but it wasn't the correct dose.  And that was literally on the way out the door").  Despite this, another portion of Mr. Daggett's testimony from the same deposition supports his denial and qualifications and therefore the Court accepts his qualification.  When asked whether he received any Sinemet during his first hospital visit Mr. Daggett responded: "The first time, that's a big fat no."  *Id.* at 32:10.

After speaking with Dr. Schmitz, Nurse Brady contacted CCS' on-call provider, Julie Zale, P.A., and CCS' site medical director, Dr. George Stockwell. CDSMF ¶ 26; PRCDSMF ¶ 26. As a result of their communications with the hospital, YCJ staff were already aware of Mr. Daggett's condition when he arrived with Officer Poore. BDSMF ¶ 52; PRBDSMF ¶ 52. Dr. Schmitz and Nurse Brady determined YCJ could not accept Mr. Daggett at the YCJ because CCS did not have enough medication to meet his needs. CDSMF ¶ 27; PRCDSMF ¶ 27. Nurse Brady relayed this determination to YCJ's intake officer. CDSMF ¶ 28; PRBDSMF ¶ 28.

Due to the severity of Mr. Daggett's medical condition, YCJ staff advised Officer Poore that the jail would not accept him, even though Dr. Schmitz had found Mr. Daggett fit for incarceration. BDSMF ¶ 53; PRBDSMF ¶ 53; CDSMF ¶ 29; PRCDSMF ¶ 29; YDSMF ¶ 10; PRYDSMF ¶ 10. Officer Poore was unsure how to proceed because the bail commissioner previously told him that Mr. Daggett could not be bailed out due to the nature of his offense. BDSMF ¶ 54; PRBDSMF ¶ 54.

Officer Poore called his supervisor, Captain Locke, for advice on how to proceed. BDSMF ¶ 55; PRBDSMF ¶ 55. Captain Locke told Officer Poore to again contact the on-call ADA for instructions. BDSMF ¶ 56; PRBDSMF ¶ 56. As Officer Poore was explaining the situation to the on-call ADA, YCJ's intake officer told him the YCJ would accept Mr. Daggett if he took Mr. Daggett back to the hospital and obtained the proper medications. BDSMF ¶ 57; PRBDSMF ¶ 57; CDSMF ¶ 31; PRCDSMF ¶ 31. Behind the scenes, the YCJ's superintendent, Lieutenant Colonel

Michael Vitiello, had instructed the intake officer to accept Mr. Daggett with proper medications.[18]  CDSMF ¶ 30; PRCDSMF ¶ 30.

### D.    Thomas Daggett Returns to the Hospital

They returned to the hospital, and Mr. Daggett was triaged at approximately 9:39 p.m.  BDSMF ¶¶ 58; PRBDSMF ¶¶ 58; CDSMF ¶ 32; PRCDSMF ¶ 32. Mr. Daggett was again evaluated by SMHC staff and Dr. Schmitz, and the purpose of this visit was to get to-go doses of Mr. Daggett's medications that he could bring to the YCJ.[19]  BDSMF ¶ 59; PRBDSMF ¶ 59; CDSMF ¶ 33; PRCDSMF ¶ 33. Mr. Daggett did not raise any new complaints or health concerns.  CDSMF ¶ 34; PRCDSMF ¶ 34.

Dr. Schmitz ordered medications for Mr. Daggett, which SMHC staff gave to Officer Poore in a bag.[20]  BDSMF ¶ 60; PRBDSMF ¶ 60.  Dr. Schmitz ordered thirty tablets of Sinemet 25/100 mg, three doses of Azilect, six does of Metformin, and six doses of Vicodin.  CDSMF ¶¶ 35-36; PRCDSMF ¶¶ 35-36.  This was a lower dose of Sinemet than the 25/250 mg dose Mr. Daggett was prescribed to take at that time.[21] PRYDSMF ¶ 11.  The hospital could only provide Mr. Daggett with ten tablets of

---

[18]    The Court reviewed the stipulated record and accepts Mr. Daggett's qualification that Michael Vitiello was the YCJ's lieutenant colonel and superintendent at the time of the events at issue in this case.  PRCDSMF ¶ 30; CDSMF ¶ 30; PRYDSMF ¶ 29.

[19]    The Court accepts Mr. Daggett's qualification of this point.  BDSMF ¶ 59; PRBDSMF ¶ 59.

[20]    The Court accepts Mr. Daggett's qualification that the second hospital visit did not produce a second fit for incarceration form and struck the Berwick Defendants' contention that "SMHC staff . . . provided Officer Poore with paperwork indicating Mr. Daggett was medically cleared for incarceration" during his second hospital trip.  BDSMF ¶ 60; PRBDSMF ¶ 60.

[21]    Mr. Daggett cited his deposition testimony in support of the fact that he obtained a lower than necessary dose of medications than what he was taking at the time of his arrest.  PRYDSMF ¶ 11 (citing *Nov. 1 Daggett Dep.* at 38:25-39:7).  Consistent with its obligation to view the facts in the light most favorable to Mr. Daggett, the Court credits his statement as true.

Sinemet rather than the thirty tablets that Dr. Schmitz had ordered.  CDSMF ¶ 37;
PRCDSMF ¶ 37.  This amount of Sinemet would only last Mr. Daggett less than a
day.  PSAMF ¶ 37; BDRPSAMF ¶ 37; CDRPSAMF ¶ 37; YDRPSAMF ¶ 37.  After the
second visit, Dr. Schmitz still believed Mr. Daggett was fit for incarceration but did
not complete a second fit for incarceration form.  CDSMF ¶ 38; PRCDSMF ¶ 38;
YDSMF ¶ 12; PRYDSMF ¶ 12.  SMHC discharged Mr. Daggett for the second time at
10:23 p.m.  CDSMF ¶ 40; PRCDSMF ¶ 40.  He received some Sinemet as he left the
hospital, but it was not the correct dose.  *Nov. 1. Daggett Dep.* at 36:24-37:2.[22]  Around
10:29 p.m., Officer Poore and Mr. Daggett departed from the hospital and returned
to YCJ.  BDSMF ¶ 61; PRBDSMF ¶ 61; YDSMF ¶ 13; PRYDSMF ¶ 13.

### E.     Thomas Daggett Goes Back to Jail

Upon arrival at YCJ, Officer Poore provided YCJ staff with all the medical
paperwork and medication he received from the hospital.  BDSMF ¶ 62; PRBDSMF
¶ 62; CDSMF ¶ 41; PRCDSMF ¶ 41.  Mr. Daggett was slow to move, and Office Poore
had to assist him with walking.  PSAMF ¶ 28; BDRPSAMF ¶ 28; CDRPSAMF ¶ 28;
YDRPSAMF ¶ 28.  Mr. Daggett could not hold a pen and was not able to sign the
summons that Officer Poore served on him.[23]  PSAMF ¶¶ 29-30; BDRPSAMF ¶¶ 29-
30; CDRPSAMF ¶¶ 29-30; YDRPSAMF ¶¶ 29-30.  Intake paperwork shows that YCJ

---

[22]     The Court cites Mr. Daggett's deposition testimony in support of this fact for the reasons
explained in footnote 17.
[23]     Mr. Daggett contends that "[w]hen examined by health professionals at the jail who are
employed by CCS Mr. Daggett was unable to respond to questions."  PSAMF ¶ 36 (citing *YCJ Records*
at 16).  CCS and the York Defendants denied this fact as unsupported by the record.  CDRPSAMF
¶ 36; YDRPSAMF ¶ 36.  The Court examined the record and determines that no reasonable juror could
conclude that it supported a finding that Mr. Daggett was unable to respond to questions from CCS
providers.  *YCJ Records* at 16.  On the contrary, the record indicates that Mr. Daggett orally responded
to questioning but was physically unable to sign the intake form.  *Id.*

personnel categorized Mr. Daggett as unstable, which means "[t]he inmate appears to be out of control.  Unstable physically or mentally."[24]

The YCJ accepted custody of Mr. Daggett.  BDSMF ¶ 63; PRBDSMF ¶ 63; CDSMF ¶ 42, PRCDSMF ¶ 42; YDSMF ¶ 14; PRYDSMF ¶ 14.  Officer Poore then departed and had no further contact with Mr. Daggett.  BDSMF ¶ 64; PRBDSMF ¶ 64.  Prior to entering YCJ custody, Mr. Daggett had last taken his Sinemet around 2:00 p.m. and then again shortly after his approximately 6:41 p.m. arrest while he was at the Berwick police department.[25]  BDSMF ¶ 65; PRBDSMF ¶ 65; CDSMF ¶ 5; PRCDSMF ¶ 5.  In total, Mr. Daggett's incarceration at the YCJ lasted for about sixteen hours—from approximately 11:00 p.m. on Sunday, May 17, 2015 until 3:15 p.m. on Monday, May 18, 2015.  CDSMF ¶ 3; PRCDSMF ¶ 3.

During Mr. Daggett's incarceration, Correct Care Services, Inc. (CCS) provided medical care to inmates at the YCJ.  CDSMF ¶ 1; PRCDSMF ¶ 1; YDSMF ¶ 9; PRYDSMF ¶ 9.  Dr. Stockwell, CCS' chief provider, ordered that Mr. Daggett be placed on medical watch, kept in intake with his medication in-unit, and that the YCJ confirm his medication list with his medical provider in the morning.[26]  CDSMF ¶ 43;

---

[24]     The Court reviewed the record and accepts the Defendants' qualification.  PSAMF ¶ 35; CDRPSAMF ¶ 35; YDRPSAMF ¶ 35; *YCJ Records* at 40.

[25]     The Court modifies this statement of fact somewhat from the parties' statements of material facts and qualifications.  The Berwick Defendants' Statement of Material Facts states that Mr. Daggett had last taken his Sinemet "prior to his arrest" at around 2:00 pm.  BDSMF ¶ 65.  Mr. Daggett's qualification does not respond to the Berwick Defendants' assertion but adds that he took Sinemet after his arrest while in custody at the Berwick police department, a fact already before the Court.  PRBDSMF ¶ 65; BDSMF ¶ 33; PRBDSMF ¶ 33; CDSMF ¶ 5; PRCDSMF ¶ 5.

[26]     Mr. Daggett attempts to qualify this statement, stating "Dr. Stockwell ordered that his medications be verified in the morning but they were not."  PRCDSMF ¶ 43 (citing *YCJ Records* at 12).  Similarly, the PSAMF avers that Mr. Daggett's medications were not verified the following morning but provides no record citation and therefore the Defendants object to it as unsupported by the record.  PSAMF ¶ 43; BDRPSAMF ¶ 43; CDRPSAMF ¶ 43; YDRPSAMF ¶ 43.  The Court reviewed the record Mr. Daggett cited in PRCDSMF ¶ 43 and finds that it cannot, even when construed in the

PRCDSMF ¶ 43.  For the duration of his stay at the YCJ, he was housed in a holding cell in the intake area.  YDSMF ¶ 15; PRYDSMF ¶ 15.  Mr. Daggett was unable to move under his own power, and so one or two corrections officers wheeled Mr. Daggett into the holding cell on an office chair.[27]  PSAMF ¶ 48; BDRPSAMF ¶ 48; CDRPSAMF ¶ 48; YDRPSAMF ¶ 48; YDSMF ¶ 16; PRYDSMF ¶ 16.  Once in the cell, the corrections officers placed Mr. Daggett onto a bunk, but he could not hold himself up and hit his head on the cell wall.[28]  PSAMF ¶ 49; BDRPSAMF ¶ 49; CDRPSAMF ¶ 49; YDRPSAMF ¶ 49; YDSMF ¶ 17; PRYDSMF ¶ 17.  Mr. Daggett admits to receiving Sinemet while incarcerated but it was not the correct dose and he did not swallow all of the medication that CCS providers gave to him.[29]  CDSMF ¶ 44; PRCDSMF ¶ 44.  Mr. Daggett could not tell any medical provider or corrections officer at the YCJ that he had hit his head because he could not speak in the immediate aftermath of hitting his head.[30]  YDSMF ¶ 18; PRYDSMF ¶ 18; PSAMF ¶ 51;

---

light most favorable to him and drawing all reasonable inferences in his favor, be read to support his qualification.  In fact, the record he cites establishes that the Jail did verify his medication at 8:45 a.m. the next day.  In a handwritten note, the record states:

> 5-18-15, @1555, medication verified from York Hosp Berwick pharmacy and correct dosage and direction [unintelligible] obtained @ 0845.  [Unintelligible] wasn't [unintelligible] yet and still in the intake.  Julie Zale, PA called for medication approval.  [Unintelligible] released @1545.  Pt's own meds returned to him upon release.  [Unintelligible], RN.

*YCJ Records* at 12.

[27]   The Court accepts Mr. Daggett's qualification on this point as supported by his deposition testimony.  *See* PRYDSMF ¶ 16 (citing *Nov. 1 Daggett Dep.*, at 51:24-54:23).
[28]   Mr. Daggett qualified this fact, noting that he was unable to move under his own power. PRYDSMF ¶ 17.  The Court already accepted this qualification.
[29]   The Court reviewed the stipulated record and accepts Mr. Daggett's qualification of CCS' statement of material fact.  CDSMF ¶ 45; PRCDSMF ¶ 45 (citing *Nov. 1 Daggett Dep.*, at 66:22-68:6).
[30]   The Court accepts Mr. Daggett's qualification as supported insofar as he contends that he could not speak immediately after he hit his head.  *See* PRYDSMF ¶ 18 (citing *Nov. 1 Daggett Dep.,* at 56:25-57:3); CDRPSAMF ¶ 50; YDRPSAMF ¶ 50.  However, the record does not support that Mr. Daggett lost his power of speech for the remainder of his incarceration after hitting his head.  Mr. Daggett's own sworn testimony does not support that, and other evidence in the stipulated record indicates that he gave oral consent for medical treatment.  *YCJ Records* at 16.

BDRPSAMF ¶ 51; CDRPSAMF ¶ 51; YDRPSAMF ¶ 51.  Mr. Daggett was seen by

representatives of CCS while he was in the YCJ.  YDSMF ¶ 19; PRYDSMF ¶ 19.

Sometime after 11:00 p.m., Mary Howarth arrived at the YCJ and spoke to the

charge nurse.[31]  PSAMF ¶ 31; BDRPSAMF ¶ 31, CDRPSAMF ¶ 31, YDRPSAMF ¶ 31.

Ms. Howarth had brought an unopened bottle of Mr. Daggett's Sinemet 25/250 mg

with her, which she gave to the charge nurse.[32]  PSAMF ¶¶ 31, 34; BDRPSAMF

¶¶ 31, 34; CDRPSAMF ¶¶ 31, 34; YDRPSAMF ¶¶ 31, 34.  Ms. Howarth spoke with

the charge nurse for approximately forty minutes and during that conversation the

charge nurse informed Ms. Howarth that she had not been able to give Mr. Daggett

any Sinemet and described him as "unresponsive and uncooperative."[33]  PSAMF ¶

33; CDRPSAMF ¶ 33; YDRSPAMF ¶ 33; *see Howarth Dep.* at 66:13-67:4.

---

[31]    The Court accepts the Berwick Defendants' qualification that Ms. Howarth was not Mr. Daggett's caretaker at the time of the incident in question.  BDRPSAMF ¶ 31.  Ms. Howarth's deposition testimony is unambiguous that she did not assume the role of Mr. Daggett's caretaker until after this incident and that at the time of these events she was his roommate.  *See Howarth Dep.* at 7:7-9 ("When [Mr. Daggett] was released from the jail he had a concussion.  At that point, my role as roommate transferred to my taking care of him").

[32]    CCS and the York Defendants qualified these factual assertions as unsupported by the record citation.  CDRPSAMF ¶¶ 31, 34; YDRPSAMF ¶¶ 31, 34.  The Court determines the Defendants are correct but concludes that another portion of Ms. Howarth's deposition supports Mr. Daggett's factual position.  *See Howarth Dep.* at 67:24-68:8 (affirming that the charge nurse took the unopened bottle of Sinemet but none of the other medications Ms. Howarth had brought for Mr. Daggett).

[33]    Mr. Daggett asserts that "Ms. Howarth had an extensive conversation with the charge nurse, lasting over 40 minutes, about Mr. Daggett's condition including the fact that he can appear comatose and the charge nurse described Mr. Daggett as being unresponsive or uncooperative."  PSAMF ¶ 33 (citing *Howarth Dep.* at 67:1-11).  CCS qualifies this statement by noting that Ms. Howarth's deposition testimony is that the charge nurse told her Mr. Daggett was both uncooperative and unresponsive.  CDRPSAMF ¶ 33.  The Court reviewed Ms. Howarth's testimony and accepts that qualification.  The York Defendants raise that same qualification but also contend that the charge nurse's statements are inadmissible hearsay.  YDRPSAMF ¶ 33 (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) and Local Rule 56(e)).  The Court overrules the hearsay objection as it is not yet clear whether the charge nurse's statements are being offered for their truth, or for another purpose such as to show the charge nurse had notice of Mr. Daggett's condition.  Later in this opinion, the Court provides a more substantive analysis of whether these statements are, in fact, hearsay.  *See infra* page 84.  Finally, rather than rely on the parties' statements of material facts, the Court cites Ms. Howarth's deposition testimony because it provides the information.

Mr. Daggett does not remember how many Sinemet tablets he received while at the YCJ, nor does he remember exactly when he received those doses, but he does recall that whatever doses he received were not enough.[34]  CDSMF ¶¶ 47-48; 50-53; PRCDSMF ¶¶ 47-48, 50-53.  He also does not remember how many times he was seen by medical staff at the Jail.[35]  CDSMF ¶ 49; PRCDSMF ¶ 49.  Although Mr. Daggett never asked to see someone from YCJ's medical team, this is in part because they were visiting his cell or because his speech was hit or miss.  YDSMF ¶ 21; PRYCSMF ¶ 21.  Medical records from the YCJ suggest that staff attempted to administer a dose of Sinemet 25/100 mg to Mr. Daggett at approximately 11:00 pm on Sunday, May 17, 2015, and again at 1:00 a.m., 3:00 a.m., 5:00 a.m., 7:00 a.m., 9:16 a.m., and 11:00 a.m. on Monday, May 18, 2015.  *YCJ Records* at 2.

The Sinemet Mr. Daggett received at the YCJ was dispensed from the hospital's pharmacy and brought to the YCJ by Officer Poore.  CDSMF ¶ 45;

---

[34]     CCS cites portions of the record to contend that (1) Mr. Daggett received multiple Sinemet 25/100 mg doses while incarcerated at 11:00 p.m., 1:00 a.m., 3:00 a.m., 5:00 a.m., 7:00 a.m., 9:16 a.m., and 11:00 a.m. CDSMF ¶¶ 50-54.  Mr. Daggett contends that he does not remember exactly when he received Sinemet, only that whatever Sinemet he received was not enough.  PRCDSMF ¶¶ 50-54.

[35]     The York Defendants asserted that Mr. Daggett never asked to see someone from the YCJ's medical team.  YDSMF ¶ 21.  Mr. Daggett attempted to qualify this statement by noting that he was unable to make a request for assistance.  PRYDSMF ¶ 21.  From the Court's review of the stipulated record, neither factual assertion is quite right, and the Court combines the parties' positions to provide an accurate reflection of the record.

       Both parties cite Mr. Daggett's November 1, 2019 deposition in support of their contentions. In that deposition, Mr. Daggett was asked "Do you ever recall making any request to see somebody from medical?"  *Nov. 1 Daggett Depo.*, at 79:25-80:1.  Mr. Daggett responded "No.  Because they were coming into the room, and it was, you know, it would have been – no."  *Nov. 1 Daggett Dep.*, at 80:2-3. In another part of his deposition, Mr. Daggett noted that he told corrections officers and the medical provider that he needed Sinemet 25/250 mg but that during portions of his incarceration his speech was "hit or miss."  *Id.*, at 77:15-80:5.  Construing Mr. Daggett's own testimony in the light most favorable to him, the reason he did not ask to see the medical team is because they were already coming to see him, not because he was completely unable to speak, but his ability to speak was impaired during his time in the YCJ and inhibited his ability to make a request for YCJ medical team involvement at times when they were not visiting his cell.

PRCDSMF ¶ 45.   Mr. Daggett states that the Jail's medical personnel never administered his Sinemet from home and he did not swallow all the medication he received.  CDSMF ¶ 45; PRCDSMF ¶ 45; YDSMF ¶¶ 20, 22; PRYDSMF ¶¶ 20, 22. Mr. Daggett further avers that, although he refused to take some of the Sinemet the YCJ attempted administer, that was because he could not identify some of the medications.  CDSMF ¶ 46; PRCDSMF ¶ 46.

The next morning, on Monday, May 18, 2015 at 9:07 a.m., Mr. Daggett was taken to see the lawyer of the day.  CDSMF ¶ 53; PRCDSMF ¶ 53.  He was brought from his cell to court at approximately 12:37 p.m. and returned to intake at 1:19 p.m. CDSMF ¶ 55; PRCDSMF ¶ 55.  At 1:44 p.m., Mr. Daggett began medical intake screening, but he was not physically able to sign the medical forms and consent to treatment.  CDSMF ¶ 56; PRCDSMF ¶ 56.  Between 2:30 p.m. and 3:30 p.m. he began completing bail paperwork and his bail bond was signed at 2:50 p.m.  CDSMF ¶ 57; PRCDSMF ¶ 57.

## F.    The Aftermath

Mr. Daggett was released from the YCJ after 3:20 p.m. on May 18, 2015.[36] Upon his release, a corrections officer provided Mary Howarth with a bottle containing Mr. Daggett's personal medication.  CDSMF ¶ 59; PRCDSMF ¶ 59. Mr. Daggett had to be wheeled out of the YCJ in a wheelchair.  PSAMF ¶ 43; BDRPSAMF ¶ 43; CDRPSAMF ¶ 43; YDRPSAMF ¶ 43.  According to Ms. Howarth

---

[36]      Mr. Daggett concedes this approximate release time in some places but contests it in others. CDSMF ¶¶ 58, 60; PRCDSMF ¶ 58, 60 (denying and citing *Howarth Dep.* at 93:21-25 for proposition that release did not occur until after 3:30 p.m.); YDSMF ¶ 23; PRYDSMF ¶ 24 (admitting release occurred around 3:20 p.m.).

he was in rough shape when she picked him up from the YCJ.[37]  PSAMF ¶ 45; BDRPSAMF ¶ 45; CDRPSAMF ¶ 45; YDRPSAMF ¶ 45.

Mr. Daggett claims to have suffered a concussion that seriously advanced his Parkinson's Disease, post-traumatic stress disorder (PTSD), a broken hip, a chipped tooth, anxiety, and depression as a result of the treatment he received at the YCJ. CDSMF ¶ 71; PRCDSMF ¶ 71.  He claims that this concussion occurred after he arrived in the Jail the second time and was brought to a holding cell.  CDSMF ¶ 72; PRCDSMF ¶ 72.  Two weeks after his release from the Jail, Mr. Daggett fell and broke his hip while at Maine Medical Center.  CDSMF ¶ 73; PRCDSMF ¶ 73.  He panicked because he thought he was back in jail, ran out of the hospital, and fell in the parking lot.  CDSMF ¶ 73; PRCDSMF ¶ 73.

## G.   Additional Relevant Facts

### 1.   Facts Relevant to the Berwick Defendants[38]

---

[37]     The York Defendants qualified that this fact is conclusory.  YDRPSAMF ¶ 45.  The Court rejects their qualification because Ms. Howarth's testimony describes Mr. Daggett's general well-being at the time of his release.

[38]     Mr. Daggett claimed the town of Berwick has regulations and ordinances regarding the width of any public right of way in Berwick.  PSAMF ¶ 38 (citing PSAMF, Attach. 2, *Town of Berwick Road Construction Standards Road Opening Standards* (*Berwick Road Standards*)); BDRPSAMF ¶ 38; CDRPSAMF ¶ 38; YDRPSAMF ¶ 38.  The Berwick Defendants objected to this fact as unsupported by admissible evidence and denied it as unsupported by evidence in the record that may be admissible.  BDRPSAMF ¶ 39.  They stated the cited record only applies to new roads in Berwick or to improvements made so that a private road may be upgraded to a public way.  *Id.* (citing *Berwick Road Standards*).  The York Defendants qualified the fact as a legal conclusion.  YDRPSAMF ¶ 39 (citing *Chiang*, 595 F.3d at 30).

Mr. Daggett also claims the width of the right of way of the public road is twenty-five feet to each side from the center of the road.  PSAMF ¶ 39.  He further notes the width of the right of way results in the boundaries of a property owner's private property being limited to the area inside of the utility poles and the drainage ditch.  PSAMF ¶ 40 (citing *R.*, Attach. 26, *Pl.'s Expert Designation* at 2).  Once again, the Berwick Defendants denied this, stating that it "is a purported summary by Plaintiff's counsel of expected expert testimony, not an actual expert opinion provided by a witness competent to offer expert testimony.  The statement is not under oath and is offered for the truth of the matter asserted.  As such, even if it were offered by an expert with qualifications necessary to assert it, rather than by Plaintiff's counsel, the statement should be stricken as inadmissible hearsay."  BDRPSAMF

At all times relevant to this case, Timothy Towne was the Chief of Police for the town of Berwick. BDSMF ¶ 67; PRBDSMF ¶ 67. Chief Towne was a graduate of the Maine Criminal Justice Academy (MCJA) and certified by the state of Maine to work as a full-time law enforcement officer. BDSMF ¶ 68; PRBDSMF ¶ 68. The MCJA is responsible for the development and implementation of training of all law enforcement officers in Maine and has standardized the initial and annual training requirements of all officers in the state. BDSMF ¶ 71; PRBDSMF ¶ 71. He was not present during Mr. Daggett's arrest and had no interactions with Mr. Daggett at the police station following the arrest. BDSMF ¶ 69; PRBDSMF ¶ 69. Due to his role as Chief of Police and his more than thirty years in Maine law enforcement, Chief Towne is familiar with the training requirements for Maine police officers, the certification process, and Maine's requirements for law enforcement agencies regarding the adoption of state-mandated policies. BDSMF ¶ 70; PRBDSMF ¶ 70. In his official capacity, Chief Towne is responsible for ensuring that Berwick's police officers meet the state's mandatory training requirements, for ensuring appropriate supervision of officers, and for the discipline of officer. BDSMF ¶ 72; PRBDSMF ¶ 72. He also

---

¶ 40. The Berwick Defendants also deny the assertion, stating that "[t]he record citation does not support the facts asserted, and Plaintiff has misstated even the summarized opinion of counsel in the cited record." *Id.* The York Defendants also object to the factual assertion as hearsay. YDRPSAMF ¶ 40.

    The Court sustains the objections and denials because the cited portion of the stipulated record is inadmissible hearsay, and in any event, the record does not support Mr. Daggett's assertion. A more complete discussion of Mr. Daggett's failure to properly designate experts and submit admissible expert testimony occurs later in this order. *See infra* pages 89-95. Furthermore, the Court is skeptical that the existence or not of a town right of way is material to the resolution of the issues before the Court for the reasons explained in footnote 49. Even assuming that Mr. Daggett is correct that the town of Berwick had a twenty-five foot right of way from the center line of the road, the right of way was a right of passage, not a right to push over his estranged wife's trash bin and strew her trash on her lawn in derogation of an existing protection order.

promulgates appropriate department policies and procedures, including implementing minimum policies mandated by the state of Maine.  BDSMF ¶ 76; PRBDSMF ¶ 76.

The Berwick Police Department (BPD) has general orders that govern citizen complaints and employee discipline.[39]  BDSMF ¶ 85; PRBDSMF ¶ 85.  Chief Towne is notified of all complaints against the officers and investigates them.  BDSMF ¶ 86; PRBDSMF ¶ 86.  Prior to receiving Mr. Daggett's civil Complaint in August 2018, Chief Towne had not received any complaints or notices of claim regarding alleged unlawful arrests for violating protection from harassment/abuse orders, unlawful arrest procedures, or allegations relating to officers denying arrestees proper medical care.  BDSMF ¶ 87; PRBDSMF ¶ 87.  The town of Berwick never received notice of claim from Mr. Daggett, his attorney, or other representative relating to his arrest on May 17, 2015.  BDSMF ¶ 91; PRBDSMF ¶ 91.

Subject to a limited exception for lateral or experienced hires, all Berwick police officers must complete the BPD training program, which is a three-phase training and evaluation program, requiring completion of the eighteen-week course at the MCJA, an intensive field training program with a Berwick Field Training Officer (FTO) and six additional months of close monitoring by the FTO.  BDSMF ¶ 73; PRBDSMF ¶ 73.  The trainings cover topics such as federal and state

---

[39]     The Defendants objected to and denied this fact as unsupported by a record citation when Mr. Daggett raised it.  PSAMF ¶ 41; BDRPSAMF ¶ 41, CDRPSAMF ¶ 41; YDRPSAMF ¶ 41.  The Court found that strange because the Berwick Defendants previously asserted the same fact in BDSMF and Mr. Daggett admitted it.  BDSMF ¶ 85; PRBDSMF ¶ 85.  The Court overrules the objection and includes the fact.

constitutional law, Fourth Amendment search and seizure law, lawful arrest procedures, probable cause to make warrantless arrests, Maine criminal statutes, domestic abuse and protection from harassment and abuse orders, the Americans with Disabilities Act, and the Maine Civil Rights Act. BDSMF ¶ 74; PRBDSMF ¶ 74. All Berwick officers must satisfy the MCJA's requirements to maintain their state certification as a law enforcement officer, including annual mandatory training requirements. BDSMF ¶ 75; PRBDSMF ¶ 75.

All BPD policies, including its Standard Operating Guideline, Domestic Abuse Policy No. O-18, comply with the MCJA minimum standards and all Berwick officers are trained in the police department's policies, including the MCJA minimum standards. BDSMF ¶ 77; PRBDSMF ¶ 77. All BPD policies are reviewed with the patrol officers on an annual basis and at departmental meetings throughout the year. BDSMF ¶ 78; PRBDSMF ¶ 78. Pursuant to the departmental policy in effect at the time of Mr. Daggett's arrest, arrest is mandatory when there is probable cause to believe a suspect has violated a protection order. BDSMF ¶ 79; PRBDSMF ¶ 79. The police department also has standard operating guidelines on arrest procedures and prisoner transportation. BDSMF ¶ 80; PRBDSMF ¶ 80. Under these two policies, officers must ensure the safety of individuals in their custody, obtain medical care for sick or injured arrestees before bringing them to jail, and transport handicapped prisoners in a manner that is convenient, comfortable, and safe for both the prisoner and the officer. BDSMF ¶ 81; PRBDSMF ¶ 81.

At all times, there are two patrol sergeants who supervise the patrol officers and a police captain who oversees the patrol sergeants and the officers. BDSMF ¶ 82; PRBDSMF ¶ 82. There is always a supervisor on duty or on call who is available to respond to or assist. BDSMF ¶ 83; PRBDSMF ¶ 83. The Berwick Police Department encourages its officers to call the on-call ABA with questions about the law or a particular situation that they may be facing. BDSMF ¶ 83; PRBDSMF ¶ 83. Every report that a patrol officer prepares is reviewed and must be approved by a supervising officer, such as the patrol sergeant, captain, or chief, who addresses any concerns or questions about the report. BDSMF ¶ 84; PRBDSMF ¶ 84.

## 2.   Facts Relevant to CCS

Mr. Daggett does not allege that any of his injuries resulted from a CCS policy, practice, or custom and is not aware of any CCS policy, practice, or custom, that caused him harm. CDSMF ¶¶ 65-68; PRCDSMF ¶¶ 65-68. Mr. Daggett has no information about the training that CCS provides to its medical staff. CDSMF ¶ 69; PRCDSMF ¶ 69.

Mr. Daggett listed a number of experts to testify about his injuries, but as the Court will discuss, none of those experts was properly designated on the issue of causation and Mr. Daggett did not proffer any expert testimony on causation.[40]

---

[40]     Mr. Daggett denied CCS' assertion that he failed to designate an expert witness on causation, contending that he has designated treating professionals who can testify regarding his conditions, symptoms, onset of symptoms, and what occurs if he does not take his medications. CDSMF ¶ 70; PRCDSMF ¶ 70. Mr. Daggett technically designated a number of expert witnesses to testify about his medical conditions. However, as the Court later discusses, those designations were defective, and he has no qualified expert witness who could testify in open court before a jury about how the improper administration of Sinemet caused his alleged injuries. *See infra* pages 89-94. In light of this fact the Court somewhat altered CCS' factual assertion on the issue.

CDSMF ¶ 70; PRCDSMF ¶ 70.  CCS designated Dr. Ryan Herrington, M.D., M.P.H., the former Regional Medical Director for the Maine and Vermont departments of corrections as its expert witness.  CDSMF ¶ 74; PRCDSMF ¶ 74.  Dr. Herrington will testify that the treatment provided to Mr. Daggett was reasonable and clinically appropriate.  CDSMF ¶ 75; PRCDSMF ¶ 75.  He will also testify that the 25/100 mg doses of Sinemet that CCS staff gave to Mr. Daggett during his incarceration could not have caused the injuries alleged and that missing one or two doses could not have caused his injuries either.  CDSMF ¶ 75; PRCDSMF ¶ 75.

### 3.  Facts Relevant to the York Defendants

Mr. Daggett has no knowledge suggesting that Sheriff King was involved with the events alleged in his Complaint.  YDSMF ¶ 25; PRYDSMF ¶ 25.  Sheriff King was not present for the incident and had no physical contact with Mr. Daggett at any time relevant to the claims in his Complaint.  YDSMF ¶ 26; PRYDSMF ¶ 26.  Furthermore, Sheriff King has no personal knowledge of any use of force or control involving Mr. Daggett during his time in the Jail and was not involved with Mr. Daggett's access to medical services while in the Jail.  YDSMF ¶¶ 27-28; PRYDSMF ¶¶ 27-28.

Similarly, Superintendent Vitiello was not present for any of the incidents alleged by Mr. Daggett and had no physical contact with him at any time relevant to his claims.  YDSMF ¶ 30, PRYDSMF ¶ 30.  Superintendent Vitiello also has no knowledge of any use of force or control of Mr. Daggett while he was at the YCJ.  YDSMF ¶ 31; PRYDSMF ¶ 31.  Superintendent Vitiello was not involved with

Mr. Daggett's access to medical services while in the Jail, though records indicate the Lieutenant Colonel, presumably Michael Vitiello, ordered the Jail to take custody of Mr. Daggett if the hospital could provide his medications.  YDSMF ¶ 32; PRYDSMF ¶ 32.

Mr. Daggett has no knowledge that the incident leading to his injury resulted from a York County policy or custom.   YDSMF ¶ 33; PRYDSMF ¶ 33.   His interrogatory answers contained no facts to suggest the existence of a county policy that caused the alleged constitutional violations.  YDSMF ¶ 34; PRYDSMF ¶ 34.  It is the policy of York County for Jail employees to defer to the Jail's medical provider—in this case CCS—to make decisions about an inmate's healthcare.  YDSMF ¶ 37; PRYDSMF ¶ 37.  The YCJ also has policies to ensure that inmates can access medical care and it is the County's policy to afford inmates and detainees reasonable access to non-emergency medical care.  YDSMF ¶¶ 38-39; PRYDSMF ¶¶ 38-39.

Mr. Daggett has no facts to support an argument that his injuries resulted from any failure by York County to train its employees.  YDSMF ¶ 35; PRYDSMF ¶ 35.  He acknowledges that he has asserted a Fourth Amendment claim only against the Berwick Defendants, not the York Defendants or CCS.  YDSMF ¶ 36; PRYDSMF ¶ 36.  The YCJ has policies concerning the use of control, and those policies limit use of control measures to situations where physical force is necessary to: (1) protect an officer from assault or threat of assault; (2) protect another person from assault or threat of assault; (3) protect an inmate from harm; or (4) prevent destruction of property.  YDSMF ¶¶ 40-41; PRYDSMF ¶¶ 40-41.  The YCJ's officers are instructed

to limit the degree of control to that which the officer believes is reasonable and necessary under the circumstances.  YDSMF ¶ 42; PRYDSMF ¶ 42.  York County's medical access and its use of control policy were all in effect at the time of the events alleged in Mr. Daggett's complaint.  YDSMF ¶ 43; PRYDSMF ¶ 43.

## III.   THE PARTIES' POSITIONS

### A.   The Berwick Defendants

#### 1.   The Berwick Defendants' Motion for Summary Judgment

The Berwick Defendants move for summary judgment as to all of Mr. Daggett's claims against them.  *Berwick Mot.* at 1.  They begin by listing these claims, which include: (1) a civil rights conspiracy under 42 U.S.C. § 1985, (2) a violation of the Maine Civil Rights Act (MCRA), (3) civil conspiracy to commit torts under Maine law, (4) false arrest and failure to protect claims pursuant to 42 U.S.C. § 1983 against Officer Poore, and (5) § 1983 failure to train/supervise claims against the town of Berwick and Chief Towne.  *Id.* at 2.  Because the MCRA "was patterned after § 1983," the Berwick Defendants argue that "the disposition of [Mr. Daggett's] federal law claims controls the outcome of [his] claims under the MCRA."  *Id.* (citing *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007)).

##### a.   Officer Poore

###### i.   Officer Poore Had Probable Cause to Arrest Thomas Daggett

Turning first to the § 1983 claims against Officer Poore, the Berwick Defendants contend "there was probable cause to believe that [Mr. Daggett] had committed or was committing the crime of violation of protective order and therefore

Officer Poore was mandated under Maine law to arrest him." *Id.* at 4.  The Berwick Defendants observe that before arresting Mr. Daggett, a "911 caller reported that [Mr. Daggett] was on the property in violation of the [protective] order . . . that prohibited [Mr. Daggett] from entering the property or premises . . .." *Id.*  They further claim that "Officer Poore was entitled to rely on that confirmation and the information relayed through dispatch from the caller." *Id.* (citing *United States v. Barbosa*, 896 F.3d 60, 70 (1st Cir. 2018)).

The Berwick Defendants also point out that "once Officer Poore arrived at the residence, he personally observed [Mr. Daggett] standing in the driveway and then walk through the ditch . . . [and Officer Poore] also observed belongings scattered on the yard and premises." *Id.* at 4-5.  Combining this information with the report from dispatch, the Berwick Defendants conclude that "there was, at the very least, a probability or substantial chance that [Mr. Daggett] was in violation of the protection order." *Id.* at 5.

Next, the Berwick Defendants argue that, although Mr. Daggett contests several facts surrounding his arrest, those facts are immaterial to probable cause. *Id.* First, they claim that even if Mr. Daggett did not violate the order by trying to get his belongings out of the trash "a police officer does not have 'a standing obligation to investigate potential defenses or resolve conflicting accounts prior to making an arrest'" and therefore, there was still probable cause. *Id.* (citing *Holder v. Town of Sandown,* 585 F.3d 500, 505 (1st Cir. 2009)).  Second, the Berwick Defendants argue that even if Mr. Daggett never physically entered the property, the protection order

34

barred him from the premises of that property, which is larger than the property itself. *Id.* Third, again citing *Holder*, they reiterate that Officer Poore was entitled to rely upon the 911 caller's report that Mr. Daggett was on the property "and was not required to resolve the conflicting account prior to making an arrest." *Id.*

### ii. Officer Poore is Entitled to Qualified Immunity

The Berwick Defendants next contend that "[e]ven if Officer Poore was mistaken in his belief that probable cause existed to arrest [Mr. Daggett] for violation of a protective order, he is nevertheless entitled to qualified immunity." *Id.* Quoting *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004), the Berwick Defendants assert "[h]ere 'in the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.'" *Id.* at 6. As such, they suggest that even assuming Officer Poore was incorrect, and Mr. Daggett never entered the property at 317 Cranberry Meadow Road, he could nonetheless reasonably conclude that Mr. Daggett had entered the "premises" of the property. *Id.* In the same vein, the Berwick Defendants contend that "[a] reasonable officer could also conclude that [Mr. Daggett] violated the Order by harassing or otherwise disturbing the peace of Ms. Daggett by tipping over her trash and scattering trash all over the yard." *Id.*

The Berwick Defendants conclude that "based on the circumstances of this case, the law was not clearly established that Officer Poore lacked probable cause to arrest [Mr. Daggett] for the crime of violation of protection order." *Id.* at 7. They argue that there is no clearly established law on point because "[t]here is no

35

controlling precedent construing the meaning of 'premises' to establish probable cause in the context of Maine's or a comparable protection from abuse statute such that *every* reasonable officer . . . would have known that the decision to arrest [Mr. Daggett] in the particular circumstances he faced would violate the Fourth Amendment." *Id.* (emphasis in original).

### iii.   The Failure to Protect Claim Fails as a Matter of Law

The Berwick Defendants assert that Mr. Daggett's "[f]ailure to [p]rotect [c]laim [f]ails as a [m]atter of [l]aw." *Id.* They contend "[w]hile these allegations seem to implicate the substantive due process clause of the Fourteenth Amendment, [Mr. Daggett's] failure to protect claim cannot survive summary judgment." *Id.* The Berwick Defendants contend that Officer Poore lacked an affirmative duty to protect Mr. Daggett because "the mere creation of a custodial relationship is insufficient to establish a substantive due process claim based on a failure to protect." *Id.* at 8. Moreover, "[t]he First Circuit has explained that a plaintiff has to establish not only a deprivation of a protected right but also that the governmental conduct *caused* the deprivation of the right." *Id.* (citing *Morgan v. Town of Lexington*, 823 F.3d 737, 742-43 (1st Cir. 2016)) (emphasis in original).

Casting their own argument in a slightly different light, the Berwick Defendants reframe Mr. Daggett's argument as follows: "[Mr. Daggett] is essentially claiming that Officer Poore had a constitutional duty to intervene to provide more medical treatment or medication to [him] or somehow override the decision of a trained doctor that [Mr. Daggett] was fit for incarceration." *Id.* at 8-9. The Berwick

36

Defendants then contend that even if Officer Poore had a duty to protect Mr. Daggett, it was not breached as a matter of law. *Id.* at 9. They write "based on the undisputed facts, no reasonable jury could infer deliberate indifference or conscience-shocking conduct on the part of Officer Poore." *Id.* In support, the Berwick Defendants observe that Officer Poore brought Mr. Daggett to the jail after confirming he had violated the protective order and was not eligible for bail, after visiting the hospital twice to be cleared for incarceration, and after ensuring that Mr. Daggett had obtained medications from the treating physicians. *Id.* Thus, The Berwick Defendants contend that "[i]t was reasonable for Officer Poore to rely on the medical professionals who were evaluating [Mr. Daggett] to provide him with necessary medical care, including his required medication, and who made an informed decision that [he] was fit for incarceration." *Id.* at 10. What's more, the Berwick Defendants argue that "Officer Poore also cannot be held liable under Section 1983 for the alleged constitutional deprivations of the [other defendants]." *Id.* This is because it would be a so-called "bystander" claim and Officer Poore is not a bystander because he left the jail after it accepted Mr. Daggett into custody. *Id.*

Shifting to causation, the Berwick Defendants mention that Mr. Daggett "has . . . failed to designate an expert witness on causation to link his alleged injures to the alleged failure to receive his medication while he was in Officer Poore's custody." *Id.* at 11. They note that Mr. Daggett had already missed two doses of Sinemet before his arrest, and that "[w]ithout expert testimony, a jury would only be left to speculate as to the cause of his subsequent alleged injuries." *Id.*

Notwithstanding the above, the Berwick Defendants argue that qualified immunity protects Officer Poore. *Id.* They urge that a police officer's duty to protect was not clearly established at the time of Officer Poore's arrest. *Id.* (citing *Morgan*, 823 F. 3d 737, 740 (1st Cir. 2016)). They state that "[i]t was not until March 1, 2017, that the First Circuit permitted a substantive due process claim to proceed in *Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017) based on a failure to protect and creation of danger theory." *Id.* at 12. Thus, because these cases followed Mr. Daggett's arrest, they "could not have given any clear guidance to Officer Poore." *Id.* Moreover, the Berwick Defendants find this case distinguishable from the "more extreme" conduct by police in *Irish*. *Id.* Thus, the Berwick Defendants conclude that "[b]ecause the law was not clearly established that Officer Poore's decisions violated [Mr. Daggett's] substantive due process rights, he is entitled to qualified immunity." *Id.* at 12.

### b.     Chief Towne and the Town of Berwick

#### i.     No Underlying Constitutional Violation

The Berwick Defendants contend that "to establish a § 1983 claim against Chief Towne or the Town of Berwick, [Mr. Daggett] would need to show that a Berwick officer violated [Mr. Daggett's] constitutional rights." *Id.* at 13. They argue that here, for the reasons just discussed, "there was no underlying constitutional violation by Officer Poore" and therefore the "clams against Chief Towne and the Town of Berwick fail as a matter of law." *Id.*

#### ii.    Failure to Train/Supervise Claims Fail as a Matter of Law

38

The Berwick Defendants next assert that even assuming a constitutional violation occurred, Mr. Daggett has not met "the standard for imposing liability based on a failure to train or supervise theory." *Id.* at 13.  The Berwick Defendants aver that this standard imposes liability only "where the conduct amounts to deliberate indifference to the rights of the persons with whom the police come into contact and is closely related to, or the moving force behind, the constitutional injury." *Id.* (citing *Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 365 (D. Me. 2011) (internal citation omitted)).  They claim that Mr. Daggett cannot prove that constitutional harm befell him due to a failure to train because Officer Poore, like all Berwick police officers, attended the Maine Criminal Justice Academy, trained with a Berwick field training officer, and underwent six months of additional close monitoring by the field training officer.  *Id.* at 14.  The training included "federal and state constitutional law, Fourth Amendment search and seizure law, lawful arrest procedures, determining when probable cause to make a warrantless arrest exists, Maine criminal statutes, domestic abuse and protection from harassment and abuse orders, the Americans with Disabilities Act, and the Maine Civil Rights Act." *Id.* at 14-15.  Furthermore, the police department has a chain of command, which provides officers with supervision, and "Chief Towne is notified of all complaints made against Berwick officers and the Berwick Police Department investigates all complaints or grievances against Berwick officers." *Id.* at 15.

In light of these facts, the Berwick Defendants contend the record supports neither a "causal link between" Chief Towne's conduct and "the arrest or subsequent

processing of" Mr. Daggett, nor "a finding that Chief Towne or any Berwick official trained or supervised Officer Poore with deliberate indifference." *Id.*

### iii.    Chief Towne is Entitled to Qualified Immunity

The Berwick Defendants also argue that Chief Towne is entitled to qualified immunity on "any supervisory claim." *Id.* at 16.  The crux of this argument is that Chief Towne lacked "notice . . . or otherwise should have known that his supervisory acts amounted to a constitutional violation." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  Rather, "[i]t was . . . not foreseeable to Chief Towne that, after Officer Poore received medication from the hospital and had [Mr. Daggett] cleared for incarceration, the Jail and Correct Care Solutions would fail to provide [Mr. Daggett] with his proper medication or otherwise cause him injuries . . .." *Id.*  Thus, Mr. Daggett "cannot show that Chief Towne clearly acted with deliberate indifference towards [his] constitutional rights" and "Chief Towne is entitled to qualified immunity." *Id.*

### c.    No Evidence Supports the § 1985 Civil Rights Conspiracy Claim

The Berwick Defendants further assert that they are entitled to summary judgment in their favor on Mr. Daggett's 42 U.S.C. § 1985 civil rights conspiracy claim. *Id.* at 17.  First, they argue that there "has been no constitutional violation by the Berwick Defendants" and therefore, Mr. Daggett's "conspiracy claims must fail." *Id.*  Second, they claim that the factual record contains "nothing to suggest that [the Berwick Defendants] collectively agreed on a course of action." *Id.*  As such, they

characterize Mr. Daggett's "allegations of a conspiracy" as "bald allegations unsupported by any record evidence."  *Id.*

### d. The Civil Conspiracy Claim is Unsupported by the Evidence and Barred by the Maine Tort Claims Act

The Berwick Defendants provide a detailed discussion of why Mr. Daggett's claims for civil conspiracy to commit torts are barred or otherwise insufficient to survive summary judgment under the Maine Tort Claims Act (MTCA)  *Id.* at 17-20. However, in his response, Mr. Daggett waived his MTCA claims in his opposition brief to the Defendants' summary judgment motions.  *Pl.'s Opp'n* at 18 ("Plaintiff at this time concedes his state law claims of civil conspiracy against all defendants").

### 2. Thomas Daggett's Opposition

### a. Officer Poore

#### i. Officer Poore Lacked Probable Cause to Arrest Mr. Daggett

Mr. Daggett asserts that "[p]robable cause requires evidence that it is more likely than not a crime was committed and the particular suspect was involved in its commission."  *Pl.'s Opp'n* at 7.  He claims that the information known to Officer Poore at the time of the arrest fell short of probable cause because "Officer Poore conducted absolutely no investigation into the violation of a protection order complaint that was made."  *Id.*  He contends that he was not standing within the property lines of 317 Cranberry Meadow Road and was protecting his property pursuant to his rights in a pending divorce case.  *Id.* at 7-8.  Moreover, he points out that Officer Poore did not identify or converse with the complaining party before arresting Mr. Daggett.  *Id.*

at 8.  He claims that relying on the ADA's advice that probable cause existed is unavailing to Officer Poore because Officer Poore withheld relevant facts during that conversation, namely that Mr. Daggett was standing in the town right of way and was protecting his own property from destruction.  *Id.*  Thus, Mr. Daggett concludes that a jury must ultimately decide whether "a reasonable and prudent person [would] make a finding of probable cause when there was zero investigation done before the officer decided to arrest."  *Id.*

### ii.    Officer Poore is Not Entitled to Qualified Immunity

Mr. Daggett further asserts that "Officer Poore is not entitled to [q]ualified [i]mmunity."  *Id.*  He identifies the legal standard for qualified immunity, noting that it does not apply when the state actor violated clearly established law that a reasonable officer should have known of.  *Id.* at 8-9.  He then states that "the need for probable cause to exist before the effectuation of an arrest is a clearly established principle in our constitutional jurisprudence."  *Id.* at 9.  Therefore, he concludes that "[a]n arrest that is void of probable cause and perpetrated without an investigation by the law enforcement officer is not entitled to qualified immunity."  *Id.*

### iii.    The Failure to Protect Claim is Viable

Mr. Daggett believes his "[f]ailure to [p]rotect claim should be allowed to proceed."  *Id.* at 10.  Mr. Daggett states that Officer Poore had a duty to protect him while in official custody because he was "not able to fully protect or care for himself."  *Id.*  He states that the duty was "a duty to ensure that Mr. Daggett's medical needs

are met which is a substantive due process right . . .." *Id.* (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-200, n.5 (1989)).

Mr. Daggett argues that Officer Poore breached his duty to protect him. *Id.* He reminds the Court that Officer Poore was responsible for his medical care until he turned him over to the YCJ. *Id.* However, at the time Mr. Daggett was placed in YCJ custody, he was no longer able to move under his own power and "was not able to sign his name or hold a pen." *Id.* He continues, noting that this deterioration occurred on Officer Poore's watch despite "Officer Poore's duty to make sure Mr. Daggett had access to his medications." *Id.* Therefore, he concludes Officer Poore breached his duty to protect him by removing his medication from his pockets at the Berwick Police Department and by "not acting when his physical condition deteriorated . . .." *Id.* at 10-11.

### b.   Chief Towne and the Town of Berwick

#### i.   The Failure to Train/Supervise Claims Are Viable

Mr. Daggett urges that summary judgment on his claims against Chief Towne and the town of Berwick is similarly improper. *Id.* at 11. He repeats his assertion that there was an underlying constitutional violation—namely, the wrongful arrest by Officer Poore and Officer Poore's failure to protect Mr. Daggett. *Id.* He submits that the "[f]ailure to [t]rain and [f]ailure to [s]upervise claims are viable." *Id.* On this point he observes that failure to train claims generally require a showing that the failure to train was predictable or conscious and therefore require showing a pattern of past constitutional violations. *Id.* at 11-12. However, the First Circuit and

43

Supreme Court have given credence to the notion that some constitutional violations are so obvious and likely to occur absent training that they satisfy the deliberate indifference standard without a pattern or practice of similar violations. *Id.* at 12.

Mr. Daggett further claims that he has "shown that [Berwick] possesses the requisite level of fault which is deliberate indifference." *Id.* at 13 (internal citation and quotation marks omitted). He thus opposes summary judgment, noting that "[s]ummary judgment is not warranted in a situation in which the jury could find that the department knew that a constitutional violation was a predictable consequence of the department's failure to train and therefore deliberately indifferent to [Mr. Daggett's] constitutional rights." *Id.* at 13-14.

### ii.    Chief Towne and Qualified Immunity

Mr. Daggett argues that Chief Towne is not entitled to qualified immunity. *Id.* at 14. He maintains, without citing any cases, that "[a]n arrest of an individual without an investigation being performed and the failure to provide medication for and to an inmate of a correctional institution are obviously violations that cannot be protected by qualified immunity." *Id.* He describes these rights as "fully established recognizable rights." *Id.*

### c.    The § 1985 Civil Rights Conspiracy Claim

Mr. Daggett avers that his "[c]laims under section 1985 are viable against all parties." *Id.* He notes that contrary to the Defendants' objections, he has established sufficient evidence of a conspiracy and deprivation of a constitutionally protected right to survive summary judgment. *Id.* at 15. Without reference to Officer Poore,

Chief Towne, or the town of Berwick, Mr. Daggett contends that "Defendant Vitiello in concert with medical providers worked to put [Mr. Daggett] in a position where he would be accepted into the Jail without the proper medications – and in an amount that would last less than 24 hours." *Id.* Moreover, the medical staff neither provided the correct dose nor administered the medications on the correct schedule. *Id.* He concludes these injuries are sufficient evidence of a civil rights conspiracy. *Id.*

### d.   The MTCA Claim

Mr. Daggett waives his state law claims of civil conspiracy. *Id.* at 18.

### 3.   The Berwick Defendants' Reply

The Berwick Defendants begin their reply by noting that Mr. Daggett's statement of material facts includes factual assertions immaterial to the allegations against them. *Berwick Reply* at 1-2. They inform the Court that they have conceded these immaterial facts because "they do not have sufficient information to admit or deny them" but "understand[] that these admissions are only for purposes of the Berwick Defendants' summary judgment motion and that they do not affect the motions filed by the other defendants." *Id.* at 1-2 (citing D. ME. LOC. R. 56(g) and *Doe v. Solvay Pharms., Inc.*, 350 F. Supp. 2d 257, 274 n.11 (D. Me. 2004)).

Turning to the merits, the Berwick Defendants first reject Mr. Daggett's argument that his arrest occurred without probable cause. *Id.* at 2. They note Mr. Daggett's claim "rests on two arguments, one that totally ignores Maine law regarding enforcement of Protection Orders and another in which [Mr. Daggett] offers only his own opinion, devoid of any admissible evidence . . . or cited legal authority."

45

*Id.*   The Berwick Defendants recount the facts they believe gave Officer Poore probable cause to arrest Mr. Daggett, such as the 911 dispatcher's communication to Officer Poore about a complaint that Mr. Daggett was on the property going through the trash in violation of a protection order.   *Id.*   Other information included Officer Poore's observation of Mr. Daggett standing in the property's driveway "before watching him walk through the ditch in front of the residence on his way back to his vehicle." *Id.*   In addition, "Officer Poore saw that a large pile of belongings had been strewn about the ditch." *Id.*   Thus, the Berwick Defendants conclude that Officer Poore's "observations upon arrival were consistent with the information conveyed to him while on his way to the scene, and justified his conclusion that there was a probability, or a substantial chance, that [Mr. Daggett] had violated the Protection From Abuse Order." *Id.* at 3 (citing *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5 (1st Cir. 2004)).

The Berwick Defendants further argue that Mr. Daggett has not provided "any factual basis" for his "claim that no probable cause to arrest existed in this case." *Id.* According to them, Mr. Daggett's "claim that he never left public property" is based "entirely on an inadmissible statement by his counsel in her expert designation as to what anticipated expert testimony would be regarding the width of rights of way on certain roads in the Town of Berwick, without a showing that it even applied to Cranberry Meadow Road." *Id.*

Regarding qualified immunity, the Berwick Defendants argue Mr. Daggett's "Memorandum does nothing with regard to Officer Poore's claim for qualified

immunity other than restate black letter law regarding the qualified immunity test, then disregard that law by resorting to a generalized claim that 'the need for probable cause to exist before the effectuation of arrest is a clearly established principle in our constitutional jurisprudence.'"  *Id.* at 4 (quoting *Pl.'s Opp'n* at 9).  The Berwick Defendants disagree with Mr. Daggett's characterization, instead noting that "[q]ualified immunity rests not on abstract, generalized principles, but on the particular facts and circumstances of each case."  *Id.*  They conclude the Court should "find that Officer Poore is entitled to qualified immunity in this unique set of circumstances."  *Id.*

The Berwick Defendants similarly contend that summary judgment is warranted on Mr. Daggett's failure to protect claim.  *Id.*  They contend that, as a matter of law, Mr. Daggett "clearly fails to demonstrate that Officer Poore acted with deliberate indifference to [his] constitutional rights and engaged in 'conscience-shocking' behavior."  *Id.*  They characterize the threshold for conscience-shocking behavior as "extremely high," more "than merely violating state law."  *Id.*  The Berwick Defendants urge that Officer Poore's repeated trips to the hospital where Mr. Daggett was twice deemed fit for incarceration and given medication before being turned over to YCJ custody falls short of conscience-shocking behavior.  *Id.* at 5.  The Berwick Defendants reassert that qualified immunity also shields Officer Poore from liability because the First Circuit has never recognized the legitimacy of failure to protect claims and therefore "an affirmative duty to protect was not 'clearly

established law' at the time of [Mr. Daggett's] arrest in 2015. *Id.* (citing *Morgan*, 823 F.3d at 740).

As for the town of Berwick and Chief Towne, the Berwick Defendants contend that the record does not support liability. *Id.* They note that Mr. Daggett "conflates supervisory and municipal liability theories, as well as the Town of Berwick and York County, as if the same facts and legal arguments apply equally to all." *Id.* at 5-6. They then point to the fact that Mr. Daggett admitted that the town of Berwick had "training, policies, procedures, and supervision of Berwick police officers, such as Officer Poore, that are relevant to any supervisory or municipal liability theory." *Id.* at 6. Moreover, they contend that supervisory liability is lacking because of "the absence of an underlying constitutional violation by Officer Poore . . .." *Id.* Furthermore, the Berwick Defendants aver that no facts support a claim of supervisory liability against Chief Towne. *Id.*

Turning finally to Mr. Daggett's § 1985 conspiracy claim, the Berwick Defendants conclude that Mr. Daggett "must be deemed to have waived any objection to summary judgment" as to them. *Id.* at 7. This is because Mr. Daggett does "not provide evidence of any 'overt act in furtherance of the conspiracy' to which the Berwick Defendants were a party . . .." *Id.* Moreover, "he fails to mention them at all, or otherwise address [their] claim to summary judgment on the conspiracy count." *Id.*

**B.    Correct Care Solutions, LLC**

**1.    Correct Care Solutions, LLC's Motion for Summary Judgment**

CCS insists that it "is entitled to summary judgment on Counts IV and VIII of [Mr. Daggett's] Amended Complaint" for three reasons. *CCS Mot.* at 5. First, CCS argues that Mr. Daggett "cannot establish a constitutional claim for inadequate medical care." *Id.* Second, Mr. Daggett "has not designated an expert witness to testify regarding the cause of his alleged injuries, an essential element of his constitutional claim." *Id.* Third, "even assuming [Mr. Daggett] could establish an underlying constitutional violation, he cannot . . . establish[] municipal liability, as the record is devoid of evidence establishing: (A) a policy or custom, (B) deliberate indifference, or (C) causation." *Id.*

> a.  **Mr. Daggett Cannot Make a Prima Facie Case of Deliberate Indifference to His Serious Medical Needs**

On the first issue, CCS states that to prevail on a constitutional claim for inadequate medical care while incarcerated, a plaintiff "must assert 'acts or omissions sufficiently harmful to evidence deliberate indifference' to his serious medical needs." *Id.* at 6 (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). It claims "[s]ubstandard treatment amounting to mere negligence or malpractice does not constitute deliberate indifference." *Id.* (citing *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 498-99 (1st Cir. 2011)). Rather, inadequate medical care in a jailhouse setting is only actionable when (1) prison officials "possessed a sufficiently culpable state of mind" and (2) "the deprivation alleged was objectively, sufficiently serious." *Id.* at 6-7 (quoting *Leavitt*, 645 F.3d at 497). They claim that the legal measuring stick of objective adequacy is "prudent professional standards" rather than "care that is ideal,

49

or of the prisoner's choosing." *Id.* at 7 (citing *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 142 (1st Cir. 2014) and *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir 2014)).

CCS asserts that, as a matter of law, Mr. Daggett "cannot establish that the medical care he received during his . . . stint at YCJ was inadequate as measured against prudent professional standards." *Id.* at 7-8. CCS points out that Mr. Daggett has failed to designate an expert "to testify that the medical care he received fell below prudent professional standards." *Id.* at 8. What's more, CCS contends that its "medical staff acted reasonably by relying on the medication and instructions provided by [Doctors] Schmitz and Dolan." *Id.* Furthermore, CCS maintains that although Mr. Daggett "may disagree with the strength of the medication that was ordered [by] Dr. Schmitz after he consulted with Dr. Dolan, this disagreement cannot form the basis for a deliberate indifference claim . . .. Mere disagreements about the proper course of care do not create constitutional claims." *Id.* (citing *Kosilek*, 774 F.3d at 82). And, although Mr. Daggett "does not recall how many doses of Sinemet he received while detained nor how many times he was seen by CCS medical staff" CCS cites records for the proposition that Mr. Daggett was given Sinemet at approximately two-hour intervals during his stay at the YCJ. *Id.* at 8-9.

Regardless whether Mr. Daggett's care was objectively adequate, CCS further asserts that his claim cannot survive summary judgment because he cannot show CCS or its employees "intentionally provided [him] with the wrong dose of his Sinemet." *Id.* at 9. It contends that to the extent Mr. Daggett missed doses of Sinemet while in court or completing paperwork, those errors were "[a]t worst . . . negligent."

*Id.* On this point, CCS argues that Mr. Daggett's "inability to establish the subjective prong of the deliberate indifference standard is compounded by the fact that [Mr. Daggett] has not identified a specific CCS employee that he claims was deliberately indifferent to his medical needs." *Id.* at 10. Thus, CCS concludes it is "entitled to summary judgment on [Mr. Daggett's] claims under § 1983 and the MCRA." *Id.*

### b.   Mr. Daggett Lacks the Necessary Expert Testimony on Causation

CCS' second argument in favor of summary judgment is that Mr. Daggett "does not have the requisite expert testimony to establish his constitutional claim." *Id.* More specifically, CCS describes "the basis" for Mr. Daggett's claims as "that he did not receive the right medication at the right time." *Id.* at 11. As a result, Mr. Daggett "claims that this rendered him mostly catatonic, and that correctional officers pushed him onto a bed, causing him to hit his head on a wall. . .." *Id.* (internal citation omitted). Further, CCS notes Mr. Daggett "alleges that he suffered a concussion at YCJ that significantly advanced his Parkinson's disease, PTSD, a broken hip, a chipped tooth, anxiety, and depression." *Id.* For CCS, these allegations are not enough for Mr. Daggett to survive summary judgment because he "has not designated an expert witness to establish the causal link between the alleged medication errors and his claimed injuries, some of which occurred weeks after he was released from custody." *Id.*

CCS contends that "[w]here a plaintiff's claim involves the treatment of a sophisticated medical condition, expert testimony is generally required to establish causation." *Id.* (collecting cases). Here, CCS specifically argues that "[p]roof of

51

proximate cause of the injuries alleged by [Mr. Daggett] requires expert medical evidence attributing the injuries to the acts of which [he] complains. [Mr. Daggett] suffers from a complex medical condition that is treated with an unusual medication regimen." *Id.* at 13. Thus, because "[t]he etiology of [these] injuries . . . are not obvious to a layperson," an average juror would lack the knowledge needed to determine whether (1) "the dosage of Sinemet administered to [Mr. Daggett] caused or exacerbated [his] injuries," and (2) "whether missing one (or even multiple) doses of Sinemet would cause the future injuries claimed by [Mr. Daggett]." *Id.*

Summing up, CCS writes that without expert testimony on causation, any jury verdict would be "entirely speculative." *Id.* CCS points out that in addition to the factors already noted, "prior to his arrest at approximately 6:40 p.m., the last time [Mr. Daggett] had taken Sinemet was at approximately 2:00 p.m., meaning that he had already missed at least two doses by the time he was taken into custody." *Id.* Thus, CCS contends summary judgment is proper on Counts IV and VIII because Mr. Daggett has proffered insufficient evidence of causation. *Id.*

### c.    Mr. Daggett Cannot Establish Municipal Liability

CCS' final argument for summary judgment is that Mr. Daggett "cannot establish municipal liability." *Id.* at 14. CCS relies on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for the proposition that "a municipal entity is liable under § 1983 only if an official municipal policy caused a plaintiff to be deprived of a federal right." *Id.* (citing *Monell*, 436 U.S. at 694). According to CCS, municipal liability cannot be predicated on the tort doctrine of respondeat superior, rather municipal "liability only

can attach when the execution of a custom or policy inflicts the injury." *Id.* (citing *L.A. Cty. v. Humphries*, 562 U.S. 29, 35 (2010)).  CCS next notes that if the policy or custom is not itself unconstitutional, a plaintiff "must do far more" to prevail against a municipality.  *Id.* at 15.  The plaintiff must then "show that the policy or custom evidences a deliberate indifference to his constitutional rights."  *Id.*

As applied to Mr. Daggett, CCS first notes that he has presented "no evidence of a policy or custom."  *Id.*  In support, CCS cites Mr. Daggett's November 15, 2019 deposition where he stated that he "was not aware of any policy or custom that caused him harm" and "that his only allegation against CCS was that its employees failed to provide his medication at the appropriate time and in the right dosage."  *Id.* at 15-16.  Thus, CCS concludes that it is entitled to summary judgment on Mr. Daggett's constitutional claim.  *Id.* at 16.

CCS also notes that "there is no evidence of deliberate indifference."  *Id.*  It observes that "there is no evidence of CCS employees at YCJ failing to properly medicate other inmates" and "during the pendency of this case, [Mr. Daggett] has not deposed a single CCS employee, much less a CCS employee with policymaking authority."  *Id.* at 17.  CCS employs the same argument against Mr. Daggett's failure to train claim, noting that Mr. Daggett "testified that he does not have any information about the training that CCS provides to its medical personnel."  *Id.* at 18.  Moreover, CCS asserts that there is no evidence in the record to suggest that a policy or custom of CCS caused any of his injuries.  *Id.* at 19.

### d.    The Civil Conspiracy Claim is Not Viable

Finally, CCS argues that it "is entitled to summary judgment on [Mr. Daggett's] civil conspiracy claims." *Id.* As the Berwick Defendants did, CCS notes that civil conspiracy to commit torts is not actionable in Maine without the perpetration of an underlying tort. *Id.* It also asserts that Mr. Daggett has not presented "any evidence suggesting that an agreement existed among the Defendants to deprive [him] of his civil rights." *Id.* at 20. Thus, CCS concludes it "is entitled to summary judgment on Count I of [the] Amended Complaint." *Id.* Because Mr. Daggett conceded this claim, the Court need not further describe CCS' position on the matter. *Pl.'s Opp'n* at 18.

### 2.   Thomas Daggett's Opposition

#### a.   The § 1985 Civil Rights Conspiracy and Civil Conspiracy to Commit Torts Claims

Mr. Daggett claims that summary judgment on his § 1985 civil rights conspiracy is improper. *Pl.'s Opp'n* at 15. As with the Berwick Defendants, he notes that "Defendant Vitiello in concert with medical providers worked to put [Mr. Daggett] in a position where he would be accepted into the Jail without the proper medications – and in an amount that would last less than 24 hours." *Id.* Moreover, "[t]he medical staff at the Jail did not provide the correct dosage of medication to [Mr. Daggett] nor was it provided on the correct schedule . . .." *Id.* Mr. Daggett concedes summary judgment is proper on his state conspiracy to commit torts claims. *Id.* at 18.

#### b.   Mr. Daggett's Claims for Deliberate Indifference to his Serious Medical Needs are Viable

Mr. Daggett also contends that "CCS is not entitled to Summary Judgment on Counts IV and VIII." *Id.* at 15. He states that "[t]he conditions of confinement for a pretrial detainee are judged pursuant to the 14th Amendment to the United States constitution through a due process analysis." *Id.* at 15-16. He notes that "the relevant question . . . is whether the conditions of confinement amount to an unjust punishment of the detainee." *Id.* at 16. Mr. Daggett puts forth that the Eighth Amendment's "deliberate indifference standard" governs the constitutional sufficiency of a prisoner's medical care. *Id.*

According to Mr. Daggett, determining whether medical care is constitutionally sufficient "is a two pronged analysis requiring both a subjective and an objective showing." *Id.* He believes that the objective prong "requires a showing of serious medical need" such that even a layperson would easily see the need for medical attention. *Id.* He claims that "[a] significant risk of future harm" also suffices. *Id.* Regarding the subjective prong, Mr. Daggett suggests that it "requires a showing of intentional conduct or wanton disregard to the medical needs of the inmate." *Id.*

Mr. Daggett puts forth that his Parkinson's Disease "would qualify as a serious medical need" because "[m]edical staff at the Jail [were] told by Dr. Schmitz that maintaining Mr. Daggett's medication regimen was extremely important and that failure to do so would cause Mr. Daggett to become immobile." *Id.* at 16-17. Mr. Daggett claims that he also meets the subjective prong. *Id.* at 17. He points out that "Ms. Howarth has provided testimony that at the time she spoke to the charge

55

nurse the Jail had yet to give Mr. Daggett any medication and based on their description of his behavior – unresponsive; unable to walk into the Jail on his own; unable to hold a pen and sign his name; needing to be wheeled around in a chair – an inference can be drawn in Mr. Daggett's favor . . . that the medication was intentionally not administered as required." *Id.*

### c.   Mr. Daggett Provided the Necessary Expert Testimony on Causation

Finally, regarding causation, Mr. Daggett urges that he "does not need expert testimony and whatever testimony is in the record is sufficient for Summary Judgment purposes." *Id.* He notes that he "designated treating professionals who are able to testify regarding [his] conditions; symptoms; onset of symptoms; and what occurs [if Mr. Daggett] does not take his medications." *Id.* Moreover, he points to "record testimony from Dr. Schmitz regarding what occurs to a Parkinson's patient if their medication is discontinued." *Id.*

### 3.   Correct Care Solutions, LLC's Reply

CCS makes three broad points in its eight-page reply. *CCS Reply* at 1-8. First, it claims that Mr. Daggett cannot satisfy any of the three elements required to establish municipal liability under § 1983. *Id.* at 1. On this point, CCS notes that Mr. Daggett "admits that he is not aware of a CCS policy, practice, or custom that caused him harm" and "likewise admits that he is not claiming that a CCS policy, practice, or custom caused him harm in this case." *Id.* Moreover, he "has not offered any argument or evidence to establish deliberate indifference by CCS itself" nor has he "offered any argument or evidence to establish the necessary strong causal link

between his alleged constitutional violation and a hypothetical CCS policy, practice, or custom." *Id.*

CCS points out that Mr. Daggett "does not even attempt to raise a municipal liability [claim] against CCS in his Opposition." *Id.* at 2. Instead, CCS notes that Mr. Daggett "only argues that he can establish an underlying constitutional claim against CCS medical staff and that he does not need expert testimony to do so." *Id.* CCS states that this is incorrect because under § 1983, CCS cannot be held liable under respondeat superior. *Id.*

CCS' second point is that Mr. Daggett "cannot establish his underlying constitutional claim." *Id.* In support, CCS recounts the course of treatment that Mr. Daggett received at YCJ, noting that "[t]he material facts are undisputed." *Id.* at 2-3. CCS notes "Dr. Schmitz provided 10 Sinemet 25/100 pills, and there were only two Sinemet pills leftover following [Mr. Daggett's] discharge." *Id.* Thus, "eight Sinemet 25/100 pills were administered to [Mr. Daggett] while he was incarcerated at YCJ during his roughly 16-hour detention, which is consistent with a pill every two hours." *Id.* CCS states that contending "these facts support an 'inference' that [Mr. Daggett's] 'medication was intentionally not administered as required' is baseless, particularly given the fact that medical staff initially refused to accept [him] because they did not have enough medication." *Id.* (quoting *Pl.'s Opp'n* at 17). CCS also points to the lack of expert testimony regarding causation, noting that "[w]ithout expert testimony, a jury would need to resort to rank speculation to conclude that the injuries [Mr. Daggett] claims he suffered when he was brought to an intake cell after

he was admitted to YCJ had anything to do with CCS medical staff allegedly not administering him Sinemet at 11:00 p.m., especially given the undisputed fact that he received Sinemet at approximately 10:23 p.m." *Id.* at 4. CCS raises the same causation argument about the injuries Mr. Daggett allegedly suffered two weeks after his incarceration. *Id.*

CCS' third point is that Mr. Daggett has no viable claim for a civil rights conspiracy under § 1985. *Id.* at 6. First, CCS argues that Mr. Daggett's argument that he has made a prima facie showing of a conspiracy "turns the factual record on its head" and "is unfounded." *Id.* Second, CCS notes that Mr. Daggett "never attempts to argue how the purpose of this purported conspiracy was to deprive him of equal protection of laws." *Id.* Moreover, he lacks an evidence of "discriminatory animus." *Id.* at 7. In addition, CCS states Mr. Daggett "cannot skirt the stringent restrictions on municipal liability under § 1983 by attempting to frame his claim against CCS as a conspiracy under § 1985." *Id.* CCS declares that both are subject to the same requirement of an "official policy or custom" that causes injury to the plaintiff, but that Mr. Daggett "has admitted there is no CCS policy or custom that caused him any harm in this case, and he has not argued otherwise." *Id.*

### C. The York Defendants

#### 1. The York Defendants' Motion for Summary Judgment

The York Defendants begin by identifying Mr. Daggett's claims against them, which include a violation of 42 U.S.C. § 1985 in Count I of the Amended Complaint, a violation of 42 U.S.C. § 1983 by Sheriff William King in Count VI, a violation of

§ 1983 by York County in Count VII, a violation of the Maine Civil Rights Act in Count VIII, and civil conspiracy in Count IX. *York Mot.* at 2. They point out that "[a]lthough the Amended Complaint refers to 'John Does' who are purportedly employees of the Jail, Mr. Daggett has never identified these individuals or joined them as parties." *Id.*

> a. **Mr. Daggett Has No Viable § 1983 Claims Against the York Defendants**

The gist of the York Defendants motion for summary judgment is that "[b]ased on the factual record . . . none of [Mr. Daggett's] claims are legally viable" and, to the extent that they are "Sheriff King and Superintendent Vitiello are protected from liability . . . by qualified immunity and all of the County Defendants are protected by immunity with regard to the civil conspiracy claim." *Id.* at 3. Beginning with the civil rights claims, the York Defendants note that although Mr. Daggett's Amended Complaint "invokes the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution," he does not assert "viable First, Fourth or Fifth Amendment claims against the County Defendants." *Id.* at 4. This is because the Amended Complaint does not identify a First Amendment violation, Mr. Daggett has conceded his Fourth Amendment claim applies only to the Berwick Defendants, and the Fifth Amendment applies only to the federal government. *Id.*

Regarding the Fourteenth Amendment, the York Defendants urge that negligent infliction of harm is insufficient to support liability—rather a pretrial detainee "must show: one, that the force was purposefully or knowingly used against him or her; and two, that the force was objectively unreasonable based on the

particular facts and circumstances and in light of the prison's legitimate security interests." *Id.* at 4-5.   Although the York Defendants concede that "[t]he requirements for a claim of inadequate medical care under the Fourteenth Amendment" are not doctrinally clear, they contend that the standard is, at minimum, coextensive with a prisoner's Eighth Amendment rights. *Id.* at 5.  They then assert that to prevail on an Eighth Amendment claim for inadequate medical care, a prisoner must show "deliberate indifference to a prisoner's serious medical needs." *Id.* (internal quotation marks omitted).

### i.   Sheriff King

The York Defendants argue that this standard is not met as applied to Sheriff King.  First, they contend that Mr. Daggett has not met his burden to show "any basis for civil rights claims against Sheriff King." *Id.*  They note that Sheriff King was not present for, or otherwise involved in, "any of the events alleged in the Amended Complaint." *Id.*  They contend that a claim based on supervisory liability is similarly unsupported by the record. *Id.*  On this latter point, the York Defendants observe that "there is no evidence of any constitutional violation by any member of the Jail staff." *Id.* at 7.  They claim that "Mr. Daggett alleges that he hit his head on the wall after the officers lowered him onto a bunk" but that "[a]t best, his testimony suggests that the officers did not correctly assess whether Mr. Daggett would be able to sit upright on the bunk once they released him." *Id.*  They further contend that this does "not constitute objectively unreasonable conduct as a matter of law." *Id.*

As for the medical care Mr. Daggett received in prison, the York Defendants remind the Court of the care Mr. Daggett received, noting that it shows Mr. Daggett had "ample access to medical care in the Jail" which "precludes any liability of the Jail officers under the Fourteenth Amendment." *Id.* The York Defendants further assert that even if Mr. Daggett had shown a constitutional violation by YCJ staff, "there is no evidence of action or inaction on Sheriff King's part that was affirmatively linked to that behavior, in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." *Id.* at 8. Thus, the York Defendants conclude that absent a constitutional violation and evidence causally linking Sheriff King to such violation, "Sheriff King is entitled to summary judgment with regard to Counts VI and VIII." *Id.*

### ii.   Michael Vitiello

The York Defendants contend the "Amended Complaint does not assert a federal civil rights claim against Mr. Vitiello and, in any event, the record would not support such a claim as a matter of law." *Id.* Nevertheless, they state that "the same arguments presented above in support of summary judgment for Sheriff King would apply to any federal civil rights claims against Superintendent Vitiello. There is no record evidence to suggest that Superintendent Vitiello was involved in any of the events that Mr. Daggett alleges as the basis of his claims." *Id.* at 9. They further declare that there is "no evidence that Superintendent Vitiello was on notice of any of the issues alleged in the Amended Complaint" and "no evidence of a causal link

between action or inaction on the part of Superintendent Vitiello and the alleged constitutional violations." *Id.* Thus, the York Defendants contend Superintendent Vitiello is entitled to summary judgment. *Id.*

### iii.    Qualified Immunity

As an alternative ground for summary judgment, the York Defendants argue that "Sheriff King and Superintendent Vitiello are protected by qualified immunity." *Id.* After restating the legal standard for qualified immunity they argue that even "[a]ssuming, for the purposes of argument, that Mr. Daggett could demonstrate that his claims implicate clearly-established constitutional rights, he cannot demonstrate that a supervisor would be liable for constitutional violations committed by Sheriff King and Superintendent Vitiello's subordinates in that context." *Id.* at 10-11. Thus, they conclude that, because supervisory liability does not apply, "Mr. Daggett cannot establish the existence of a clearly established right . . ." and Sheriff King and Superintendent Vitiello "are both protected by qualified immunity." *Id.*

### iv.    York County

The York Defendants maintain that "the County cannot be held liable under Section 1983" because Mr. Daggett cannot trace his constitutional claim to a county policy or custom. *Id.* at 11-12. They note that York County has policies in place regarding "the use of control," and "to afford inmates and detainees at the Jail reasonable access to non-emergency . . . medical services." *Id.* at 11-12. It is also county policy "for employees working at the Jail to defer to the medical provider –

which was, in May of 2015, CCS – with regard to decisions pertaining to health care diagnosis and treatment of inmates." *Id.* at 12.

Here, the York Defendants point out that "Mr. Daggett has not identified any custom or policy of York County that would contradict these established policies. Moreover, he has not identified how any York County custom or policy was the moving force behind the alleged violations of his constitutional rights." *Id.* They further observe that Mr. Daggett conceded that he knew of no county policy or custom that caused his alleged constitutional injuries. *Id.* Thus, they claim "the County is entitled to summary judgment on Count VII." *Id.*

### b.     The § 1985 Civil Rights Conspiracy Claim

The York Defendants assert that Mr. Daggett has not provided sufficient evidence to "support the existence of several required elements of a conspiracy claim pursuant to 42 U.S.C. § 1985." *Id.* They claim that there is no evidence in the record to show "the existence of a conspiracy against Mr. Daggett; a conspiratorial purpose to deprive Mr. Daggett of the equal protection of the laws or of equal privileges and immunities under the laws; or an overt act in furtherance of the conspiracy." *Id.* at 13.

### c.     Civil Conspiracy Under Maine Law

The County Defendants raise similar contentions in favor of summary judgment on Mr. Daggett's civil conspiracy claim. *Id.* at 13-16. As previously stated, Mr. Daggett waived this claim, so the Court need not summarize the York Defendants' arguments for summary judgment.

### d.      Punitive Damages

As a final point, the County Defendants argue that "punitive damages are not recoverable against the County under state tort law or under Section 1983 . . .. Therefore, the Court should enter summary judgment in favor of York County with regard to punitive damages." *Id*. at 17.  They further urge that this ground for summary judgment extends to Sheriff King and Superintendent Vitiello as well, because they lacked the requisite "evil motive or intent" and did not "act with reckless or callous indifference to Mr. Daggett's federally-protected rights." *Id*.

### 2.      Thomas Daggett's Opposition

### a.      There Was an Underlying Constitutional Violation

Mr. Daggett first asserts that the York Defendants are not entitled to be summary judgment because "[t]here was an underlying constitutional violation," specifically "the failure to protect Mr. Daggett and provide him appropriate medical care and treatment by . . . the York County Jail . . .." *Pl.'s Opp'n* at 11.  He then contends that "Sheriff King [] and Lt. Colonel Vitiello are not entitled to [q]ualified [i]mmunity" stating that "the failure to provide medication for and to an inmate of a correctional institution are obviously violations that cannot be protected by qualified immunity." *Id*. at 14.  He asserts that Superintendent Vitiello violated YCJ policy when he "instructed that Mr. Daggett be admitted into the jail if medication could be provided by the hospital in contrast to the judgment of the medical personnel." *Id*. Further, he declares that "the failure of the Jail to supervise the medical provider

and ensure that they were actually administering the medications ordered meets the deliberate indifference standard needed to deny summary judgment." *Id.*

### b.    The § 1985 Conspiracy is Viable

Next, as with the other Defendants, Mr. Daggett puts forth that his § 1985 claim for a civil rights conspiracy is "viable" because "Defendant Vitiello in concert with medical providers worked to put [Mr. Daggett] in a position where he would be accepted into the Jail without the proper medications . . .." *Id.* at 14-15.  However, Mr. Daggett "concedes his state law claims of civil conspiracy . . .." *Id.* at 18.

### c.    The York Defendants Were Deliberately Indifferent to Mr. Daggett's Serious Medical Needs

Elaborating on the constitutional standards for providing medical care to incarcerated individuals, Mr. Daggett suggests that the inquiry is two-pronged and requires a showing of (1) "a serious medical need" and (2) "a showing of intentional conduct or wanton disregard to the medical needs of the inmate." *Id.* at 16.  He claims that Parkinson's Disease qualifies as a "serious medical need" and that, at this stage, the fact that Mr. Daggett experienced symptoms consistent with the withholding of his Sinemet by jail staff permits "an inference . . . that the medication was intentionally not administered as required." *Id.* at 17.

### 3.    The York Defendants' Reply

The York Defendants pursue two arguments in their reply.  *York Reply* at 1-7. First, they contend that Mr. Daggett "has not demonstrated any viable claims under Section 1983." *Id.* at 1.  Second, they assert that "[s]everal required elements of a conspiracy claim pursuant to Section 1985 do not exist in this case." *Id.* at 5.

Regarding section 1983, the York Defendants claim "Mr. Daggett . . . has not presented any developed argument in support of his bald assertion that York County violated his constitutional rights." *Id.* at 1.  They claim that "[b]y failing to develop even a semblance of an argument, Mr. Daggett has waived any objection to summary judgment for the County." *Id.*  More specifically, the York Defendants put forth that Mr. Daggett has not provided evidence that a policy, custom, practice, or failure to train caused his constitutional injury, and has instead conceded that he knows of no such policy, practice, custom, or deficient training. *Id.* at 2.

As applied to Sheriff King and Superintendent Vitiello, the York Defendants raise similar arguments, noting that Mr. Daggett's opposition references Sheriff King sparingly and "does not discuss Sheriff King's *involvement* in the alleged events, let alone analyze his liability for alleged constitutional violations." *Id.*  Moreover, the York Defendants contend that Mr. Daggett's references to Superintendent Vitiello are "not tied to any developed argument" and therefore Mr. Daggett has waived any objection to summary judgment. *Id.* at 2-3.  Despite this, the York Defendants persist in their argument that "the limited references to Sheriff King and Superintendent Vitiello do not support a basis for liability." *Id.* at 3.  They note that Mr. Daggett has not shown Sheriff King was present or involved in Mr. Daggett's confinement and medical treatment "and had no notice of the events alleged by Mr. Daggett." *Id.*  Thus, they conclude that without evidence of supervision, Sheriff King cannot be liable. *Id.*

The same argument extends to Superintendent Vitiello, who "was not present for any of the incidents . . ., had no contact with Mr. Daggett, and had no personal knowledge of any alleged use of force or control involving Mr. Daggett." *Id.* at 4. Moreover, to the extent that Superintendent Vitiello was involved with the decision to admit Mr. Daggett to the YCJ, the York Defendants contend his "role was limited to ensuring that the Jail's medical provider would be able to provide . . . proper medical care" not that "he involved himself in the administration of that medical care" or "was involved in Mr. Daggett's access to medical care while at the Jail." *Id.* The York Defendants further assert that Mr. Daggett's objection to their claim of qualified immunity is underdeveloped and therefore, waived. *Id.* at 5.

As for the civil rights conspiracy claim under § 1985, the York Defendants aver that several elements of the claim are unsupported by the evidentiary record. *Id.* Namely, Mr. Daggett has not "identif[ied] a conspiratorial purpose to deprive him or a class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." *Id.* Moreover, he similarly fails to allege discrimination on the basis of race or other factors. *Id.* at 5-6. Due to these defects, the York Defendants assert that Mr. Daggett's "failure to address these required elements constitutes a waiver of any objection he may have had." *Id.* at 6. Even so, the York Defendants conclude that the facts "reflect the exact opposite" of a civil rights conspiracy instigated by Defendant Vitiello because "Mr. Daggett's entry into the Jail was not permitted until he obtained the necessary medication from the hospital. The hospital supplied medication and Mr. Daggett was admitted to the Jail. From that

67

point, it is undisputed that Mr. Daggett received medical attention, including the administration of medication." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

After the moving party "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, the Court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation."

*Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

Mr. Daggett's Amended Complaint contains twelve counts: (1) violation of 42 U.S.C. § 1985 against all defendants; (2) Fourth, Fifth, Eighth, and Fourteenth Amendment claims under 42 U.S.C. § 1983 against "John Doe 3," an employee of York County; (3) Fourth, Fifth, Eighth, and Fourteenth Amendment claims under 42 U.S.C. § 1983 against "John Doe 1" and "John Doe 2," corrections officers at the YCJ; (4) Fourth, Fifth, Eighth, and Fourteenth Amendment Claims against CCS under 42 U.S.C. § 1983; (5) Fourth, Fifth, Eighth, and Fourteenth Amendment claims under § 1983 against "Jane Doe 1" and "Jane Doe 2," two purported CCS employees; (6) violation of § 1983 against Sheriff King; (7) violation of § 1983 against York County; (8) violation of the Maine Civil Rights Act (MCRA), 5 M.R.S. § 4682, against all Defendants; (9) civil conspiracy to commit torts against all defendants; (10) a claim for false arrest, purportedly under 42 U.S.C. § 1983, against Officer Poore; (11) a § 1983 claim for failure to protect against Officer Poore; and (12) a § 1983 claim against the town of Berwick and Chief Towne. *Am. Compl.* ¶¶ 93-161.

At the outset, the Court must address four threshold matters. First, Mr. Daggett conceded his state law civil conspiracy claims against all Defendants. *Pl.'s Opp'n* at 18. Due to his concession, summary judgment is warranted on Count IX and the Court will not address the merits further. Relatedly, Mr. Daggett conceded that his only Fourth Amendment claim arises against the Berwick Defendants. YDSMF ¶ 36; PRYDSMF ¶ 36. Based on his further concession, the Court grants summary judgment on all Fourth Amendment claims against other Defendants.

Second, some of Mr. Daggett's claims are barred outright. To the extent Mr. Daggett has asserted Fifth Amendment due process claims, the Defendants are entitled to summary judgment on those claims. "The Fifth Amendment Due Process Clause . . . applies 'only to actions of the federal government – not to those of state or local governments.'" *Martínez-Rivera v. Sánchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001)); *Collins v. Univ. of N.H*, 664 F.3d 8, 12 n.1 (1st Cir. 2011). Mr. Daggett has never alleged that any of the Defendants are federal actors, and therefore the Fifth Amendment's Due Process Clause does not apply to their actions.[41]   Accordingly, the Court grants summary judgment in favor of the Defendants on Mr. Daggett's Fifth Amendment claims.

---

[41]      Of course, "[o]ther provisions of the Fifth Amendment, such as the prohibitions against self-incrimination and double jeopardy, are applicable to the states through the Fourteenth Amendment." *Martínez-Rivera*, 498 F.3d at 8 n.6 (citing *Duncan v. Louisiana*, 391 U.S. 145, 148 (1968) (self-incrimination); *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (double jeopardy)). However, Mr. Daggett never alleges the Defendants violated his rights to be free from compelled self-incrimination or double jeopardy.

Third, "[t]he disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA." *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (citing *Dimmitt v. Ockenfels*, 220 F.R.D. 116, 123 (D. Me. 2004)). Therefore, the Court's rulings on Mr. Daggett's § 1983 claims apply to his MCRA claims. To avoid redundancy, the Court only addresses Mr. Daggett's § 1983 claims, bearing in mind that the analysis applies to multiple counts.

Fourth, some brief background on 42 U.S.C. § 1983 is warranted. "Section 1983 creates a 'species of tort liability,' for 'the deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Manuel v. City of Joliet*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) and 42 U.S.C. § 1983) (internal citations omitted). Deprivations of federal statutory rights are also actionable under § 1983. *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (reasoning the phrase "and laws," as used in § 1983, encompassed all deprivations of federally conferred rights); *but see Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (rejecting "the notion that [caselaw] permit[s] anything short of an unambiguously conferred right to support a cause of action brought under § 1983"). As the Supreme Court has "said many times, § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal citation and quotation marks omitted). "Mere violations of state law do not, of course, create constitutional claims." *Roy v. City of Augusta*, 712 F.2d 1517, 1522 (1st Cir. 1983).

"[T]he threshold inquiry in a § 1983 suit . . . requires courts to identify the specific constitutional right at issue." *Manuel*, 137 S. Ct. at 920 (internal citation and quotation marks omitted). Once a court has "pinpoint[ed] that right, courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Id.* (citing *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978)). Frequently, state actors invoke qualified immunity as a defense to liability in § 1983 cases. "Government officials sued in their individual capacities are immune from damages claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) (internal quotation marks omitted).

"The test to determine whether a right is clearly established asks whether the precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply' and whether '[t]he rule's contours [were] so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 590) (alteration in *Irish*). This requires either "controlling authority," such as a vertical precedent from either the Supreme Court or the First Circuit, or a consensus of "sister circuit law" that "would provide notice to every reasonable officer that his conduct was unlawful." *Id.* It is not necessary "that cases involve[e] materially similar facts" for a court to conclude the law was clearly established. *Id.* With this background in mind, the Court turns to the merits.

### A.      Count One: Violation of 42 U.S.C. § 1985

Count I of the Amended Complaint asserts a civil rights conspiracy against all Defendants under 42 U.S.C. § 1985.  "Section 1985 permits suits against those who conspire to deprive others 'of the equal protection of the laws, or of the equal privileges and immunities under the law . . ..'" *Soto-Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 4 (1st Cir. 2012) (quoting 42 U.S.C. § 1985(3)).  A § 1985 claim has four elements: "(1) 'a conspiracy,' (2) 'a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws,' (3) 'an overt act in furtherance of the conspiracy,' and, lastly, (4) either (a) an 'injury to person or property' or (b) 'a deprivation of a constitutionally protected right.'" *Id.* (quoting *Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008)).  The second prong "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

In response to the Defendants' motions for summary judgment, Mr. Daggett proffered two paragraphs contending that "Defendant Vitiello in concert with medical providers worked to put [Mr. Daggett] in a position where he would be accepted into the Jail without the proper medications – and in an amount that would last less than 24 hours." *Pl.'s Opp'n* at 15.  He adds that "[t]he medical staff at the Jail did not provide the correct dosage of medication to [Mr. Daggett] nor was it provided on the correct schedule and it appears from the records of the medications remaining upon . . . discharge that the chart of medications delivered to Mr. Daggett do not square with the pills left." *Id.*

Construing the evidence in the light most favorable to Mr. Daggett and drawing all reasonable inferences in his favor, the Defendants are entitled to summary judgment on the § 1985 claim. Mr. Daggett's civil rights conspiracy claim cannot survive summary judgment for several reasons. First, he has not made a prima facie showing of a conspiracy—an agreement—among the Defendants. *See Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019) ("[A] plaintiff seeking to allege such a conspiracy must plausibly allege facts indicating an agreement among the conspirators to deprive the plaintiff of her civil rights"). When a plaintiff lacks "direct evidence of such an agreement . . . the plaintiff must plead plausible factual allegations sufficient to support a reasonable inference that such an agreement was made." *Id.* Thus, although "'conspiracy is a matter of inference,' summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations." *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (affirming summary judgment for defendants on a § 1983 conspiracy claim)[42]; *see also Johnson v. City of Biddeford*, 454 F. Supp. 3d 75, 92-93 (D. Me. 2020) (granting summary judgment to defendants on a § 1985 conspiracy claim after finding "allegations of a conspiracy . . . no more than conclusory" because "[p]laintiffs ha[d] not pointed to any statements demonstrating an agreement . . . giving rise to a conspiracy").

---

[42]    *Estate of Bennett* considered the elements of a § 1983 conspiracy claim, but the analysis is similar, in part, to a § 1985 conspiracy claim. *See Parker*, 935 F.3d at 17-18 (relying on *Estate of Bennett*, 548 F.3d at 178 to explain that a plaintiff alleging a civil rights conspiracy must support his claims with evidence sufficient to permit a reasonable trier of fact to infer there was an agreement to deprive the plaintiff of his rights).

Mr. Daggett's allegations of conspiracy are conclusory. The record is devoid of any evidence that, even when construed in the light most favorable to Mr. Daggett and drawing all inferences in his favor, could plausibly suggest the Defendants agreed to violate his constitutional rights. The gist of his opposition to summary judgment is that he suffered injuries to his constitutional rights and therefore, a conspiracy must have occurred. But the law requires more than this. While Mr. Daggett alleged multiple actors contributed to his injuries, he failed to make even a passing evidentiary showing of an agreement among those actors. Absent such an agreement, his conspiracy claim is not viable.

Mr. Daggett's conspiracy claim is defective in other ways. On the issue of intent, Mr. Daggett has similarly made no factual showing that the Defendants acted with "racial, or perhaps otherwise class-based, invidiously discriminatory animus. . .." *Parker*, 935 F.3d at 18 (quoting *Griffin*, 403 U.S. at 102). Furthermore, he failed to pinpoint an overt act in furtherance of the conspiracy. Although Mr. Daggett suggests the provision of inadequate medical care was the overt act, the Court finds this bare assertion insufficient because Mr. Daggett's description of Superintendent Vitiello's conduct belies the facts. Rather than work in concert with other actors to admit Mr. Daggett to the YCJ without the proper medications, the record shows that Superintendent Vitiello instructed YCJ staff to accept Mr. Daggett only after he obtained the necessary medications. If Superintendent Vitiello actually intended to deprive Mr. Daggett of adequate medical care, it would be peculiar to require Mr. Daggett to return to the hospital and obtain prescription medication for

Parkinson's Disease.  Similarly, Mr. Daggett puts forth no evidence that YCJ staff, CCS, or CCS staff intentionally provided Mr. Daggett with a dose of Sinemet other than the doses Dr. Schmitz ordered.

The conspiracy claim cannot proceed.  The underlying facts are undisputed, and Mr. Daggett lacks any evidence of an agreement, a conspiratorial purpose to deprive him of his civil rights, and an overt act in furtherance of the conspiracy. While he alleges physical and constitutional injuries, that is merely one of four elements he must show.  Thus, Mr. Daggett failed to make a prima facie showing of a civil rights conspiracy in violation of 42 U.S.C. § 1985 and the Court grants summary judgment in favor of the Defendants on Count I.

### B.    Counts Two and Three: Constitutional Claims Against the York County John Doe Employees

Counts II and III of Mr. Daggett's Amended Complaint state constitutional claims against John Does 1, 2, and 3 under § 1983 and alleges that these individuals are employees of York County.  *Am. Compl.* ¶¶ 7-12, 97-108.

In *Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 1998), the First Circuit explained that "[u]nder FED. R. CIV. P. 4(m), a district court may dismiss a complaint without prejudice as to a particular defendant if the plaintiff fails to serve that defendant within 120 days after filing the complaint."  *Id.* at 83.  "Moreover, a district court otherwise prepared to act on dispositive motions is not obligated to 'wait indefinitely for [the plaintiff] to take steps to identify and serve . . . unknown defendants.'"  *Id.* (quoting *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980)) (alteration in original). Accordingly, the *Figueroa* Court affirmed a district court's dismissal of a plaintiff's

constitutional claim for deliberately indifferent medical care against unnamed defendants. *Id.* The First Circuit reasoned that the passage of seventeen months between when the plaintiff filed his complaint and when the district court entered judgment was "more than an ample interlude" for the plaintiff to identify the unnamed defendants and serve process. *Id.* Accordingly, the First Circuit affirmed the dismissal of claims against the unnamed defendants. *Id.*

Counts II and III merit similar treatment as in *Figueroa.* Mr. Daggett's claims against the John Does have been pending since August 8, 2018. *Compl.* Discovery closed on November 15, 2019. *Order on Discovery Issues and Am. Scheduling Order* (ECF No. 39). Since then, Mr. Daggett has not amended his Amended Complaint to identify the John Doe employees. All told, nearly two and a half years have passed since Mr. Daggett first brought these claims and it has been over a year since discovery closed. As in *Figueroa*, the Court concludes Mr. Daggett has had "more than an ample interlude" to name these defendants. Moreover, Mr. Daggett's opposition brief to the Defendants' motions for summary judgment identified only Officer Poore, the York County Jail, and CCS as the perpetrators of the "underlying violations of Mr. Daggett's constitutional rights – the wrongful arrest by Officer Poore; the failure to protect Mr. Daggett and provide him appropriate medical care and treatment by Officer Poore; the York County Jail and CCS." *Pl.'s Opp'n* at 11.

In light of the above, the Court concludes Mr. Daggett's claims against the John Doe Defendants are withdrawn, or alternatively, insufficiently developed to continue. In either case, the Court need not pass further judgment on those claims and

77

therefore dismisses the Amended Complaint without prejudice as to the John Doe Defendants. *See, e.g., Johnson*, 454 F. Supp. 3d at 81 n.2 (dismissing undeveloped claims against unnamed defendants on a motion for summary judgment); *Gonzalez v. Dooling*, 98 F. Supp. 3d 135, 141 n.9 (D. Mass. 2015) (same); *Covillion v. Alsop*, 145 F. Supp. 2d 75, 77 n.1 (D. Me. 2001) (same).

### C.   Counts Four and Five: Constitutional Claims Against CCS and the Two Jane Doe Employees

#### 1.   Count Four: Constitutional Claim Against CCS

Count IV alleges CCS violated Mr. Daggett's constitutional rights to adequate medical care by being deliberately indifferent to his medical needs. *Am. Compl.* ¶¶ 109-16. Because Mr. Daggett was a pretrial detainee, his claim arises under the Fourteenth Amendment to the United States Constitution. *Leavitt v. Corr. Med. Servs. Inc.*, 645 F.3d 484, 497 n.21 (1st Cir. 2011). However, the Fourteenth Amendment standard applicable to pre-trial detainees is the same as the Eighth Amendment standard that protects prisoners after conviction. *Id.* The adequacy of medical care is "measured against 'prudent professional standards.'" *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 142 (1st Cir. 2014).

#### a.   Legal Standard: Inadequate Medical Treatment

"It is well established that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment . . . and is actionable under 42 U.S.C. § 1983." *Abernathy v. Anderson*, 984 F.3d 1, 6 (1st Cir. 2020) (per curiam) (quotation marks omitted) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference

claim, "a plaintiff must satisfy a two-prong standard." *Id.* The first prong requires that a plaintiff "show, as an objective matter, that he has a 'serious medical need[]' that received inadequate care." *Id.* (quoting *Leavitt*, 645 F.3d at 497) (alteration in original). "A serious medical need is that which 'has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Leavitt*, 645 F.3d at 497). Under *Leavitt*, "[t]he 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay in treatment." *Leavitt*, 645 F.3d at 497-98 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2 203, 208 (1st Cir. 1990)). This first "inquiry is fact-specific and must be tailored to the specific circumstances of the case." *Abernathy*, 984 F.3d at 6 (citing *Leavitt*, 645 F.3d at 500).

The second prong is subjective. *Id.* at 6. "[T]he Eighth Amendment is not violated unless prison administrators also exhibit deliberate indifference to the prisoner's needs." *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014). Proving deliberate indifference "requires evidence that the failure in providing treatment to the plaintiff was purposeful." *Abernathy*, 984 F.3d at 6. "Thus, an 'inadvertent failure to provide adequate medical care' does not give rise to a constitutional claim." *Id.* (quoting *Estelle*, 429 U.S. at 105-06). However, a "wanton disregard to a prisoner's needs . . . akin to criminal recklessness, requiring consciousness of impending harm, easily preventable" may satisfy the subjective test. *Kosilek*, 774 F.3d at 83 (internal citations and quotation marks omitted). In short, the Constitution requires jails and

prisons only to provide adequate medical care, but providers cannot turn a blind eye to obvious or known risks to an incarcerated person's health. *Id.*

Municipal actors such as CCS can only be held liable under § 1983 for municipal acts.[43] *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020). "Municipal liability 'cannot be based on respondeat superior but requires independent liability based on an unconstitutional policy or custom of the municipality itself.'" *Id.* (quoting *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71 (1st Cir. 2002)). In other words, "[r]*espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "Rather, 'a plaintiff seeking to impose liability on a municipality under § 1983 . . . [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.'" *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 65 (D. Me. 2006) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). "Thus, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, 'through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged.'" *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (quoting *Brown*, 520 U.S. at 404) (emphasis in *Brown*).

---

[43]     Private contractors that provide medical care within jails are typically municipal defendants for purposes of § 1983, although the First Circuit has never expressly held as much. *See Leavitt*, 645 F.3d at 504 n.30 ("This circuit has not expressly held that private entities should be treated analogously to municipalities for the purpose of § 1983 liability"); *but see, e.g., Witham v. Corizon, Inc.*, No. 2:12-cv-00146-NT, 2012 U.S. Dist. LEXIS 152869, at *21 (D. Me. Sept. 17, 2012) (Magistrate Judge's Recommended Decision) *aff'd,* 2012 U.S. Dist. LEXIS 152045 (D. Me. Oct. 23, 2012); *Wall v. Dion*, 257 F. Supp. 2d 316, 319 (D. Me. 2003) (Magistrate Judge's Recommended Decision) (noting that other circuits have concluded jail medical services providers are municipalities for purposes of 42 U.S.C. § 1983 "because they provide services that are municipal in nature") *aff'd*, 257 F. Supp. 2d 316, 317 (D. Me. 2003).

Another variety of municipal liability is a failure to train claim.  *Id.* at 52.
"Triggering municipal liability on a claim of failure to train requires a showing that
municipal decisionmakers either knew or should have known that training was
inadequate but nonetheless exhibited deliberated indifference to the unconstitutional
effects of those inadequacies." *Id.* (citing *Brown*, 520 U.S. at 407 and *City of Canton*,
489 U.S. at 387, 390 n.10).

### b.    Analysis

To begin, the Court concludes that even if Mr. Daggett has made a prima facie
showing that CCS was deliberately indifferent to a serious medical need, the record
evidence, when viewed in the light most favorable to Mr. Daggett, does not support a
claim of municipal liability.  Mr. Daggett conceded he knows of no CCS policy that
injured him, does not allege a CCS policy caused him harm, does not allege a CCS
practice or custom harmed him, is not aware of a CCS practice or custom that caused
him harm, and has no information about the training CCS provides to its medical
staff. PRCDSMF ¶¶ 65-69.  CCS is therefore entitled to summary judgment on
Count IV because Mr. Daggett conceded essential elements of his prima facie case.

Notwithstanding this ruling, the Court considered the merits of Mr. Daggett's
constitutional claim because the First Circuit has never expressly held that entities
such as CCS are municipalities.[44]  Ultimately, Mr. Daggett offered evidence that
would permit a reasonable trier of fact to find his Parkinson's Disease was a serious

---

[44]     If CCS is not a municipal actor under § 1983, summary judgment is proper for CCS because
§ 1983 generally only permits actions against state actors.

medical need; however, even when construing the record in the light most favorable to him, he has not made a prima facie showing of deliberate indifference. Therefore, the Court grants summary judgment in favor of CCS on Count IV.

### i.   Serious Medical Need

The Court concludes that Mr. Daggett has raised a genuine issue of material fact as to whether his Parkinson's Disease constituted a "serious medical need" within the meaning of Eighth and Fourteenth Amendment caselaw. Before taking custody of Mr. Daggett, YCJ and CCS staff required that he visit the hospital to obtain medications to treat his Parkinson's Disease. It was only after Mr. Daggett and Officer Poore secured this medication that the YCJ was willing to take custody of him. Before doing so, CCS staff spoke with Dr. Schmitz, the physician who had examined Mr. Daggett at the hospital and who informed a CCS nurse it was important to adhere to Mr. Daggett's Sinemet schedule. When Mr. Daggett arrived at the YCJ, he needed assistance with walking, had impaired speech, and could not sign his own name. Furthermore, a YCJ record noted that he was "unstable" which is defined as being physically or mentally out of control. Due to his condition, YCJ staff kept Mr. Daggett in intake under medical watch, rather than placing him with the jail's general population. Corrections officers wheeled Mr. Daggett into this cell on an office chair and placed him on a cot because he could not walk. After the officers placed him on the cot, he could not hold himself up, fell, and hit his head on the cell wall.

The undisputed facts show several laypersons and at least one physician "recognize[d] the necessity for a doctor's attention." *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016); *see Belskis v. Somerset Cty.*, No. 1:15-cv-00091-JAW, 2017 U.S. Dist. LEXIS 160517, at *50-52 (D. Me. Sept. 29, 2017) (concluding a diabetic's need for special shoes was potentially a serious medical need because medical professionals recommended the special shoes).  The record provides ample grounds on which a jury could conclude that Mr. Daggett's inability to walk or write, difficulty balancing, and limited capacity for speech, were serious medical conditions and required medical attention.  The Court concludes the Defendants have not demonstrated that Mr. Daggett failed to raise a genuine issue of material fact on this element.

### ii.      Deliberate Indifference

Despite this initial showing, Mr. Daggett's constitutional claim against CCS ultimately falters.  Even viewing the facts in the light most favorable to Mr. Daggett, no reasonable trier of fact could conclude CCS was deliberately indifferent to his medical needs.  Thus, CCS is entitled to judgment as a matter of law.  In response to CCS' motion for summary judgment, Mr. Daggett asserted that a jury could reasonably conclude his "medication was intentionally not administered as required" because the charge nurse told Ms. Howarth that Mr. Daggett was uncooperative and unresponsive and that she had not given him any medication when the two spoke sometime after 11:00 p.m. on May 17, 2015. *Pl.'s Opp'n* at 17.

Mr. Daggett places more weight on the charge nurse's comments than they can bear. As a threshold matter, York County objects to the charge nurse's statements, as echoed by Ms. Howarth's deposition testimony, as hearsay if offered for the truth that the charge nurse had not administered Sinemet to Mr. Daggett. YDRPSAMF ¶ 33. Even though Mr. Daggett did not identify any relevant hearsay exception or exclusion in response to the objection, the Court overrules York County's objection. Viewing the facts in the light most favorable to Mr. Daggett, the implication is that the charge nurse was a CCS employee. As such, her statements are non-hearsay because they are opposing party statements. FED. R. EVID. 801(d)(2)(D).

Accepting the charge nurse's statements as admissible for their truth, they are nevertheless insufficient to support a finding of deliberate indifference. "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." *Ruiz-Rosa v. Rullán*, 485 F.3d 150, 156 (1st Cir. 2007). Rather, showing deliberate indifference requires that "a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Inaction in the face of an obvious risk of serious harm may permit that a reasonable inference of deliberate indifference. *Ruiz-Rosa*, 485 F.3d at 157. "However, there is no deliberate indifference if an official responds reasonably to the risk." *Miranda-Rivera*, 813 F.3d at 74. "Where the dispute concerns not the absence

84

of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [a court] will not second guess the doctors." *Massey v. Rufo*, No. 92-1380, 1994 U.S. App. LEXIS 6202, at *3 (1st Cir. Jan. 14, 1994) (per curiam) (unpublished table decision) (quoting *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987)).

As a matter of law, deliberate indifference requires wrongdoing beyond what Mr. Daggett alleges happened to him. *Compare Estelle*, 429 U.S. at 107 (finding no deliberate indifference when medical providers examined an inmate seventeen times in three months); *Ruiz-Rosa*, 485 F.3d at 156-57 (finding no deliberate indifference where a jailhouse doctor did not know an antibiotic was ineffective and unaware of a substantial risk of harm); *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162-63 (1st Cir. 2006) (finding "delay alone" in rendering proper care did not show deliberate indifference where correctional center's medical staff was otherwise responsive to the inmate's needs and "adopted other measures . . . to alleviate his discomfort"); *Massey*, 1994 U.S. App. LEXIS 6202, at *3 (finding no deliberate indifference where the plaintiff "was seen the same day as the incident, provided with medication and sent for a consultation to the hospital"); *Parlin v. Cumberland Cty.*, 659 F. Supp. 2d 201, 209 (D. Me. 2009) (finding no deliberate indifference to an inmate's mental health needs when the inmate "was given her prescribed medication three days after she reported to Jail . . ., was repeatedly seen by the Jail's medical contractors and was . . . under twenty-four-hour nursing supervision"); *with Miranda-Rivera*, 813 F.3d at 75 (finding a jury could reasonably find deliberate indifference when, despite that a

suspect "was sweaty, nervous, and yelling incoherently," had an "extremely pale" face, and "his eyes were bulging, and lips were black," law enforcement did not take him to a medical facility); *Perry v. Roy*, 782 F.3d 73, 79-81 (1st Cir. 2015) (reversing summary judgment because a jury could reasonably conclude that corrections staff were deliberately indifferent to the plaintiff's broken jaw after waiting twenty hours to transport him the hospital).  Because Mr. Daggett's claim "concerns not the absence of help, but the choice of a certain course of treatment" he must show "the attention [he] received [was] 'so clearly inadequate as to amount to a refusal to provide essential care.'"  *Feeney*, 464 F.3d at 163 (quoting *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991); *accord Parlin*, 659 F. Supp. 2d at 208 ("A treatment regime can amount to deliberate indifference only where it effectively results in a complete denial of basic care").

Mr. Daggett cannot meet this standard, even when construing the record in the light most favorable to him and drawing all reasonable inferences in his favor. Accepting the unidentified charge nurse's statement that she had not administered Sinemet gets Mr. Daggett only so far.  Mr. Daggett had only just arrived at the YCJ around 11:00 p.m. and received a dose as he left SMHC less than an hour prior.  As CCS points out, the record contains other evidence that another CCS provider administered, or at least attempted to administer, Sinemet to him around 11:00 p.m. *CCS Reply* at 4 n.8 (discussing the actions of LPN Linda Leitz); *accord* CDSMF, Attach. 2, *Aff. of Linda Leitz* ¶¶ 3-5 (*Leitz Aff.*) (recounting administering Sinemet to Mr. Daggett at 11:00 p.m. on May 17, 2015).

86

The record further undermines Mr. Daggett's assertion that CCS acted with deliberate indifference.  Mr. Daggett admits to receiving Sinemet while incarcerated but contends it was not the correct dose and he did not swallow all the medication given to him.  CDSMF ¶ 44; PRCDSMF ¶ 44.  Mr. Daggett does not remember how many Sinemet tablets he received while at the YCJ, nor does he remember exactly when he received those doses, but he does assert that whatever doses he received were not enough.  CDSMF ¶¶ 47-48, 50-53; PRCDSMF ¶¶ 47-48, 50-53.  As such, his claim against CCS, the YCJ, and its staff is rooted in providing him with the incorrect dose of Sinemet, rather than withholding the medication entirely.

As a matter of law, these facts fall short of deliberate indifference.  The doses CCS administered to Mr. Daggett were ordered by Dr. Schmitz after he confirmed Mr. Daggett's medications with Dr. Dolan, the on-call neurologist.  Although this dose was incorrect, the Court concludes that no reasonable jury could find CCS staff were deliberately indifferent to Mr. Daggett's serious medical needs by following the treatment instructions of a physician who had examined Mr. Daggett, consulted with a specialist, and ordered medications.  It is true that Mary Howarth's conversation with the unidentified charge nurse suggests that CCS had notice Mr. Daggett's dose of Sinemet was potentially different than what Dr. Schmitz had ordered.  But CCS was following Dr. Schmitz's medication order and Mr. Daggett has provided no convincing evidence that CCS should have accepted Ms. Howarth's assertion about Mr. Daggett's proper dosage above the professional opinion of a medical doctor.

Again, mere disagreements about the proper course of treatment do not amount to deliberate indifference under the constitutional standard, which requires a showing of culpability akin to criminal recklessness. *Feeney*, 464 F.3d at 162 ("The obvious case would be a denial of needed medical treatment in order to punish the inmate. But deliberate indifference may also reside in 'wanton' decisions to deny or delay care, where the action is recklessness, not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable"). Even if CCS was actually aware that Mr. Daggett had regularly been prescribed a different dose of Sinemet, nothing in the record suggests any CCS staff member was subjectively aware of the consequences an incorrect dose might have for Mr. Daggett. Therefore, at worst, CCS' reliance on Dr. Schmitz's instructions despite Ms. Howarth's additional information was negligent and does not amount to a constitutional violation. Mr. Daggett's asserted injury is effectively a mistreatment of his Parkinson's Disease rather than non-treatment. Under *Feeney*, this allegation is insufficient to show deliberate indifference. *Id.* at 163.

Other facts also preclude any reasonable factfinder from finding CCS was deliberately indifferent to Mr. Daggett's medical needs. For one, CCS and the YCJ refused to take custody of Mr. Daggett when he first arrived at the jail without his medications even though Dr. Schmitz deemed Mr. Daggett fit for incarceration. The YCJ only accepted Mr. Daggett after he returned to the hospital to obtain his medications. Moreover, Mr. Daggett stated that medical providers were periodically coming into the room where he was housed to check on him. *Nov. 1 Daggett Dep.*,

at 80:2-3.  Taken together, these facts show CCS acted consistent with the treatment plan Dr. Schmitz approved such that no reasonable trier of fact could conclude CCS was deliberately indifferent to Mr. Daggett's needs.  The Court concludes that summary judgment is proper on Count IV because Mr. Daggett failed to make prima facie showing of deliberate indifference.

### iii.   Causation and Expert Witnesses

Finally, CCS raised the issue of whether Mr. Daggett proffered sufficient expert testimony to present the issue of causation to a jury.  *CCS Mot.* at 10-13; *CCS Reply* at 4-5.  To be clear, the Court is not considering whether Mr. Daggett needs expert testimony to show CCS' conduct caused a constitutional violation.  The two-pronged test requires Mr. Daggett to make a prima facie showing of (1) a serious medical need that even a layperson would recognize and (2) that CCS acted with a sufficiently culpable state of mind, deliberate indifference, to that medical need.  *Abernathy*, 984 F.3d at 7-8.  Even if there may be a case where expert medical testimony would not be necessary to prove a constitutional violation, it would have to be a situation where causation and state of mind fall within a layperson's competence.  *See Griffin v. Hillsborough Cty. Dep't of Corr.*, No. 13-cv-539-SM, 2015 U.S. Dist. LEXIS 84915, at *8 (D.N.H. May 28, 2015) (collecting cases for the proposition that "[w]hether expert testimony is necessary to prove deliberate indifference . . . depends on the nature of the specific issues in the particular cases and what other evidence is available in the record").  Rather, the causation issue here is whether Mr. Daggett can establish that the alleged constitutional violation caused him actual

89

damages. *See, e.g.*, *Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (conducting a similar analysis).

Specifically, CCS argues Mr. Daggett "has not designated an expert witness to establish the causal link between the alleged medication errors and his claimed injuries, some of which occurred weeks after he was released from custody." *CCS Mot.* at 11. Mr. Daggett believes he submitted sufficient evidence on causation to survive summary judgment, stating that he "designated treating professionals who are able to testify regarding [his] conditions; symptoms; onset of symptoms; and what occurs [if Mr. Daggett] does not take his medications." *Pl.'s Opp'n* at 17. He also observes "there is record testimony from Dr. Schmitz regarding what occurs to a Parkinson's patient if their medication is discontinued." *Id.*

The Court agrees with CCS. As alleged, CCS and YCJ's failure to administer the proper dose of Sinemet combined with other events surrounding his incarceration caused Mr. Daggett's physical injuries, including a concussion that significantly advanced his Parkinson's Disease, PTSD, a broken hip, a chipped tooth, anxiety, and depression. CDSMF ¶¶ 71-73; PRCDSMF ¶¶ 71-73. The broken hip occurred when, two weeks after being released from YCJ, Mr. Daggett was at Maine Medical Center and panicked because he thought that he was back in jail, ran out of the hospital, and fell in the parking lot. CDSMF ¶ 73; PRCSMF ¶ 73.

The causation for these injuries is complex. Even accepting as a matter of common knowledge that Parkinson's Disease may impair a person's balance and speech, determining the comparative effects of different doses of Sinemet on a

person's central nervous system is a challenging question of pharmacology and well outside a lay juror's common knowledge. Moreover, the causal link between a brain injury, such as Mr. Daggett's concussion, and later physical, psychological, and cognitive injuries—especially the concussion's impact on the progression of his Parkinson's Disease—would be similarly challenging for a juror. To boot, Mr. Daggett has alleged that some of his injuries occurred two weeks after he missed several doses of Sinemet, which further entangles the Gordian Knot of causation.

Finally, the record lacks substantial evidence of Mr. Daggett's physical condition while properly medicated. Therefore, it does not rule out that his injuries resulted, not from inadequate medical care, but from his Parkinson's Disease in its usual presentation. As the First Circuit wrote in a somewhat analogous malpractice case arising under Maine law, "[w]hen the harm alleged is a failure to treat and the causation standard is more likely than not, a plaintiff must vault over a higher bar in order to prove that the failure to treat a condition in a particular way – rather than the underlying condition itself – caused the adverse outcome." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 35 (1st Cir. 2012).

Mr. Daggett cannot clear this "higher bar" because he provided no expert testimony on causation. On November 13, 2018 the Magistrate Judge issued a scheduling order in this case, which set the deadline for Mr. Daggett's expert witness designations and related Federal Rule of Civil Procedure 26(a)(2)(A) disclosures as January 29, 2019.[45] *Scheduling Order with Incorporated Rule 26(f) Order* at 2 (ECF

---

[45]   The Magistrate Judge set a similar deadline of March 5, 2019 for the Defendants. *First Scheduling Order* at 2.

No. 20) (*First Scheduling Order*).   The order required that Mr. Daggett "shall designate experts required to be disclosed by FED. R. CIV. P. 26(a)(2)(A) (including treating physicians and other non-retained or specially employed experts) and, with respect to each of them, provide a complete statement of all opinions to be expressed and the basis and reasons therefor . . .."   *Id.*   The order further stated that "[a]ll required information may, but need not, be provided in the form of a written report prepared and signed by the expert."   *Id.*

On December 4, 2018, the Magistrate Judge granted the Defendants' consent objection and extended Mr. Daggett's expert designation deadline until March 14, 2019 and the Defendants' expert designation deadline until April 19, 2019.   *Order* (ECF No. 23); *Defs. Town of Berwick, Towne and Poore's Obj. to Scheduling Order (Consented To)* (ECF No. 22).   The stipulated record contains a document, signed by Mr. Daggett's counsel and dated March 14, 2019, titled "Plaintiff's Expert Designation."   *R.*, Attach. 26, at 1-2 (*Pl.'s Designation*).

Mr. Daggett claims that this document suffices as evidence to put the issue of causation before the jury.   The Court disagrees.   First, the document plainly fails to comply with the requirements Federal Rule of Evidence 702 imposes on expert testimony.   The document does not describe the facts or data on which the experts will base their opinions, nor does it describe the experts' methodologies for using facts to reach conclusions.

Second, the designation runs afoul of the Magistrate Judge's scheduling order and Rule 26 because it states no conclusions or opinions on the issue of causation, let

alone provides any description of the facts or underlying reasons for the designated experts' opinions. *Pl.'s Designation* at 1-2. Rule 26(a)(2) requires specific disclosures about an expert's qualifications, the facts and data considered by the expert, and a "complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i)-(vi). Furthermore, the Scheduling Order expressly required Mr. Daggett to "provide a complete statement of all opinions to be expressed and the basis and reasons therefor." *Scheduling Order* at 2.

Mr. Daggett's expert designations fall woefully short of compliance with his Rule 26 disclosure obligations as reinforced by this Court's Scheduling Order. This document is entitled "Plaintiff's Expert Designation." *Pl.'s Designation* at 1. In that document, Mr. Daggett names ten doctors and references their medical records, saying for each that the "records . . . are the best explanation of the treatment that occurred" and the physicians are expected to "testify consistent with these treatment records." *Id*. at 1-2. As the Court noted in *Rozzetti*, a treating physician may testify as a fact witness about his or her treatment. *Rozzetti*, 2020 U.S. Dist. LEXIS 102069, at *8 (*Samaan*, 670 F.3d at 36). But, as the First Circuit has written, "witnesses who were not designated to speak as experts on causation . . . could not supply competent proof of causation." *Samaan*, 670 F.3d at 38. In the Court's view, Mr. Daggett's March 14, 2019 designation would allow the designated physicians to testify as percipient witnesses, but not as experts on causation. In short, this document cannot be used to establish causation of actual injuries or damages, it is little more than an annotated witness list.

93

Mr. Daggett points out that the record contains the deposition testimony of one expert designee, Dr. Michael Schmitz.[46] *Pl.'s Opp'n* at 17; *R.*, Attach. 19 (*Schmitz Dep.*). However, even Dr. Schmitz's deposition testimony cannot forge the necessary links in the causal chain. In the Court's view, that testimony falls short of the Rule 702 standard for expert opinion testimony. *See* FED. R. EVID. 702 (permitting expert testimony when "the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue", "the testimony is based on sufficient facts or data" and "is the product of reliable principles and methods", and "the expert has reliably applied the principles and methods to the facts of the case").

It is true that Dr. Schmitz stated Parkinson's patients can suffer paralysis if they do not receive their prescribed Sinemet. *Schmitz Dep.* at 61:23-25. Importantly though, Dr. Schmitz disclaimed any ability to opine on whether Mr. Daggett could be expected to suffer paralysis due to a lack of Sinemet, stating, "[b]eing someone who only met Mr. Daggett once, did not have access to his records or the details of his past medical history with respect to how advanced his Parkinson's disease is, I don't think that I can answer that question having met him one time." *Id.* at 64:13-17. Because he apparently disclaimed any ability to testify regarding the symptoms Mr. Daggett might encounter from improper treatment, Dr. Schmitz's testimony cannot be expert testimony on the issue of causation. Dr. Schmitz testified that he lacked "sufficient

---

[46]     Other than Dr. Schmitz's deposition, the Stipulated Record contains no testimony from any of Mr. Daggett's designated experts. His counsel submitted no expert reports, affidavits, deposition testimony, or other information concerning the opinions of the purported expert designees.

facts or data" to render reliable opinions on what symptoms would result from Mr. Daggett not receiving his prescribed dose of Sinemet. The testimony also lacks any discussion of what "reliable principles and methods" Dr. Schmitz used to reach his conclusions that Parkinson's patients experience muscular rigidity if not properly medicated. Perhaps most damaging to Mr. Daggett's case, Dr. Schmitz never explains the how Sinemet affects a person's brain, thus failing to bridge the causal gap Mr. Daggett must cross.

Without the necessary expert testimony on causation, the Court cannot permit Mr. Daggett to bring his claims for actual damages premised on proof of causation before a jury. His claims are complex and require expert testimony about the chemistry and innerworkings of the human brain and nervous system to proceed. Thus, summary judgment on his claim for actual damages would be proper, even if he had established a viable claim for deliberately indifferent medical care.

### 2. Count Five: Constitutional Claims Against Unnamed CCS Employees

Count V raises similar constitutional claims for inadequate medical care against two unnamed and unidentified Jane Doe CCS employees. *Id.* ¶¶ 117-24. Like Counts II and III, the Court dismisses Count V without prejudice because Mr. Daggett has either withdrawn these claims, or otherwise failed to develop Count V, identify the defendants, and serve them with process. The time for Mr. Daggett to correct these defects has long passed. For the same reasons, the Court also dismisses the remainder of the Amended Complaint to the extent it alleges claims against the two Jane Doe CCS employees.

### D.      Counts Six and Seven: Constitutional Claims Against York County, Sheriff King, and Superintendent Vitiello

Mr. Daggett's constitutional claims for inadequate medical care against the York Defendants follow largely the same legal and factual theories as his claims against CCS.  Having established the legal standard for constitutionally inadequate medical treatment, the Court turns to the merits.  The Court first notes that no constitutional claim is cognizable against the York Defendants because the Court already concluded Mr. Daggett failed to make a prima facie showing of a constitutionally deficient medical treatment while Mr. Daggett was in the YCJ.  *See supra* section V(C).  Moreover, Mr. Daggett's failure to submit expert testimony on whether the medical treatment he received in the YCJ caused his alleged injuries dismantles his claims for actual damages against the York Defendants.  By themselves, these conclusions warrant summary judgment in favor of the York Defendants.  In the interest of completeness, the Court discusses the remaining issues that Mr. Daggett's claims raise.

#### 1.      York County

Mr. Daggett conceded that he has no knowledge that his injuries resulted from a county policy, that he knew of a county policy that caused the alleged constitutional violations, and that he has no factual basis to believe that the events he complained about occurred due to a lack of training by York County.  YDSMF ¶¶ 33-35; PRYDSMF ¶¶ 33-35.  Thus, Mr. Daggett conceded the essential elements of a claim for municipal liability against York County under § 1983.  In light of these concessions, there are no genuine issues of material facts as to the municipal liability

96

claim against York County and York County is entitled to judgment as a matter of law on Count VII.

### 2. Sheriff King

Mr. Daggett also conceded that he lacks knowledge to suggest Sheriff King was involved in the events alleged in his complaint. YDSMF ¶ 25; PRYDSMF ¶ 25. He specifically conceded Sheriff King was not involved with Mr. Daggett's access to medical services while at the YCJ. YDSMF ¶ 28; PRYDSMF ¶ 28. He further conceded that Sheriff King was not present for any of the alleged incidents, had no physical contact with Mr. Daggett during the days he was incarcerated, or at any other time relevant to his claims, and that Sheriff King has no personal knowledge of any use of force or control involving Mr. Daggett while at the YCJ. YDSMF ¶¶ 26-27; PRYDSMF ¶¶ 26-27. In short, Mr. Daggett concedes that he has no factual basis for a direct constitutional claim against Sheriff King. Thus, even construing the record in the light most favorable to Mr. Daggett, Sheriff King is entitled to judgment as a matter of law on any direct claim him for deliberate indifference to Mr. Daggett's medical needs.

Mr. Daggett also conceded that he lacked facts showing Sheriff King directed or otherwise had knowledge of the allegedly inadequate care. This concession is fatal to any constitutional claim against Sheriff King resting on supervisory liability. "[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016). Rather

"the supervisor's liability must be premised on his own acts or omissions . . ." and "the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of others.'" *Id.* (quoting *Febus-Rodríguez v. Betancourt-Lebrón*, 14 F.3d 87, 92 (1st Cir. 1994)).  But deliberate indifference alone is not enough.  *Id.*  "Causation remains an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid."  *Id.*  In addition, the supervisor must have actual or constructive notice of the alleged constitutional violation.  *Id.*

Here, the record, even when construed in the light most favorable to Mr. Daggett, contains no evidence to support a claim of supervisory liability against Sheriff King.  Regardless of the Court's conclusion on whether Mr. Daggett made a prima facie showing on his deliberate indifference claim, Mr. Daggett conceded that Sheriff King was not present, did not perpetrate, and had no first-hand knowledge of the alleged constitutional violations.  Thus, there is no genuine dispute of material facts and Sheriff King is entitled to judgment as a matter of law because no reasonable trier of fact could conclude Sheriff King was deliberately indifferent to his constitutional rights or had actual or constructive notice of a constitutional violation, let alone find a causal connection between any indifference and Mr. Daggett's injuries.[47]

### 3.     Superintendent Vitiello

---

[47]     Sheriff King raises the defense of qualified immunity.  *York Mot.* at 9-11.  The Court would typically consider his defense but concludes doing so would be superfluous.  As discussed, Mr. Daggett has submitted no evidence and indeed has no knowledge of Sheriff King's involvement in the incidents surrounding his claims.  Without any indication of what Sheriff King did or knew, the Court cannot meaningfully analyze whether Sheriff King violated clearly established law.

Summary judgment is proper in favor of Superintendent Vitiello for many of the same reasons as Sheriff King.  First, construing the record in the light most favorable to Mr. Daggett, he has not presented sufficient evidence to generate a prima facie case that Superintendent Vitiello was deliberately indifferent to his medical needs.  While Mr. Daggett points to the fact that "Defendant Vitiello instructed that Mr. Daggett be admitted into the jail if medication could be provided by the hospital," he is mistaken that judgment was "in contrast to the judgment of the medical personnel."[48]  *Pl.'s Opp'n* at 14.  Recognizing the YCJ lacked the necessary medications to care for Mr. Daggett, YCJ staff informed Officer Poore that the jail would accept Mr. Daggett if he returned with the proper medications.  This instruction was at Superintendent Vitiello's direction.  No reasonable trier of fact could conclude Superintendent Vitiello's conduct was deliberately indifferent to Mr. Daggett's medical needs.  Rather, he conferred with the jail's intake officer, and told YCJ staff they could admit Mr. Daggett to jail with the proper medications.  Superintendent Vitiello's affirmative acts to ensure CCS could treat Mr. Daggett's health conditions preclude a finding of deliberate indifference as a matter of law.

Second, on the issue of supervisory liability, Mr. Daggett conceded that Superintendent Vitiello was not present for the alleged incidents, had no physical

---

[48]     The Court is uncertain why Mr. Daggett is, for the first time, raising a direct claim for constitutional violations against Superintendent Vitiello during summary judgment briefing. Although the caption of the Amended Complaint names Superintendent Vitello as a defendant, no part of the Amended Complaint expressly raises a constitutional claim against him. Count VII of the Amended Complaint asserts claims against York Count and mentions Superintendent Vitiello in his capacity as a supervisor and policymaker for the York County Jail, apparently to state a claim against York County. *Am. Compl.* ¶¶ 130-37. Nevertheless, the Court considered whether a direct claim is viable against Defendant Vitiello.

contact with Mr. Daggett, and has no personal knowledge surrounding the use of force or control involving Mr. Daggett.  YDSMF ¶¶ 30-31; PRYDSMF ¶¶ 30-31.  Thus, as with his claim against Sheriff King, Mr. Daggett's concessions prevent him from establishing a claim of supervisory liability against Superintendent Vitiello.  These concessions, and his actions just mentioned, bar any reasonable trier of fact from finding Superintendent Vitiello was deliberately indifferent to Mr. Daggett's constitutional rights in a manner that caused any constitutional violations.

Third, regardless of whether Mr. Daggett has made a prima facie case for direct or supervisory liability, the Court concludes that Superintendent Vitiello is entitled to qualified immunity.  The Court concludes it is clearly established law that jails may not be deliberately indifferent to a prisoner's serious medical needs.  *See, e.g.*, *Estelle*, 429 U.S. at 104.  However, the Court is unconvinced that a reasonable officer would conclude Superintendent Vitiello's decision to admit Mr. Daggett to the YCJ after he sent Mr. Daggett back to the hospital, where he was cleared for incarceration a second time and obtained medications was clearly established as deliberate indifference.  Thus, qualified immunity shields Superintendent Vitiello from liability.

### E.   Counts Ten and Eleven: Constitutional Claims Against Officer Poore

#### 1.   Count Ten: The False Arrest Claim

In Count X, Mr. Daggett alleges a claim for "false arrest" under § 1983 against Officer Poore but the Amended Complaint does not specify what provision of federal law he relies upon to bring this claim.  *Am. Compl.* ¶¶ 145-49.  The Court is aware of no express language in the Constitution or federal statutes that affords Mr. Daggett

protection from "false arrests."  While it is true that state tort law might confer such a right, § 1983 does not constitutionalize the law of torts.  *See Manuel*, 137 S. Ct. at 920-21 (explaining that "courts are to look first to the common law of torts" when "defining the contours and prerequisites of a § 1983 claim" but that "[c]ommon law principles are meant to guide rather than to control the definition of § 1983 claims . . ."); *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978) (describing the false imprisonment cause of action); RESTATEMENT (SECOND) OF TORTS §§ 35, 41 (Am. L. Inst. 1965) (setting forth the elements of false imprisonment).  *See also Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160-61 (6th Cir. 2021) (clarifying "that the Fourth Amendment does not adopt separate bans on 'false arrests,' 'false imprisonments,' and 'malicious prosecutions' . . . [but] establishes a singular ban on 'unreasonable' 'seizures'") (citing U.S. CONST. amend. IV).

In the Court's view, what Mr. Daggett actually intends to allege in Count X is an unreasonable seizure under the Fourth Amendment.  *See Maddocks v. Portland Police Dep't*, 2:15-cv-00168-JAW, 2017 U.S. Dist. LEXIS 76310, at *1 n.1 (D. Me. May 19, 2017) (noting "the analysis of a claim of false imprisonment under state common law and a claim of false arrest under state or federal constitutional law is the same").  Mr. Daggett's argument that Officer Poore lacked probable cause to arrest cements the Court's conclusion that his claim arises under the Fourth Amendment for an unreasonable seizure.  *Pl.'s Opp'n* at 7.

### a.    Legal Standard: Unreasonable Seizure

The United States Supreme Court has stated "[t]he Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Wesby*, 138 S. Ct. at 587. Arrests are seizures of persons and "must be reasonable under the circumstances." *Id.* at 585-86 (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)). Warrantless arrests outside of a suspect's home are reasonable when "the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Id.* at 586 (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Although the Supreme Court has never expressly held that an officer may perform a warrantless arrest of a suspected misdemeanant when the officer does not witness the offense, numerous federal courts, including the First Circuit, have upheld such arrests as constitutional. *See Atwater*, 532 U.S. at 340 n.11 ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests") (citing *Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984) (White, J., dissenting) ("[T]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment")); *Welsh*, 466 U.S. at 756 (White, J., dissenting) ("[W]e have never held that a warrant is constitutionally required to arrest for nonfelony offenses occurring out of the officer's presence"); *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir. 1997) (affirming summary judgment on the basis of qualified immunity because "neither the Supreme Court nor this circuit ever has held that the Fourth Amendment prohibits warrantless arrests for misdemeanors not committed in the

102

presence of arresting officers"); *Budnick v. Barnstable Cty. Bar Advocates, Inc.*, No. 92-1933, 1993 U.S. App. LEXIS 6656, at *14 n.7 (1st Cir. Mar. 30, 1993) (per curiam) (unpublished slip op.) (concluding that an officer need not be in the presence of a suspected misdemeanant at the time of the offense to perform a warrantless arrest of the suspect); *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974) (same); *Fields v. City of S. Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991) (same); *Graves v. Mahoning Cty.*, 821 F.3d 772, 778 (6th Cir. 2016) (same); *Woods v. City of Chicago*, 234 F.3d 979, 992-95 (7th Cir. 2000) (same); *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) (same); *Borlawsky v. Town of Windham*, Civil No. 99-272-P-H, 2000 U.S. Dist. LEXIS 9640, at *4 (D. Me. Mar. 31, 2000) (concluding qualified immunity precluded an officer from being held liable for a warrantless misdemeanor arrest).

When ruling on probable cause, "[t]he only relevant facts are those known to the officer." *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009). If the parties dispute these facts, "the fact-finder must resolve the dispute." *Id.* "However, when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law . . .." *Id.* (citing *Bolton v. Taylor*, 367 F.3d 5, 8 (1st Cir. 2004)). A court determines whether an officer had probable cause to arrest a suspect by considering "the events leading up to the arrest, and then decides 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

"Probable cause 'is not a high bar.'" *Wesby*, 138 S. Ct. at 586. It "deals with probabilities and depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371. Moreover, probable cause "is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules'." *Wesby*, 138 S. Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). When it comes to probable cause, "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* at 588 (citing *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). Courts must "consider the whole picture" and "[t]he totality-of-the-circumstances test 'precludes.. . divide-and-conquer analysis." *Id.* (internal citations omitted).

"[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Id.* Rather an officer, and for that matter a court, must weigh "the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (citing *Gates*, 462 U.S. at 244 n.13). At bottom, the question is "whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.'" *Id.* (citing *Gates*, 462 U.S. at 244 n.13).

### b.    Analysis

Here, Officer Poore arrested Mr. Daggett without a warrant for a suspected violation of a protective order. The only disputed fact relevant to probable cause is whether Officer Poore actually saw Mr. Daggett within the property lines of the 317 Cranberry Meadow Road.[49]   BDSMF ¶¶ 10-11; PRBDSMF ¶¶ 10-11. The Court

---

[49]    Mr. Daggett's argument is based on the technical premise that because the town of Berwick's right of way extends twenty-five feet from the center of the road, he was on Berwick, not his wife's

concludes this genuine disputed fact is not material.  Probable cause requires a Court to consider the totality of the circumstances.  Considering record in the light most favorable to Mr. Daggett and drawing all reasonable inferences in his favor, no reasonable juror could conclude Officer Poore lacked probable cause.  Thus, Officer Poore is entitled to judgment as a matter of law.  Alternatively, qualified immunity shields Officer Poore from liability because his conduct did not violate clearly established law.

Maine law requires law enforcement to arrest suspected violators of protection orders when law enforcement officers have probable cause to believe a violation has occurred.  19-A M.R.S. § 4011(3).  Accepting for purposes of summary judgment that Mr. Daggett was never on the property, the record is nevertheless replete with facts providing probable cause.[50]  Officer Poore arrived on the scene after dispatch informed him a 911 caller reported Mr. Daggett was on the property in violation of a protection order.  While driving to the scene, Officer Poore confirmed there was a

---

property.  In this technical premise, he is likely technically wrong.  Even assuming that Mr. Daggett has properly placed this factual assertion before the Court, the Court is dubious.  In general, the Maine Supreme Judicial Court has held that "'legally enforceable right-of-way' means something other than ownership of property in fee simple." *Town of Minot v. Starbird*, 2012 ME 25, ¶ 39 A,3d 897 (quoting *Bizier v. Town of Turner*, 2011 ME 116, ¶ 18, 32 A.3d 1048).  This suggests that his wife's fee simple interest in her property technically extended to the center line of the town way subject to the public's right of passage.  Even if Mr. Daggett had the right as a member of the public to travel over his wife's premises on the town right of way, Mr. Daggett has not demonstrated that he was exercising the public right of passage when he stopped, got out of the vehicle, and walked on his wife's fee simple property, even if it was subject to a right of way, to inspect and disrupt his wife's trash bins.  To have probable cause, Officer Poore did not need to be an expert in municipal rights of way or a surveyor.  Officer Poore observed Mr. Daggett on or near his wife's driveway, saw Mr. Daggett walk through the ditch back to his vehicle, and observed the trash strewn about lawn, all observations consistent with Mr. Daggett's violation of a protection order and giving him probable cause to make the arrest.

[50]     The parties dispute whether Mr. Daggett has sufficient evidence to establish that he was never on the property.  Although the Court is skeptical about Mr. Daggett's property law analysis, *see* footnote 49, rather than rule on whether that issue of fact is genuine, it is simpler to assume that Mr. Daggett was not on his wife's property and then determine whether that fact was material to the question of probable cause.

protection order prohibiting Mr. Daggett from being on the property, though he did not view the actual protection order.  Upon arrival at the scene, Officer Poore saw a man who he believed was Thomas Daggett standing near the property's mailbox, walking towards a car, and also saw trash strewn across the lawn in front of the property.

Looking at the totality of the circumstances, whether Officer Poore actually saw Mr. Daggett within the property lines is immaterial to whether Officer Poore had probable cause to believe that Mr. Daggett violated the protection order.  Probable cause only requires a "substantial chance" of criminal activity.  *Wesby*, 138 S. Ct. at 588.  Thus, Officer Poore was not required to be certain that Mr. Daggett was on the property.  Instead, he only needed evidence giving rise to a substantial chance Mr. Daggett had been, or was currently, on the premises of 317 Cranberry Meadow Road.  On the above facts, Officer Poore had probable cause.  Officer Poore received word that Mr. Daggett had violated a protection order by entering a property, verified that a protection order was in place, arrived on the scene to find Mr. Daggett in an area directly adjacent to prohibited property, climbing into a car as police approached, and observed signs—piles of loose, unattended garbage—consistent with Mr. Daggett violating the protection order by causing a disturbance on or near the property subject to the complaint.

Mr. Daggett's statements to Officer Poore that orders in the divorce proceeding permitted him to protect his property did not undercut probable cause.  Officer Poore had no obligation to credit Mr. Daggett's assertion.  *See Acosta v. Ames Dep't Stores,*

*Inc.*, 386 F.3d 5, 11 (1st Cir. 2004) ("[T]he Supreme Court has flatly rejected the idea that the police have a standing obligation to investigate potential defenses before finding probable cause").  Nor did Officer Poore have a duty to speak with the 911 complainant prior to arresting Mr. Daggett.  *See id.* at 10 ("In the absence of circumstances that would raise a reasonably prudent officer's antennae, there is no requirement that the officer corroborate every aspect of every complaint with extrinsic information").

In addition, the First Circuit has "made it clear that an officer normally may terminate her investigation when she accumulates facts that demonstrate sufficient probable cause."  *Id.*  As such, the caselaw does not support Mr. Daggett's ultimate contention that whether a "reasonable and prudent person" would "make a finding of probable cause when there was zero investigation done before the officer decided to arrest" is a question for the jury.  *Pl.'s Opp'n* at 8.  The federal reporters are teeming with caselaw on probable cause, but Mr. Daggett failed to cite a single case in support of his argument and the Court knows of none.  *Ames* makes manifest that an investigating officer need not scour the crime scene for more clues or exculpatory evidence once he has enough facts to support probable cause.  Accordingly, construing the record in the light most favorable to Mr. Daggett, there are no genuine disputes of material fact regarding the alleged Fourth Amendment violation by Officer Poore, and Officer Poore is entitled to judgment as a matter of law.

Finally, even if Officer Poore lacked probable cause to arrest Mr. Daggett, he is nonetheless entitled to summary judgment under the doctrine of qualified

immunity. Here, Mr. Daggett has pointed to no controlling or persuasive precedent that would undercut Officer Poore's claim of qualified immunity. Instead, he asserts that "the need for probable cause to exist before the effectuation of an arrest is a clearly established principle" and that "[a]n arrest that is void of probable cause and perpetrated without an investigation by the law enforcement officer is not entitled to qualified immunity." *Pl.'s Opp'n* at 9.

The Court agrees with Mr. Daggett on the first point. *See generally* U.S. CONST., amend IV; *accord Cox v. Hainey*, 391 F.3d 25, 30 (1st Cir. 2004) (concluding the Fourth Amendment right to be free from unreasonable seizures is clearly established). However, Mr. Daggett's second point is legally incorrect; an arrest without probable cause does not abrogate qualified immunity. *Cox*, 391 F.3d at 30. Rather, in the context of an alleged unreasonable seizure, "a defendant 'is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest.'" *Id.* at 31 (quoting *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992)). As such, the First Circuit has stated that qualified immunity on the issue of probable cause "requires a somewhat lesser showing" than probable cause itself. *Id.* "It follows that this suit may go forward only if the unlawfulness of the arrest would have been apparent to an objectively reasonable officer standing in [Officer Poore's] shoes." *Id.*

Mr. Daggett cannot overcome qualified immunity. To reiterate, Officer Poore responded to a 911 complainant's report that Mr. Daggett was on a property in violation of a protection order. Officer Poore confirmed that a protection order was in place, traveled to the scene, and found Mr. Daggett in the vicinity of the property

heading into a waiting vehicle.  There was trash scattered on the lawn in front of the home.  Put together, these facts would not have led an objectively reasonable officer to conclude he lacked probable cause.  The above facts are consistent with an ongoing or just completed violation of the protection order, as well as other criminal offenses, regardless of whether Mr. Daggett ever actually entered the property.  Once again, two points bear emphasis.  First, "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." *Cox*, 391 F.3d at 32.  Second, the law did not require Officer Poore to credit Mr. Daggett's statements that he did not enter the 317 Cranberry Meadow Road property and was lawfully removing his belongings from the trash consistent with an order in the divorce proceeding.  *See id.* at 32 n.2 ("A reasonable police officer is not required to credit a suspect's story").  Applying these principles to the facts construed in the light most favorable to Mr. Daggett, the Court concludes Officer Poore's probable cause determination was reasonable and that he is entitled to qualified immunity on Mr. Daggett's Fourth Amendment claim.

### 2.    Count Eleven: The Failure to Protect Claim

Count XI of the Amended Complaint states a claim under 42 U.S.C § 1983 against Officer Poore for a "failure to protect" Mr. Daggett while he was in custody. *Am. Compl.* ¶¶ 150-56.  However, Count XI does not state which portion of federal law this claim relies upon.  *Id.*  Instead, he states "Defendant Poore turned Plaintiff over to the Custody of the York County Jail knowing that the York County Jail could not meet Plaintiff's medical needs," contends Officer Poore "had a duty to protect

Plaintiff because Plaintiff was in his custody" and "failed in that duty," and "[a]s a result of Defendant Poore's failure Plaintiff suffered harm." *Id.* ¶¶ 153-56.

Mr. Daggett's opposition brief clarifies that "[t]he duty to protect as it relates to Officer Poore is a duty to ensure that Mr. Daggett's medical needs are met which is a substantive due process right afforded to Mr. Daggett by the Fourteenth Amendment to the United States Constitution." *Pl.'s Opp'n* at 10 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-200 n.5 (1989)). He concludes that "the Government's role in causing a deprivation of Mr. Daggett's right[s] is removing his medication from his person and not acting when his physical condition deteriorated to the point where he could not walk on his own or write his own name." *Id.* at 10-11.

As such, the Court concludes Mr. Daggett challenges his treatment by Officer Poore under the substantive due process clause of the Fourteenth Amendment. However, due to Mr. Daggett's reliance on *DeShaney*, the Court is unclear as to whether Mr. Daggett alleges (1) that Officer Poore's failure to protect Mr. Daggett from his own medical conditions violated due process or (2) that placing Mr. Daggett in the jail's custody while he was experiencing debilitating Parkinson's symptoms violated due process. In any event, even viewing the facts in the light most favorable to Mr. Daggett, he cannot survive summary judgment on either claim. Although the Court need not address the issue at length here, the Court's prior finding that Mr. Daggett did not proffer adequate expert testimony on causation to state a claim for

actual damages applies to his claims against Officer Poore as well and merits summary judgment in favor of Officer Poore on the issue of actual damages.

### a.    Legal Standard

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV § 1.  "[T]o establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property."  *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005).  "Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct.  That is easily met when a government actor causes the injury, such as when police officers act under color of law."  *Id.* at 34.

As the Court has mentioned, the substantive component of the Fourteenth Amendment's due process clause incorporates a pretrial detainee's Eighth Amendment right to adequate medical care.  *See DeShaney*, 489 U.S. at 200 ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . ."); *see also Ruiz-Rosa*, 485 F.3d at 155-56 ("Because Ruiz's son . . . was a pretrial detainee rather than a convicted inmate, the Fourteenth Amendment governs his claim").  However, as discussed above, Mr. Daggett's Fourteenth Amendment claim could be construed as a claim that Officer Poore violated Mr. Daggett's constitutional rights

by transferring him to YCJ custody with knowledge that the YCJ could not adequately care for his medical needs.

Essentially, this second possible interpretation of Mr. Daggett's due process claim is a variant of a theory of liability which the Supreme Court discussed in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989). In *DeShaney*, the Supreme Court considered "when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights." *Id.* at 194. The *DeShaney* Court held "that in general, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause' . . .." *Irish*, 979 F.3d at 73 (quoting *DeShaney*, 489 U.S. at 197). However, the Supreme Court "has also suggested that when the state creates the danger to an individual, an affirmative duty to protect might arise." *Id.* (quoting *DeShaney*, 489 U.S. at 201).

In the three decades since *DeShaney*, this second so-called "state-created danger" theory of liability has percolated within the federal district courts and courts of appeal. *See id.* at 73-75 (collecting cases and performing an exegesis of the state-created danger doctrine). In November 2020, the First Circuit formally recognized the doctrine in *Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020). The *Irish* Court identified the following essential elements of a state-created danger claim:

(1)     that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2)     that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the general public;

(3)     that the act or acts caused the plaintiff's harm; and

(4)     that the state actor's conduct, when viewed in total, shocks the conscience.

      (i)     Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger.    To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

      (ii)    Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

*Id.* at 75.

Due to the case's posture, *Irish* did not analyze the merits of a state-created danger claim; however, it did consider the doctrine's application in the context of a state actor's qualified immunity defense.    *Id.* at 76-80.    The *Irish* Court applied caselaw from other circuits to conclude that the defendant law enforcement officers were on notice that they could be liable under the Due Process Clause (1) "if, after receiving a report of criminal activity, they effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing the suspect was likely to become violent . . ." and (2) "failing to take steps to mitigate the danger they had created and misleading the victim about the level of police protection she had . . .." *Id.* at 79.    Accordingly, the

113

First Circuit held the defendants were not entitled to qualified immunity. *Id.* at 79-
80

> **b.    Analysis**
>
>> **i.    Deliberate Indifference to Serious Medical Needs**

Assuming Mr. Daggett's failure to protect claim against Officer Poore is a claim for constitutionally inadequate medical care, even viewing the facts in the light most favorable to Mr. Daggett, Officer Poore is entitled to judgment as a matter of law. The Court concludes that a reasonable jury could conclude Mr. Daggett's Parkinson's Disease and need for medication was a serious medical condition. However, as with his claims against CCS and the York Defendants, that only gets Mr. Daggett so far. To make his prima facie case, he needed to proffer sufficient evidence for a reasonable jury to conclude Officer Poore was deliberately indifferent to those needs. He did not.

The undisputed facts show Officer Poore repeatedly connected Mr. Daggett with medical providers while in his custody. On these undisputed facts, no reasonable trier of fact could conclude that Officer Poore was deliberately indifferent to Mr. Daggett's medical needs. Officer Poore had custody of Mr. Daggett from approximately 6:40 p.m. to 11:00 p.m. He learned that Mr. Daggett had Parkinson's Disease within minutes of arresting him and immediately accommodated his request to sit with his hands in front of his body. Twice, when Officer Poore did not know how to proceed in caring for Mr. Daggett, he transported Mr. Daggett to the hospital for medical treatment. A doctor twice examined Mr. Daggett, twice deemed him fit for incarceration and then, at the request of the YCJ, dispensed medications. At no

point did Mr. Daggett report any acute medical issues to Officer Poore.  Out of the approximately four hours and twenty minutes that Mr. Daggett was in Officer Poore's custody, approximately an hour and a half was spent at the hospital.  Another twenty-six minutes were spent transporting Mr. Daggett from the Berwick Police Department to the hospital.  In short, nearly half the time Officer Poore had custody of Mr. Daggett was spent at the hospital or on the way to the hospital.  No reasonable trier of fact could equate this with deliberate indifference to Mr. Daggett's medical needs.

Back at the YCJ after the second hospital trip, Officer Poore gave jail staff all the medical paperwork and medication from the hospital.  Mr. Daggett was slow to move, and Office Poore had to help him walk.  Mr. Daggett could not hold a pen and was not able to sign the summons that Officer Poore served on him.  Jail intake paperwork shows that YCJ personnel categorized Mr. Daggett as unstable, which means "[t]he inmate appears to be out of control.  Unstable physically or mentally." *YCJ Records* at 40.  The jail accepted custody of Mr. Daggett.  Officer Poore departed and had no further contact with Mr. Daggett.

Mr. Daggett points to Officer Poore's decision to take custody of Mr. Daggett's medications after Mr. Daggett took a dose of Sinemet at the Berwick Police Department as the smoking gun establishing a prima facie case of deliberate indifference.  *Pl.'s Opp'n* at 10-11.  He also suggests that the deterioration of his condition to the point where he became unable to write his own name or walk under his own power, suffices to show Officer Poore was deliberately indifferent.  Viewed

alongside the remainder of the undisputed record and construing the record in the light most favorable to Mr. Daggett, the Court is unpersuaded that these facts make a difference.  Again, Mr. Daggett needs to show that Officer Poore acted with a state of mind akin to criminal recklessness.  *Leavitt*, 645 F.3d at 498.  Given that Officer Poore took Mr. Daggett to the hospital twice for an examination, twice received a treating physician's opinion that Mr. Daggett was fit for incarceration, and obtained medications for Mr. Daggett, no reasonable trier of fact could conclude that Officer Poore was deliberately indifferent to Mr. Daggett's medical needs.  The Court is hard-pressed to think of what more Officer Poore could have done under these circumstances, other than deviate from Dr. Schmitz's treatment plan.  Officer Poore's failure substitute a physician's treating decisions with his own did not amount to deliberate indifference.

What's more, even if Officer Poore was deliberately indifferent, these facts entitle him to qualified immunity.  The Fourteenth Amendment and related caselaw clearly establish that an officer cannot be deliberately indifferent to a pretrial detainee's serious medical needs.  *See, e.g., Estelle*, 429 U.S. at 104 ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal citation and quotation marks omitted).  However, it is not clear that every reasonable law enforcement officer would have known, on these facts, that Officer Poore's conduct violated Mr. Daggett's right to medical care.  "[Q]ualified immunity protects officers who make good-faith mistakes."  *Camilo-Robles v. Hoyos*, 151 F.3d 1, 14 (1st Cir.

116

1998).   To the extent that Officer Poore's reliance on medical professionals was mistaken and amounted to deliberate indifference to Mr. Daggett's constitutional rights, the Court concludes he acted in good faith by repeatedly seeking treatment for Mr. Daggett and is therefore entitled to qualified immunity.  *See Kosilek*, 774 F.3d at 91-92 ("The choice of a medical option that, although disfavored by some in the field, is presented by competent professionals does not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation").

Thus, summary judgment is proper in favor of Officer Poore.  Construing the record in the light most favorable to Mr. Daggett and drawing all inferences in his favor, no reasonable trier of fact could conclude Officer Poore was deliberately indifferent to his medical needs.  Therefore, Officer Poore is entitled to judgment as a matter of law. In addition, even if Mr. Daggett has made a prima facie showing of deliberate indifference, Officer Poore is entitled to qualified immunity.

### ii.    State-Created Danger[51]

If Mr. Daggett's substantive due process claim against Officer Poore arises under the legal theory discussed in *Irish*, it similarly cannot survive summary judgment.   Due to the absence of controlling caselaw from the First Circuit

---

[51]      The state-created danger theory of liability discussed in both *Irish* and *DeShaney* concerned the extent to which the Due Process Clause permits state actors to be held liable for a failure to protect an individual from private violence.  However, by its terms, *Irish* does not expressly limit its cause of action to situations when a non-state actor perpetrates the plaintiff's ultimate injury.  Even so, the Court is uncertain about the extent to which one state actor can be held liable under *Irish* for the acts or omissions of other state actors who, like the first state actor, are bound to uphold the rights conferred by the United States Constitution and may be sued directly under § 1983 for their damages to the plaintiff.  The Berwick Defendants did not raise this complex question of constitutional law. Without briefing, the issue is not ripe for decision.  As such, the Court assumed, without deciding, that *Irish* permits such a claim.

117

elaborating on the *Irish* cause of action, and the uncertainty surrounding whether Mr. Daggett is actually raising an *Irish* claim, the Court limits its analysis to the third and fourth elements of an *Irish* claim, which are clearly not satisfied here.

*Irish* requires a plaintiff show "the [state actor's] act or acts caused the plaintiff's harm . . .." *Irish*, 979 F.3d at 75. As the Court discussed at length, Mr. Daggett's alleged injuries resulted from CCS and YCJ's failure to administer the correct dose of medication. Because these injuries implicate scientifically rigorous questions of causation, they require Mr. Daggett to introduce expert testimony to prevail. As discussed, Mr. Daggett failed to submit any expert testimony on the issue of causation. Thus, he cannot make a prima facie showing of causation necessary to bring an *Irish* claim.

Construing the record in the light most favorable to him, Mr. Daggett failed to proffer sufficient evidence for a reasonable trier of fact to find that Officer Poore's "conduct, when viewed in total, shocks the conscience." *Irish*, 979 F.3d at 75. Therefore, Officer Poore is entitled to judgment as a matter of law. "Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk." *Id.* Mr. Daggett has not met this standard. As with his claim that Officer Poore was deliberately indifferent to his serious medical needs, there is not enough evidence

such that a reasonable trier of fact could conclude Officer Poore "actually knew of a substantial risk of serious harm and disregarded that risk" by transferring Mr. Daggett to YCJ custody. *Id.*

When Officer Poore transferred custody of Mr. Daggett to the YCJ, he had already taken Mr. Daggett to the hospital twice where a physician examined him and deemed him fit for incarceration. On the second trip to the hospital, Officer Poore procured medications for Mr. Daggett that the doctor had ordered and then brought those medications to the jail along with treatment instructions from the hospital's physician. Officer Poore knew that the jail had a medical provider in-house because the medical provider had initially rejected Mr. Daggett, claiming it did not have the medications to meet Mr. Daggett's needs. As a state actor, the jail had the same obligation to uphold Mr. Daggett's constitutional rights as Officer Poore did. As such, Mr. Daggett has made no factual showing that Officer Poore actually knew of a substantial risk of serious harm to him or disregarded such a risk. A doctor had already informed Officer Poore that Mr. Daggett's medical conditions were not so severe as to preclude incarceration and Officer Poore provided care instructions and medications to the jail. No reasonable jury could find this behavior was conscience shocking. Thus, summary judgment is proper in favor of Officer Poore on Count XI.[52]

---

[52]    The Court elected not to consider whether qualified immunity shields Officer Poore's conduct from liability on this claim because Mr. Daggett did not make a prima facie showing of a state-created danger claim. In passing, the Court merely notes that *Irish*, which considered constitutional violations occurring in July 2015, stands for the proposition that an officer's constitutional duty to protect was clearly established at the time of Mr. Daggett's May 2015 arrest. *See Irish*, 979 F.3d at 73-75 (collecting cases for the proposition that the state-created danger theory was clearly established at the time of the events in *Irish*). Beyond that, whether every objectively reasonable officer would know, on these facts, that Officer Poore's actions violated Mr. Daggett's rights is a complex question involving an emerging legal doctrine, which the parties did not brief, and which the Court need not consider as

### F.     Count Twelve: Constitutional Claims Against the Town of Berwick and Chief Towne

#### 1.     The Town of Berwick

Summary judgment is proper in favor of the town of Berwick for two reasons. First, "it is only when [a] governmental employee['s] 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality can be liable." *Young v. City of Providence*, 404 F.3d 4, 25 (1st Cir. 2005) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Mr. Daggett's claim fails to satisfy both necessary elements.  As discussed, even construing the record in the light most favorable to Mr. Daggett, Officer Poore is entitled to judgment as a matter of law on the Fourth or Fourteenth Amendment claims.  Thus, without an underlying constitutional violation, there can be no municipal liability.  Second, Mr. Daggett has not established the essential factual elements of municipal liability as to the Town of Berwick.  Although Mr. Daggett contends "[s]ummary judgment is not warranted in a situation in which the jury could find that the department knew that a constitutional violation was a predictable consequence of the department's failure to train and therefore deliberately indifferent to the Plaintiff's constitutional rights" he has not identified any failure to train and has conceded some training occurred on the relevant areas of constitutional law.  *Pl.'s Opp'n* at 13-14.

---

an alternative holding.  *See Buchanan*, 417 F. Supp. 2d at 71 n.38 (declining to address qualified immunity where the plaintiff had failed to make a prima facie showing that the defendant was substantively liable for a constitutional violation).

Mr. Daggett is correct on the law surrounding a failure to train claim, but points to no facts in the record indicating how the town of Berwick failed to train its officers in a manner that is tantamount to deliberate indifference to his constitutional rights. In his response to the Berwick Defendants' Statement of Material Facts, he conceded that Officer Poore, along with virtually all other Berwick police officers, completed the Maine Criminal Justice Academy's eighteen-week training course as well as the town of Berwick's field training program. BDSMF ¶¶ 1-2, 71, 73-75; PRBDSMF ¶¶ 1-2, 71, 73-75. The MCJA course included training on constitutional law, Fourth Amendment search and seizure law, lawful arrest procedures, probable cause training, Maine criminal statutes, protection from harassment and abuse orders, the Americans with Disabilities Act, and the Maine Civil Rights Act. BDSMF ¶ 74; PRBDSMF ¶ 74.

As the plaintiff, Mr. Daggett bears the burden of proof to show that the town of Berwick's failure to train its officers was the moving force behind the constitutional violations alleged. Without any evidence or allegation of a specific failure to train, and conceding that Officer Poore, along with all other Berwick police officers, had training in the relevant areas of constitutional law, his failure to train claim fails as a matter of law. The fact that Mr. Daggett provided no evidence of similar occurrences bolsters the Court's conclusion. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to

train") (internal citation and quotation marks omitted).   Accordingly, summary judgment is proper for the town of Berwick.

### 2.    Chief Towne

Mr. Daggett's claim against Chief Towne is also defective.   His Amended Complaint alleges Chief Towne failed to adequately train and supervise Officer Poore. *Am. Compl.* ¶ 158.   Once again, construing the record in the light most favorable to Mr. Daggett, it fails to show Officer Poore's conduct violated his constitutional rights. Without an underlying constitutional violation, a failure to train is not actionable. Moreover, as just discussed, Mr. Daggett's factual concessions doom any failure to train claim.   Officer Poore, consistent with Berwick's officer training policies, received training in the relevant areas of law and Mr. Daggett did not identify any aspect of that training as deficient.   Moreover, Mr. Daggett offered no evidence suggesting any officer other than Officer Poore was inadequately trained.   The caselaw speaks with one voice on this issue: "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.   With neither the law nor the facts on his side, no reasonable jury could find in Mr. Daggett's favor and therefore Chief Towne is entitled to judgment as a matter of law.   Regardless, qualified immunity would protect Chief Towne because the police department's reliance on the MCJA and internal training practices, on these facts, is not objectively unreasonable.

Mr. Daggett's claim of inadequate supervision cannot survive summary judgment either.  As with the failure to train claim, the absence of a prima facie showing of a constitutional violation precludes a claim of supervisory liability.  But, even if Mr. Daggett made a prima facie showing of a constitutional violation against Officer Poore, his claim for supervisory liability against Chief Towne cannot proceed. As discussed with respect to Sheriff King and Superintendent Vitiello, a claim of supervisory liability must rest on the supervisor's own acts or omissions rather than respondeat superior.  *Guadalupe-Báez*, 819 F.3d at 515.  Additionally, the supervisor must have actual or constructive notice of the alleged constitutional violation.  *Id.* Finally, the supervisor's deliberate indifference must establish a strong causal link between his own conduct and the constitutional violations.  *Id.*

Mr. Daggett conceded Chief Towne "was not present when Mr. Daggett was arrested on May 17, 2015" and did not "have any interaction with Mr. Daggett at the police station following his arrest."  BDSMF ¶ 69; PRBDSMF ¶ 69.  As such, there are no facts in evidence suggesting Chief Towne acted or failed to act in a way that harmed Mr. Daggett, had any knowledge of ongoing constitutional violations, or acted in such a way that caused the alleged constitutional violations.  Thus, there are no genuine disputes of material fact and Chief Towne is entitled to summary judgment on the failure to supervise claim.[53]

### G.    Summary

---

[53]    As with Sheriff King, the lack of facts concerning what Chief Towne knew or did, and the absence of an underlying constitutional violation, make it unnecessary to consider qualified immunity.

The Court finds that, on the record before it, taking all inferences reasonably supported by the record in favor of Mr. Daggett, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on all counts of the Amended Complaint.  Many of Mr. Daggett's claims contain procedural defects, and despite discovery he neglected to identify at least five defendants.  In places he conceded facts that were essential to raising claims against the various municipal defendants, he submitted no expert testimony on the complex causation issues his case presents, he failed to proffer evidence on various elements of his prima facie case, and, even if he had made out a prima facie case, qualified immunity would bar his claims.  Because of these issues, and the others discussed, the Defendants are entitled to judgment as a matter of law.

On the record before the Court, it appears the only error which occurred in this case was an errant prescription.  The record is silent as to how and why this mistake occurred, but there is no evidence in this record that a state actor made the mistake. Common sense suggests the errant prescription may have arisen from the chain of communication between the physicians at SMHC.  Nevertheless, a doctor's mistake is not always a constitutional violation.  To demonstrate that the medical care he received in jail fell below the constitutional minimum, Mr. Daggett needed to make a prima facie showing of a discrete set of elements.  He did not do so.  The record shows that the Defendants sought treatment for Mr. Daggett's Parkinson's Disease and followed the doctor's instructions on how to care for him.  The Constitution, at least in this area of law, does not require the jailer, the arresting officer, or the jailhouse

124

nurse overrule the decisions of a treating physician so long as they are not deliberately indifferent to an incarcerated person's needs.

## VI.   CONCLUSION

The Court GRANTS the Defendants' Motions for Summary Judgment (ECF Nos. 49, 52, 55)  and ORDERS the Clerk of Court to enter judgment in favor of the Defendants and against Thomas Daggett on Counts I, IV, VI, VII, VIII, IX, X, XI, and XII  of the Amended Complaint (ECF No. 9).  The Court DISMISSES Counts II, III, and V of the Amended Complaint WITHOUT PREJUDICE due to Mr. Daggett's failure to identify the John and Jane Doe Defendants and further DISMISSES the remainder of the Amended Complaint WITHOUT PREJUDICE insofar as Mr. Daggett asserts claims against the John Doe and Jane Doe Defendants.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of March, 2021.